**Marc P. Berger**
**Sanjay Wadhwa**
**Sheldon L. Pollock**
**John O. Enright**
**Alexander M. Vasilescu**
**Philip A. Fortino**
**Lee A. Greenwood**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**(212) 336-1014 (Fortino)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **Civil Case No.** |
| **Plaintiff,** | |
| **v.** | **Complaint** |
| **JOSHUA SASON, MARC MANUEL, KAUTILYA (a/k/a TONY) SHARMA, PERIAN SALVIOLA, MAGNA MANAGEMENT, LLC (f/k/a MAGNA GROUP, LLC), MAGNA EQUITIES II, LLC (f/k/a HANOVER HOLDINGS I, LLC), MG PARTNERS, LTD., and PALLAS HOLDINGS, LLC,** | **Jury Trial Demanded** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against defendants Joshua Sason ("Sason"), Marc Manuel ("Manuel"), Kautilya (a/k/a Tony)

Sharma ("Sharma"), Perian Salviola ("Salviola"), Magna Management, LLC (f/k/a Magna

Group, LLC) ("Magna"), Magna Equities II, LLC (f/k/a Hanover Holdings I, LLC) ("Hanover"),

MG Partners, Ltd. ("MGP"), and Pallas Holdings, LLC ("Pallas") (collectively, the

"Defendants"), alleges as follows:

## SUMMARY

1.      This case arises from Defendant Sason's illegal and fraudulent microcap stock

transactions, which he effected through, among other entities, his two wholly-owned business

organizations, Magna and Hanover, and a joint venture with another investment firm, MGP

(collectively, the "Magna Entities").

2.      Sason, through the Magna Entities, fraudulently obtained unrestricted shares of

two microcap stock issuers—Lustros, Inc. ("Lustros") and NewLead Holdings Ltd.

("NewLead")—using fake promissory notes issued by those companies.  The promissory notes

did not reflect bona fide debts of the companies, but were fabricated for the sole purpose of

justifying the issuance of shares to the Magna Entities.  Sason and his deputy, Defendant

Manuel, a managing director who negotiated and structured the relevant transactions on behalf of

the Magna Entities, knew, or were at least reckless in not knowing, that the promissory notes

were fraudulent.

3.      After obtaining the shares, the Magna Entities dumped the stock on the

unsuspecting investing public, including retail investors, who were unaware that new shares were

flooding the market as a result of transactions that violated the federal securities laws.  These

securities were not registered with the Commission, and the shares could not be legally sold

pursuant to any exemption from the registration requirements of the securities laws.

4.      Defendants Sharma, Salviola, and Pallas (collectively, the "Pallas Defendants")

participated in the fraudulent scheme to acquire unrestricted stock of NewLead.  The Pallas

Defendants netted $6 million in profits, a portion of which they kicked back to NewLead.

2

5.      In addition, Pallas acted as an underwriter for a primary offering of NewLead stock, which NewLead attempted to disguise as an asset sale transaction.  Pallas purported to sell NewLead overvalued mining assets in exchange for convertible debt, which it then converted to stock and liquidated for proceeds of more than $20 million.  Pallas then wired a portion of these proceeds back to NewLead, disguised as a new loan to the company and secured by the very same mining assets Pallas had purported to sell NewLead previously.  Pallas thereafter foreclosed on the mining assets, unwinding the transaction.

6.      This lawsuit seeks an injunction prohibiting the Defendants from engaging in similar violations of the federal securities laws, penny stock bars against Sason, Manuel, Sharma, and Salviola, disgorgement of the Defendants' millions of dollars in profits from the illegal transactions, statutory prejudgment interest thereon, and civil penalties.

## VIOLATIONS

7.      Through the conduct alleged herein, Sason and Hanover are liable for violating Section 17(a)(2) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

8.      Through the conduct alleged herein, Manuel, the Magna Entities, and the Pallas Defendants are liable for violating Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

9.      Through the conduct alleged herein, Sason is liable as a control person for the Magna Entities' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule

10b-5 thereunder [17 C.F.R. § 240.10b-5], pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

10.     Through the conduct alleged herein, Manuel aided and abetted the Magna Entities' and Sason's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

11.     Through the conduct alleged herein, the Pallas Defendants aided and abetted Hanover's, MGP's, Sason's, and Manuel's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

12.     Through the conduct alleged herein, the Defendants are liable for violating Section 5 of the Securities Act [15 U.S.C. § 77e].

13.     Unless Defendants are permanently restrained and enjoined, Defendants will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

14.     The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and seeks to restrain and permanently enjoin Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein, and such other and further relief as the Court may deem just and appropriate.

4

15.     The Commission also seeks a final judgment ordering Defendants to (a) disgorge their ill-gotten gains, together with prejudgment interest thereon; and (b) pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

16.     The Commission also seeks penny stock bars against Sason, Manuel, Sharma, and Salviola pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)].

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

18.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts and transactions constituting violations alleged in this Complaint occurred within the Southern District of New York.  For example, Sason, Manuel, and the Magna Entities engaged in numerous of the acts alleged herein in rented office space located in this District, and both Sason and Manuel reside in this District.  In addition, the Pallas Defendants engaged in the securities transactions at issue herein through brokers located in this District and participated in meetings with NewLead executives relating to the transactions in this District.

19.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, made use of the means or instrumentalities of transportation or communication in, and the means or instrumentalities of, interstate commerce.

## DEFENDANTS

20.     **Sason**, age 31, resides in New York, New York.  Sason founded Magna in or about 2009.  At all relevant times, Sason has been the sole owner and chief executive officer of Magna and Hanover; he has also been the indirect 50 percent owner and a director of MGP.

21.     **Manuel**, age 50, resides in Irvington, New York.  Manuel was a managing director and the head of origination and research for Magna from July 2012 until December 2017, and he provided similar services for Hanover and MGP during this same period.  From September 2009 to May 2013, Manuel was a registered representative associated with a Commission-registered broker-dealer, where he held Series 7, 63, and 79 licenses.

22.     **Magna** is a Texas limited liability company formed in 2010 with its principal place of business in New York, New York.  Sason is the sole owner and member of Magna.  Sason engaged in certain of the securities transactions that are the subject of this Complaint through Magna.

23.     **Hanover** is a New York limited liability company formed in 2011 with its principal place of business in New York, New York.  Sason is the sole owner and member of Hanover.  Sason engaged in certain of the securities transactions that are the subject of this Complaint through Hanover.

24.     **MGP** is a limited liability company organized under the laws of Gibraltar in 2013 with its principal place of business in New York, New York.  Sason is the indirect owner of 50 percent of MGP and is a director.  Sason engaged in certain of the securities transactions that are the subject of this Complaint through MGP.

25.     **Sharma**, age 54, resides in Delray Beach, Florida.  From June 1999 to January 2005, Sharma was a registered representative and investment adviser representative associated

6

with, and the president of, Geek Securities, Inc. and Geek Advisors, Inc., then a Commission-registered broker-dealer and investment adviser, respectively.  Sharma held Series 3, 4, 7, 24, 27, 55, 63, and 65 securities licenses.  On June 4, 2004, the Commission filed a civil injunctive action against Sharma, Geek Securities, Geek Advisors, and another individual charging them with violations of Section 17(a) of the Securities Act and Sections 10(b) and 15(c) of the Exchange Act and Rule 10b-5 thereunder for their roles in a fraudulent market-timing scheme.  *See SEC v. Geek Sec., Inc., et al.*, Civ. No. 04-80525 (S.D. Fla.).  On June 24, 2004, the U.S. Attorney's Office for the Southern District of Florida filed a 36-count superseding indictment against Sharma and others for their roles in three securities fraud conspiracies, including the market-timing fraud alleged in the Commission's complaint.  *See United States v. Kerns, et al.*, No. 03-80146-CR (S.D. Fla.).  On July 27, 2004, Sharma pleaded guilty to one count of conspiracy to sell unregistered securities and one count of conspiracy to commit securities fraud.  On October 15, 2004, Sharma was sentenced to 58 months in prison and ordered to forfeit $1.3 million.  On February 8, 2006, Sharma consented to a judgment in the Commission's enforcement action enjoining him from violating Section 17(a) of the Securities Act and Sections 10(b) and 15(c) of the Exchange Act and Rule 10b-5 thereunder.  On March 17, 2006, the Commission instituted follow-on administrative proceedings against Sharma and imposed a bar from association with any broker, dealer, or investment adviser.

26.     **Salviola**, age 39, resides in Delray Beach, Florida.  From June 2002 to June 2003, Salviola was a registered representative associated with a Commission-registered broker-dealer, where she held Series 7 and 66 licenses.  Since 2009, Salviola has claimed to work in the coal mining industry.  Salviola and Sharma have been in a romantic relationship since at least 2008.

27.     **Pallas** is a Delaware limited liability company formed by Salviola in 2010 with its principal place of business in Boca Raton, Florida.  At all relevant times, Salviola was the managing member and five percent owner of Pallas; the other member and 95 percent owner of Pallas was the Matangi Irrevocable Trust (the "Matangi Trust").  Salviola and Sharma formed the Matangi Trust under Florida law in 2010 for the benefit of Sharma's family members. Salviola serves as trustee of the Matangi Trust.

## OTHER RELEVANT ACTOR

28.     **Izak Zirk de Maison** (f/k/a Izak Zirk Engelbrecht) ("Engelbrecht"), age 62, is the former CEO and director of Lustros.  On April 2, 2015, Engelbrecht pleaded guilty to criminal charges relating to broker bribery and market manipulation schemes relating to Lustros and other microcap issuers he controlled.  *See United States v. De Maison*, 15 Cr. 117 (N.D. Ohio).  On October 13, 2015, in a parallel civil enforcement action by the Commission, judgment was entered against Engelbrecht on consent, enjoining Engelbrecht from violating the antifraud and registration provisions of the securities laws for the same conduct to which he pleaded guilty. *See SEC v. Cope*, 14 Civ. 7575 (DLC) (S.D.N.Y.).  On January 25, 2017, Engelbrecht was sentenced to a term of imprisonment of 151 months and ordered to pay nearly $40 million in restitution, and he is currently incarcerated in a correctional facility in Georgia.

## FACTS

**Background on the Registration Requirements of the**
**Federal Securities Laws and Relevant Registration Exemptions**

29.     Section 5 of the Securities Act [15 U.S.C. § 77e] makes it unlawful for any person, directly or indirectly, to offer or sell securities, unless a registration statement is filed with the Commission and is in effect as to such offer or sale.

30.     Section 4(a)(1) of the Securities Act [15 U.S.C. § 77d(a)(1)] provides an exemption from the registration requirements of Section 5 of the Securities Act for "transactions by any person other than an issuer, underwriter, or dealer" (the "Section 4(a)(1) Exemption").

31.     The Securities Act defines an "underwriter," in relevant part, as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking" [15 U.S.C. § 77b(a)(11)].

32.     Securities Act Rule 144 [17 C.F.R. § 230.144] ("Rule 144") provides a non-exclusive safe harbor from the Act's definition of an "underwriter."  Accordingly, a person that meets certain conditions, including holding period conditions, set out in Rule 144 may be deemed not to be acting as an underwriter for the purpose of determining whether the person's sales of securities fall within the Section 4(a)(1) Exemption.

33.     At all times relevant to this Complaint, under Rule 144, the holding period for securities issued by Commission-reporting companies like Lustros and NewLead was six months.  That is, the holder must hold the securities for a period of six months before selling them.  In cases where a person purchases such securities, that person's six-month holding period runs from the date the purchase price or consideration is paid or given by the purchaser in full.

34.     Relatedly, the law recognizes a "tacking" concept under the Rule 144 safe harbor, whereby the holder of restricted securities may aggregate prior owners' holding periods to satisfy the current holder's applicable holding-period requirement.  Critically, though, a current holder may only "tack" on to the holding period of a non-affiliate prior holder.  If the prior holder was an affiliate of the issuer, the current holder may not "tack" on to the prior holder's holding period, and the holding period starts anew.

35.    An "affiliate" under the Securities Act [17 C.F.R. § 230.405] is defined as "a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified."

36.    Under Rule 144 [17 C.F.R. § 230.144(d)(3)(ii)], if the securities sold were acquired from the issuer solely in exchange for other securities of the same issuer, the newly-acquired securities shall be deemed to have been acquired at the same time as the securities surrendered for conversion or exchange, even if the securities surrendered were not convertible or exchangeable by their terms.

37.    The Rule 144 safe harbor is not available to any person for any transaction or series of transactions that, although technically in compliance with Rule 144, is part of a plan or scheme to evade the registration requirements of the Securities Act.

38.    In addition to the Section 4(a)(1) Exemption, the Securities Act also provides, in Section 3(a)(10) [15 U.S.C. § 77c(a)(10)], an exemption for the sale of securities issued in exchange for bona fide claims against the issuer (the "Section 3(a)(10) Exemption").  In order to take advantage of the Section 3(a)(10) Exemption, the fairness of the terms and conditions of the exchange must be approved by a court or other authorized governmental authority.

**Sason's Business Model**

39.    Beginning in or about 2009, Sason, acting through the Magna Entities and other affiliated entities, has been engaged in the business of buying and then liquidating the common stock of publicly-traded microcap issuers.

40.    The Magna Entities often transacted with these issuers by acquiring debt the issuers had purportedly issued to third parties.  The Magna Entities then would convert or exchange that debt into stock and liquidate it.

41.     When they purchased third-party debt, the Magna Entities would seek to guarantee a return on their investment by obtaining an agreement from the issuer that they could convert or exchange the debt at a price substantially lower than where the stock was trading in the open market.  The Magna Entities would then sell the stock, netting as profit the difference between the proceeds on the stock sales and the price they paid to acquire the debt.

42.     It was crucial to the economics of the Magna Entities' deals that they be able to liquidate the stock immediately.  If the stock were restricted—*e.g.*, it was acquired directly or indirectly from the issuer or an affiliate of the issuer in a transaction or chain of transactions not involving a public offering—the shares could become less liquid or the market price could decrease before they were able to unload their shares, cutting into or eliminating the Magna Entities' profit margins.

43.     Accordingly, the Magna Entities pursued only transactions in which they could immediately sell the stock in unregistered offerings by claiming that a registration exemption, such as the Section 4(a)(1) Exemption or the Section 3(a)(10) Exemption, applied.

44.     At all relevant times, Sason exercised control over the Magna Entities, and his approval was required for all investments by the Magna Entities and for all of their securities transactions, including the investments and transactions described herein.

45.     At all relevant times, Manuel negotiated the terms and structures of transactions on behalf of the Magna Entities, and he supervised the purported due diligence the Magna Entities conducted on their counterparties, including for the transactions described herein.

46.     The lucrative nature of these transactions gave Sason, Manuel, and the Magna Entities a powerful incentive to deliberately and/or recklessly disregard red flags and to perform sham due diligence on these transactions.

47.     Where the Magna Entities entered into transactions in which they were to receive an issuer's shares at a large discount to the issuer's current trading price, Sason would approve the transactions without regard to the issuer's business prospects.

**Magna's Purchase of the Fraudulent Lustros Notes**

**Magna's Funding Proposal**

48.     Lustros was a publicly-traded penny-stock issuer that purported to be in the business of mining copper sulfate in Chile.

49.     At all relevant times, Engelbrecht, who served as Lustros's CEO and as a Lustros director at various times, exercised control over Lustros by, among other things, exercising control over Lustros's bank accounts, stock issuances, and financial transactions.

50.     In or about late 2012,[1] Lustros engaged a broker-dealer registered with the Commission ("Broker-Dealer-1") to help it seek financing of up to $10 million in secured debt for its claimed mining operations.

51.     Broker-Dealer-1 was unable to secure financing for Lustros.  As a result, Lustros expressed an interest to Broker-Dealer-1 in obtaining "bridge" financing in an amount far less than $10 million.  Broker-Dealer-1 then introduced Lustros to Magna to explore such financing.

52.     On or about November 16, 2012, Magna, acting through Manuel, expressed its interest in providing bridge financing to Lustros, and proposed a number of potential financing options, including the purchase of Lustros convertible promissory notes with a face value of up to $550,000.

---

[1] Sason, Manuel, and the Magna Entities have executed tolling agreements, in which they have agreed to toll the five-year statute of limitations applicable to seeking civil money penalties, for the period February 16, 2018, through February 18, 2019.

53.     So that it potentially could take advantage of the Section 4(a)(1) Exemption and Rule 144, Magna stipulated that the debt would have to be purchased from an unaffiliated third party that had already held the debt for six months.

54.     Magna's proposal to buy debt from unaffiliated third parties ostensibly would not satisfy Lustros's existing need for bridge financing because Magna would be paying the purportedly unaffiliated third party, not Lustros, for the debt.

**The First Fake Lustros Note Purchase**

55.     On or about December 6, 2012, Engelbrecht and Manuel met one-on-one in a Los Angeles hotel to discuss the details of the potential bridge financing transaction with Magna.

56.     Upon information and belief, at the time of the meeting, Manuel was aware that Lustros had disclosed in its periodic filings with the Commission that the company owed approximately $550,000 to Engelbrecht in unsecured demand loans with no interest and no set terms of repayment.

57.     At the meeting, Engelbrecht told Manuel that there were no non-affiliated holders of Lustros debt.  Engelbrecht further told Manuel that Lustros had no outstanding convertible debt whatsoever.  Engelbrecht then told Manuel, however, that Lustros had approximately $550,000 in debt owed to Engelbrecht and/or Engelbrecht's company, Suprafin Ltd. ("Suprafin"), confirming the information in the company's public filings.

58.     The fact that Lustros had no convertible debt held by a non-affiliate of Lustros made Magna's proposal unworkable.

59.     Determined to pursue the transaction, nonetheless, Engelbrecht and Manuel agreed at the meeting that Engelbrecht would transfer the debt owed to Engelbrecht and/or

Suprafin to a purported non-affiliated third party to make it appear that the debt was held by the non-affiliate, and not Engelbrecht.

60.     Manuel told Engelbrecht at the meeting that Magna would need to perform due diligence on the transaction and offered to send Engelbrecht the list of due diligence items Magna planned to request.  On or about the same day, December 6, 2012, Manuel caused such a list to be sent to Engelbrecht.

61.     Engelbrecht and Manuel engaged in several other communications following their meeting, including communications using their personal cellphones.  During the course of these communications, Engelbrecht informed Manuel that he, Engelbrecht, would have the approximately $550,000 debt owed to him and/or Suprafin transferred to another one of his nominee entities ("Company-1").

62.     Company-1 was entirely controlled by Engelbrecht, but to disguise his control over Company-1, Engelbrecht had instructed his personal assistant to pretend to serve, in name only, as Company-1's sole owner, officer, and director.

63.     After the meeting, Engelbrecht instructed the chief financial officer of Lustros, Trisha Malone ("Malone"),[2] to create a fake convertible promissory note purportedly issued by Lustros to Engelbrecht, Suprafin, and Company-1 in the amount of approximately $550,000 (the "First Fake Lustros Note").

64.     Malone created the First Fake Lustros Note in or about December 2012, but backdated it to March 31, 2012.

---

[2] The Commission previously charged Malone along with Engelbrecht (and others) in *SEC v. Cope*, 14 Civ. 7575 (DLC) (S.D.N.Y.), with violations of Sections 5 and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with her work for Lustros and other Engelbrecht issuers.  Pursuant to the judgments entered against her on October 8, 2015, and August 8, 2018, Malone was enjoined from violating these provisions and ordered to pay total monetary relief of more than $600,000.

65.     The backdating of the First Fake Lustros Note made it seem as though the debt Lustros had disclosed in its filings with the Commission had always been held in part by Company-1.  In reality, and as Engelbrecht and Manuel well knew, this debt had only been held by Engelbrecht, either individually or through Suprafin.

66.     Whereas the original debt held by Engelbrecht was not convertible to equity, the First Fake Lustros Note stated that it was convertible into the common stock of Lustros at a price to be agreed upon by the parties.

67.     Engelbrecht signed the First Fake Lustros Note on behalf of all of its purported holders, including Company-1, even though Company-1's only purported owner, officer, and director was his personal assistant.

68.     In or about December 2012, at the same time she created the First Fake Lustros Note, Malone also created, at Engelbrecht's direction, a fake assignment of Engelbrecht's and Suprafin's share of the debt described in the First Fake Lustros Note to Company-1.  This assignment also was backdated, to April 2012, more than six months before Engelbrecht's meeting with Manuel.  The purpose of the backdated assignment was to make it appear as though the full $550,000 debt was fully held by Company-1, a supposed non-affiliate of Lustros, for at least six months.

69.     Magna, acting through Manuel, and knowing or recklessly disregarding the fact that the First Fake Lustros Note was a sham, purchased the First Fake Lustros Note from Company-1 in five tranches of between $100,000 and $150,000 each.  Upon each purchase, Magna exchanged a portion of the First Fake Lustros Note for a new convertible note issued by Lustros to Magna, convertible to stock at a discount of 37.5 percent from the market price and bearing annual interest at a rate of eight percent.

70.     Sason approved Magna's purchase of the First Fake Lustros Note and authorized the wires from Magna bank accounts to fund the transaction.  Before approving the transaction, Sason neither reviewed the documentation of the debt nor the due diligence file on the transaction.

**The Second Fake Lustros Note Purchase**

71.     In or about June 2013, Magna purchased an additional $250,000 in purported convertible debt of Lustros held by Company-1, through a similar structure as the transaction involving the First Fake Lustros Note.  Like the prior transaction, this second transaction was also a sham.

72.     At Engelbrecht's direction, Malone again created fake documents, including a fake convertible promissory note from Lustros to Engelbrecht, Suprafin, and Company-1 (the "Second Fake Lustros Note") in order to effect the transaction with Magna.

73.     Malone created the Second Fake Lustros Note in or about June 2013 and backdated it to November 30, 2012.

74.     Malone backdated the Second Fake Lustros Note in order to make it appear as if a $250,000 debt Lustros had disclosed in its filings with the Commission had always been held in part by Company-1, when in fact this debt only had been held previously by Engelbrecht, either individually or through Suprafin.

75.     Whereas the actual debt held by Engelbrecht was not convertible to equity, the Second Fake Lustros Note stated that the debt was convertible into the common stock of Lustros at a price to be agreed upon by the parties.

16

76.     Engelbrecht signed the Second Fake Lustros Note on behalf of all of its purported holders, including Company-1, notwithstanding that Company-1's only purported owner, officer, and director was Engelbrecht's personal assistant.

77.     In or about June 2013, at the same time she created the Second Fake Lustros Note, Malone also created, at Engelbrecht's direction, a fake assignment of Engelbrecht and Suprafin's share of $250,000 of the debt described in the Second Fake Lustros Note to Company-1.  This assignment also was backdated, to December 2012, approximately six months before Engelbrecht began to discuss a second transaction with Manuel.

78.     During Engelbrecht's discussions with Manuel about the second transaction, in or about June 2013, Engelbrecht advised Manuel that Lustros planned to use the funds that Magna would be paying to Company-1 for a plant Lustros operated in Chile.  This statement put Manuel on further notice that the funds Magna was paying to Company-1 would be passed along to Lustros and that the two entities were under common control and therefore affiliates.

79.     Based on Manuel's discussions with Engelbrecht, including those in or about December 2012, during which Engelbrecht informed Manuel that Lustros had no outstanding convertible debt, Manuel knew, or was at least reckless in not knowing, that the Second Fake Lustros Note was also fraudulent.

80.     After purchasing the Second Fake Lustros Note, Magna exchanged it, along with the portion of the First Fake Lustros Note it had not yet exchanged, for a newly-issued note by Lustros, convertible to stock at a discount of 35 percent to the market price and bearing annual interest at a rate of 12 percent.

81.     Magna completed its purchase of the Second Fake Lustros Note by wiring $250,000 to Company-1 on or about June 11, 2013.

82.     When Magna wired these funds to *Company-1*, to purchase both the First and Second Fake Lustros Notes, Manuel and others at Magna received responses back *from Lustros* (either from Engelbrecht or Malone), and not Compnay-1, confirming that *Lustros* or its employees had received the funds and, on certain occasions, how Lustros planned to use the funds.  These statements put Magna and Manuel on further notice that Lustros and Engelbrecht controlled Company-1.

83.     Sason approved Magna's purchase of the Second Fake Lustros Note and authorized the wire from Magna bank accounts to fund the transaction.  Before approving the transaction, Sason neither reviewed the documentation of the debt nor the due diligence file on the transaction.

**Magna Converts the Fake Lustros Notes into Stock,
Which it Then Sells to the Public**

84.     After the respective purchases of the First and Second Fake Lustros Notes (collectively, the "Fake Lustros Notes") from Company-1, Magna converted the notes into Lustros stock, which it then sold to the public.

85.     In order to facilitate the conversion of the Fake Lustros Notes into unrestricted Lustros stock that could be sold to the public, Magna had to obtain a legal opinion that the shares qualified under the Section 4(a)(1) Exemption and the Rule 144 safe harbor.  Magna used the Fake Lustros Notes, and associated fake assignments, to obtain those opinions letters.  The opinion letters were predicated in part on the fact that Company-1 was not an affiliate of Lustros, which Manuel and others at Magna knew, or were at least reckless in not knowing, was false.

86.     As part of the process of acquiring the stock, Magna sent the Fake Lustros Notes, associated assignments, and legal opinions (or caused them to be sent) by, among other means,

email to Lustros's transfer agent so that the transfer agent would issue Magna shares of Lustros without a restrictive legend.

87.     Magna also sent the same materials to its broker-dealers to demonstrate that the Lustros shares it acquired through the transactions could be legally sold, pursuant to the Section 4(a)(1) Exemption and the Rule 144 safe harbor.

88.     Magna acquired more than 1.1 million Lustros shares through the First Fake Lustros Note transaction, which it sold between on or about December 19, 2012, and on or about June 21, 2013, for total proceeds of $693,521.18, including nearly 800,000 shares for $417,348.17 during the tolled limitations period.

89.     Magna acquired more than 1.4 million Lustros shares through the Second Fake Lustros Note transaction, which it sold between on or about July 9, 2013, and on or about November 29, 2013, for total proceeds of $202,378.26.

90.     None of Magna's sales of Lustros shares were pursuant to a registration statement filed with the Commission, and were therefore illegal.  The transactions did not qualify for the Section 4(a)(1) Exemption, as Magna claimed at the time, because Magna was a statutory underwriter, having acquired the shares from an entity, Company-1, under common control with the issuer, Lustros, with a view toward distributing those shares to the public.

91.     Magna's sales did not qualify under the Rule 144 safe harbor because Magna did not satisfy, at the least, the holding period requirements of the Rule.

92.     Magna's scheme defrauded Lustros's shareholders.  The scheme did not improve Lustros's financial position because it agreed to less favorable terms with Magna to settle its existing debt.  In addition, upon information and belief, Company-1 loaned the proceeds it received from Magna to Lustros, creating new debt to replace the "retired" debt.  And, even

while the company's value was being impaired, the unregistered offering increased the float of Lustros stock, diluting each shareholder's ownership interest in the company.

**Magna's Purchase of Lustros Shares Directly from Company-1**

93.     In or about January 2014, Magna purchased a block of one million shares of Lustros stock (the "Lustros Share Block") directly from Company-1 for $150,000.

94.     Like the First and Second Fake Lustros Note transactions involving Company-1, Magna did not negotiate the Lustros Share Block purchase with the sole owner and officer of Company-1, who in reality was Engelbrecht's personal assistant (a fact which Manuel and others at Magna either knew, or were at least reckless in not knowing).  Rather, Magna negotiated the transaction with Lustros, Engelbrecht, and Malone.

95.     Before the transaction was consummated, Manuel and Engelbrecht discussed, among other things, which of Engelbrecht's nominees would sell the shares to Magna.  In an email dated in or about January 2014, Engelbrecht asked Manuel to have Magna "reinvest $150,000 of your [Lustros] profit into [another issuer controlled by Engelbrecht]" by purchasing shares in the other issuer.  Manuel and Magna declined to so.  Upon information and belief, Magna wanted to buy Lustros shares from Company-1 because the First and Second Fake Lustros Note transactions had been profitable.

96.     Lustros, acting through Engelbrecht, gave Magna documents showing that Company-1 had acquired the Lustros Share Block to be sold to Magna from husband-and-wife investors in Engelbrecht's companies just a few days before Company-1 proposed to sell the Lustros Share Block to Magna.

97.     Magna, acting through Manuel, prepared and sent to Malone all of the form documents for both Company-1 and Lustros to sign in connection with the share purchase.

98.     As in the prior transactions involving Lustros and Company-1, Magna obtained an opinion letter from an attorney who incorrectly presumed, based on Magna's false representation, in his opinion letter that Company-1 was not an affiliate of Lustros.  Magna then sent, or caused to be sent, the opinion letter to Lustros' transfer agent and Magna's brokers by email in order to acquire and deposit Lustros shares that did not contain a restrictive legend.

99.     Sason approved Magna's purchase of Lustros shares directly from Company-1 and authorized the wire transfer of $150,000 from Magna's bank accounts to fund the transaction.  Before approving the transaction, Sason neither reviewed the documentation of the debt nor the due diligence file on the transaction.

100.     On or about January 15, 2014, Magna wired the $150,000 to a bank account in the name of Company-1.

101.     Between January 21, 2014, and February 7, 2014, Magna sold approximately 440,000 shares of the Lustros Share Block, earning total proceeds of $66,138.15.

102.     Magna did not sell the approximately 560,000 remaining shares because Lustros's share price had dropped below the price Magna had paid for the shares.

103.     None of Magna's sales of the shares from the Lustros Share Block were pursuant to a registration statement filed with the Commission.  Though Magna purported to rely on the Section 4(a)(1) Exemption, this exemption did not apply because Magna acted as an underwriter—*i.e.*, it acquired either the debts or shares it purchased from an entity, Company-1, under common control with the issuer, Lustros, with a view toward distributing those shares to the public.

104.     Magna's sales did not qualify for the Rule 144 safe harbor because it did not meet the holding period requirement of the Rule.

**The Lustros Shares Magna Sold Qualified as a Penny Stock**

105.    The shares of Lustros stock that Magna acquired and sold qualified as a penny

stock as defined by Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder:  (a)

Lustros's common stock was not an "NMS stock," as defined in 17 C.F.R. § 242.600(b)(47); (b)

Lustros's common stock traded below five dollars per share during the relevant period; (c)

Lustros had net tangible assets and average revenue below the thresholds of Rule 3a51-1(g)(1);

and (4) Lustros did not meet any of the other exceptions contained in Rule 3a51-1.

**Magna Conducted Sham Due Diligence Regarding Company-1**

106.    Manuel supervised and directed Magna's due diligence on the three transactions

involving Company-1 and Lustros.  Upon information and belief, Magna's research group,

acting under Manuel's direction and supervision, deliberately performed sham due diligence or,

at least, were reckless in how they performed that due diligence.

107.    Magna had no direct contact with Company-1, and instead directed all questions

concerning Company-1 to Lustros.

108.    Emails to Manuel and the members of the research group he supervised, including

two Magna employees—"Magna Employee-1" and "Magna Employee-2"—who conducted the

purported due diligence on the transactions, indicated that the person named on the documents

concerning Company-1 was Engelbrecht's assistant, Malone's assistant, or an employee of

Lustros.  Neither Manuel nor the other Magna employees inquired about this apparent

connection between the two companies.

109.    With respect to the due diligence on the First Fake Lustros Note, Magna

Employee-1 asked Lustros where the Note was disclosed in Lustros' filings with the

Commission.  Lustros referred Magna Employee-1 to its quarterly filings and the disclosure of

the approximately $550,000 in unsecured demand loans owed to Engelbrecht and/or Suprafin.
Neither Magna nor Magna Employee-1 questioned the fact that, prior to Magna's transactions
with Lustros, Lustros' filings did not mention Company-1 as holding any Lustros debt and did
not describe the existence of any convertible debt whatsoever owed by Lustros.

110.    Magna's due diligence file contained other significant red flags that should have
put others at Magna on notice that Company-1 was an affiliate of Lustros, such as (a) the fact
that Engelbrecht signed the Fake Lustros Notes on behalf of Company 1 and (b) the Company-1
bank statements Lustros sent Magna showed that Company-1 was a pass-through entity used to
fund Suprafin.

111.    In or about December 2014, after the Commission had announced charges against
Engelbrecht, Malone, and others three months earlier (in or about September 2014), Magna
Employee-1, who had since left Magna, sent a private message using a social media platform to
Magna Employee-2, who was still at Magna, with a link to the Commission's press release
concerning the charges.

112.    After Magna Employee-1 sent the link ("whoa just saw this one"), and Magna
Employee-2 confirmed that he had also seen it, Magna Employee-1 wrote:  "Always knew that
guy was a criminal."  Magna Employee-2 responded:  "[D]ont think weve [sic] spoken to zirk
[Engelbrecht] since ha."  Magna Employee-1 then responded:  "Not too surprised.  Zirk
[Engelbrecht], Trish [Malone] all of them."

**The NewLead Underwritings by Pallas**

113.    Beginning in or about 2012, NewLead, a publicly-traded company based in
Greece, purportedly operating in the shipping industry, sought to acquire mining assets and
vessels, ostensibly so that it could offer integrated mining and shipping services to customers.

114.    Also in or about 2012, Pallas,[3] through various subsidiaries, indirectly owned both a coal mine in Kentucky known as the Viking Mine and a nearby coal prep plant known as the Viking Prep Plant.

115.    As a result of changes in demand for coal, the Viking Mine was not as profitable as it once was to operate, and Pallas had been entertaining offers to purchase the assets.

116.    In or about 2011 and 2012, Pallas received offers to purchase the Viking Mine and the Viking Prep Plant from mining companies, which valued these assets at approximately $20 million.

117.    In or about 2013, NewLead sought to acquire the Viking Mine and Viking Prep Plant from Pallas through two separate transactions.

118.    Sharma negotiated both transactions on behalf of Pallas with NewLead's chief executive officer, Executive-1.

119.    Ultimately, Sharma and Executive-1 agreed to a purchase price of $45 million for the two Pallas assets:  $15 million for the Viking Mine and $30 million for the Viking Prep Plant.  The total agreed-upon purchase price valued these assets at approximately double the prior offers Pallas had received.

120.    NewLead did not have cash or bank financing to pay the $45 million purchase price, so it instead opted to raise money for the asset purchases, as well as additional working capital, through public offerings of newly-issued NewLead stock.

---

[3] The Pallas Defendants have executed tolling agreements, in which they have agreed to toll the five-year statute of limitations applicable to seeking civil money penalties, for the period October 1, 2018, through February 28, 2019.

121.    NewLead did not register these offerings with the Commission, but rather sought to evade the registration requirements of the Securities Act by selling its stock through Pallas in an effort to disguise what were in reality primary offerings of its securities.

122.    On or about September 13, 2013, NewLead issued Pallas a promissory note in the amount of $15 million (the "Mine Note") as consideration for the Viking Mine.  The Mine Note obligated NewLead to repay the Note's principal in quarterly cash payments and to pay eight percent annual interest on the debt.  The Mine Note gave NewLead the option to make the quarterly payments to Pallas in NewLead stock instead of cash.  If NewLead made such payments, those payments were subject to a "true-up" provision, which required NewLead to issue additional shares to make Pallas whole if the market value of the shares it issued to Pallas generated proceeds that were less than the amount NewLead owed under the Mine Note.

123.    Subsequently, on or about December 9, 2013, NewLead issued Pallas a second promissory note in the amount of $24 million (the "Prep Plant Note," together with the Mine Note, the "NewLead-Pallas Notes") as partial consideration for the Viking Prep Plant.  Like the Mine Note, the Prep Plant Note obligated NewLead to repay the Note's principal in quarterly cash payments and to pay eight percent annual interest on the debt.  Also like the Mine Note, the Prep Plant Note gave NewLead the option to make the quarterly payments to Pallas in NewLead stock instead of cash.  If NewLead made such payments, those payments were also subject to a "true-up" provision, which required NewLead to issue additional shares to make Pallas whole if the market value of the shares it issued to Pallas generated proceeds that were less than the amount NewLead owed under the Prep Plant Note.

124.    Upon information and belief, Pallas and NewLead knew that NewLead did not have, and would be unable to obtain, the cash necessary to make the quarterly payments due to

Pallas under the NewLead-Pallas Notes.  Rather, Pallas and NewLead both knew that NewLead would repay its purported debts to Pallas by exercising its option to pay Pallas by issuing it stock, which Pallas would then sell through its brokerage accounts to the investing public.

125.    In other words, the parties knew that NewLead would finance its acquisition of the Viking Mine and the Viking Prep Plant through an offering of its own stock that Pallas would underwrite by selling NewLead's shares to the public.

126.    In addition, notwithstanding that the NewLead-Pallas Notes were the purported consideration paid by NewLead to Pallas to obtain the Viking Mine and Viking Prep Plant, Sharma and Executive-1 agreed that Pallas would discretely kick back a portion of the proceeds of its stock sales to NewLead, in order to provide NewLead with additional working capital.

127.    Pallas thus acted as an underwriter for NewLead, raising some of the capital that NewLead needed to acquire the mining assets and additional working capital by selling NewLead's newly-issued shares to the public.

128.    From in or about April 2014 through in or about June 2017, Pallas obtained more than 570 million shares of NewLead stock pursuant to the NewLead-Pallas Notes.  Immediately upon receiving the stock, Pallas deposited the shares into its brokerage accounts with brokers located in this District, which Sharma setup and for which only Salviola had trading authority, and thereafter sold the shares to the public.

129.    Pallas received more than $20 million in proceeds from selling the stock it received via the NewLead-Pallas Notes, including in the form of quarterly payments and "true-ups," and kicked back approximately $3.7 million of the proceeds to NewLead in or about July 2014 for NewLead to use as purported working capital.  Sharma negotiated the terms of the

kickback with Executive-1, and Salviola wired the funds to NewLead from Pallas bank accounts. Pallas and NewLead disguised these kickbacks as new loans to NewLead.

130.    Pallas' sales of NewLead stock were not registered with the Commission and did not fall within any exemption to the registration requirements.

131.    After these transactions were completed, Pallas purported to foreclose on the debts still supposedly owed by NewLead and took back the Viking Mine and Prep Plant assets.

**Hanover Purchases Fake NewLead Debt from Pallas**

132.    In addition to the transactions describe above, NewLead entered into a separate fraudulent scheme with Pallas and Hanover to raise an additional $6 million in financing related to the Viking Prep Plant.

133.    In this second scheme, Sharma and Executive-1 agreed that NewLead would issue a fake promissory note in the amount of $6 million to Pallas, which Pallas would then sell at face value to Hanover (the "Hanover Note").  Thereafter, NewLead would enter into an agreement with Hanover to settle the debt in exchange for the issuance of NewLead stock, which Hanover could sell to the public for a profit.  Pallas, in turn, would kick back a portion of the $6 million it received from Hanover to NewLead.

134.    Executive-1 created the Hanover Note on or about October 13, 2013, and emailed it to Sharma, who forwarded the Note to Salviola by email.

135.    The Hanover Note, which Executive-1 backdated to reflect an issuance date of September 26, 2013, stated that it was being given as consideration for the Viking Mine, which Pallas previously had sold to NewLead in a separate transaction.  The Hanover Note attached a copy of the Viking Mine sale contract as the Note's sole exhibit.  Contrary to the terms of the

Hanover Note, however, the Viking Mine sale contract identified the Mine Note as the sole consideration given by NewLead to Pallas for the Viking Mine.

136.    Sharma and Salviola knew or recklessly disregarded the fact that the Hanover Note was fraudulent and did not reflect any bona fide debt owed by NewLead to Pallas.  Sharma and Salviola also knew or recklessly disregarded the fact that the Note had not been issued in consideration for the Viking Mine and that NewLead had no intention of paying Pallas $6 million in cash; rather, upon information and belief, Sharma and Salviola understood, or recklessly disregarded the fact that, the Note was created so that it could be sold to Hanover and eventually exchanged for stock, and that Hanover would then pay the $6 million to Pallas.

137.    Pallas sold the Hanover Note to Hanover for $6 million pursuant to a debt purchase agreement that was executed on or about November 4, 2013.  Salviola signed the agreement on behalf of Pallas.  Pallas falsely represented in the agreement that the Hanover Note was a debt arising in the regular course of business and was for money either loaned by Pallas to NewLead or due and payable for services rendered by Pallas to NewLead.  When she signed this agreement, Salviola knew or recklessly disregarded the fact that the Hanover Debt was not made in the ordinary course of business and was neither for money loaned or services rendered by Pallas to NewLead.

138.    As Pallas and NewLead had agreed, NewLead did not make any payments to Pallas on the Hanover Note by the Note's maturity date, which was October 21, 2013. Thereafter, NewLead sent the Hanover Note to Hanover to be considered for purchase as part of a potential transaction.

139.     Manuel negotiated the purchase of, and supervised the due diligence on, the Hanover Note on behalf of Hanover.  Manuel knew, or was at least reckless in not knowing, that the Hanover Note was fraudulent.

140.     On its face, the Hanover Note stated that it was issued as consideration for the acquisition of the Viking Mine.  Notwithstanding that plain language, NewLead informed Manuel that the Hanover Note was issued as consideration for a separate asset, the Viking Prep Plant.  Manuel deliberately, or at least recklessly, failed to question this discrepancy.

141.     Manuel also deliberately, or at least recklessly, failed to obtain and review the Viking Mine sale contract referenced in the Hanover Note and purportedly attached thereto.  Had he done so, the contract would have put Manuel on further notice that the Hanover Note was a sham because the contract showed that the Hanover Note was not the consideration paid for the Viking Mine.

142.     Manuel also deliberately, or at least recklessly, failed to review NewLead's public press releases on the Viking Mine and Prep Plant transactions.

143.     First, on or about September 26, 2013, the same day as the Hanover Note was supposedly issued, NewLead issued a press release stating that it had only entered into "advanced negotiations" concerning the acquisition of the Viking Prep Plant.

144.     Second, on or about October 29, 2013, just over a week after the note supposedly had become due, NewLead issued a press release concerning its acquisition of the Viking Mine and Viking Prep Plant.  This press release described the consideration NewLead had paid for the Viking Mine and planned to pay for the Viking Prep Plant, but made no mention of the Hanover Note, which supposedly had been issued as part of the consideration for the acquisitions.

145.    In or about October 2013, in an email from Executive-1 to Manuel, Executive-1 also described the need to obtain $6 million in "cash" relating to the Viking Prep Plant.  Manuel deliberately, or at least recklessly, failed to question why Executive-1 described the Hanover Note, which Executive-1 sent to Hanover and Manuel a few days later, as "cash."

146.    Manuel emailed and/or spoke with Sharma on numerous occasions concerning Hanover's purchase of the Hanover Note.  Upon information and belief, Manuel and Hanover deliberately, or at least recklessly, failed to perform due diligence on Sharma, notwithstanding Hanover's claimed policy that it did in fact perform due diligence on every person with which it interfaced in connection with a transaction.

147.    Indeed, the cursory due diligence that Hanover performed on Salviola revealed an article that mentioned Sharma's prior securities fraud conviction.  Manuel's due diligence team on the transaction, which again included Magna Employee-1 and Magna Employee-2, noted the article in their report, but concluded it was not material because it appeared there was no connection between Sharma and Salviola.  Manuel deliberately, or at least recklessly, failed to investigate further and approved the due diligence report, notwithstanding that Sharma was involved in the transaction.

148.    Despite these red flags, Manuel recommended that Sason approve the transaction, and Sason approved the transaction.  Before approving the transaction, Sason neither reviewed the documentation of the debt nor the due diligence file on the transaction.

149.    After it acquired the Hanover Note, Hanover entered into a settlement agreement with NewLead to settle the debt (together with other purported debts of NewLead that Hanover had acquired from other sources) in exchange for the issuance of NewLead stock at a discount to market price.

150.    Thereafter, on or about November 19, 2013, Hanover petitioned the Supreme Court of the State of New York to approve the settlement agreement of these purported debts, including the Hanover Note.  In connection with the petition, Hanover falsely stated that it held "bona fide claims" against NewLead, including the Hanover Note, "for non-payment of past-due debt arising from bona fide loans made or services duly rendered to NewLead."  With respect to the Hanover Note specifically, Hanover falsely stated that Pallas "provided a bona fide loan to NewLead in the amount of $6,000,000.00."  Similarly, Sason falsely swore in an affidavit under penalty of perjury that Hanover held "bona fide claims" against NewLead, including the Hanover Note, "for non-payment of past-due debt arising from bona fide loans made or services duly rendered to NewLead."

151.    Hanover and Sason's representations to the court concerning the bona fides of the Hanover Note were knowingly false or made with reckless disregard as to their truth.

152.    The court, in reliance on Hanover and Sason's false representations, approved the proposed settlement agreement, which in turn allowed Hanover to obtain newly-issued NewLead common stock.  Hanover assigned its right to receive shares pursuant to the settlement to MGP.

153.    MGP received and sold the NewLead shares issued pursuant to the court-approved settlement.  MGP sold more than 124 million shares of NewLead stock for total proceeds of more than $61.5 million, resulting in a profit of more than $17.4 million.  Of these amounts, approximately $8.1 million in proceeds and $2.1 million in profits are attributable to the Hanover Note.  MGP subsequently transferred the portion of its trading profits attributable to Hanover's stake in the joint venture back to Magna bank accounts.

154.    Hanover, Sason, and MGP sought to rely on the Section 3(a)(10) Exemption in connection with this transaction.  This exemption, however, was not applicable because at least

one of the purported debts being settled—the Hanover Note—was not a bona fide debt of NewLead.

156.    No other exemption from the registration requirement of the Securities Act applied to MGP's sales of the NewLead shares.

156.    Pallas received $6 million in total consideration for its sale of the Hanover Note to Hanover.  Of this amount, in or about May 2014, Pallas kicked back $1.3 million to NewLead.

157.    Sharma negotiated the terms of the kickback with Executive-1, and Salviola wired the funds to NewLead from Pallas bank accounts (after first moving the funds through a personal bank account and then to a separate Pallas bank account on or about the same day).

**Certain of the NewLead Shares Pallas Sold Qualified as a Penny Stock**

158.    Certain of the shares of NewLead stock that Pallas acquired pursuant to the NewLead-Pallas Notes and sold qualified as a penny stock as defined by Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder:  (a) NewLead's common stock was not an "NMS stock," as defined in 17 C.F.R. § 242.600(b)(47); (b) NewLead's common stock traded below five dollars per share during the relevant period; (c) NewLead had net tangible assets and average revenue below the thresholds of Rule 3a51-1(g)(1); and (d) NewLead did not meet any of the other exceptions contained in Rule 3a51-1.

### FIRST CLAIM FOR RELIEF

**Sason and Hanover Violated**
**Section 17(a)(2) of the Securities Act**

159.    The Commission realleges paragraphs 1 through 158, above.

160.    Sason and Hanover each violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

161.    In or about 2013 and 2014, these defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the offer or sale of securities, and with knowledge, recklessness, or negligence, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

## SECOND CLAIM FOR RELIEF

### Sason and Hanover Violated
### Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b)

162.    The Commission realleges paragraphs 1 through 158, above.

163.    Sason and Hanover each violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

164.    In or about 2013 and 2014, these defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness, made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

## THIRD CLAIM FOR RELIEF

### Manuel, the Magna Entities, and the Pallas Defendants Violated
### Sections 17(a)(1) and (3) of the Securities Act

165.    The Commission realleges paragraphs 1 through 158, above.

166.    Manuel, the Magna Entities, and the Pallas Defendants each violated Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

167.    In or about 2013 and 2014, Manuel, the Magna Entities, and the Pallas

Defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or

of the mails, or the facility of a national securities exchange, in connection with the offer or sale

of securities, and with knowledge, recklessness, or negligence, (1) employed devices, schemes,

or artifices to defraud; and/or (2) engaged in acts, practices or courses of business which

operated or would operate as a fraud or deceit upon the purchasers of the securities being offered

or sold.

### FOURTH CLAIM FOR RELIEF

**Manuel, the Magna Entities, and the Pallas Defendants Violated
Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder**

168.    The Commission realleges paragraphs 1 through 158, above.

169.    Manuel, the Magna Entities, and the Pallas Defendants each violated Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R.

§ 240.10b-5(a) and (c)].

170.    In or about 2013 and 2014, these defendants, directly or indirectly, by use of the

means or instruments of interstate commerce, or of the mails, or the facility of a national

securities exchange, in connection with the purchase or sale of securities, and with knowledge or

recklessness, (1) employed devices, schemes, and artifices to defraud; and/or (2) engaged in acts

practices, or courses of business which operates or would operate as a fraud or deceit upon any

person.

## FIFTH CLAIM FOR RELIEF

### Control Person Liability as to Sason

171.    The Commission realleges paragraphs 1 through 158, above.

172.    As alleged above, the Magna Entities violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

173.    At all relevant times, Sason was a control person of the Magna Entities for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

174.    At all relevant times, Sason exercised power and control over the Magna Entities, including by directing and causing the direction of the management and policies of those persons, and by directing and participating in the acts constituting the violation.

175.    By reason of the foregoing, Sason is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for the Magna Entities' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Liability as to Manuel

176.    The Commission realleges paragraphs 1 through 158, above.

177.    As alleged above, the Magna Entities and Sason violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

178.    By engaging in the conduct alleged above, Manuel, directly or indirectly, aided and abetted the primary violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15

U.S.C. § 77q(a)] by the Magna Entities and Sason because he knowingly, or at least recklessly, provided substantial assistance to each of those persons' violations.

179.    By reason of the foregoing, Manuel is liable under Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

<u>**SEVENTH CLAIM FOR RELIEF**</u>

<u>**Aiding and Abetting Liability as to the Pallas Defendants**</u>

180.    The Commission realleges paragraphs 1 through 158, above.

181.    As alleged above, Hanover, MGP, Sason, and Manuel violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

182.    By engaging in the conduct alleged above, the Pallas Defendants, directly or indirectly, aided and abetted the primary violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] by Hanover, MGP, Sason, and Manuel because they knowingly, or at least recklessly, provided substantial assistance to each of those persons' violations.

183.    By reason of the foregoing, the Pallas Defendants are liable under Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## EIGHTH CLAIM FOR RELIEF

**All Defendants Violated**
**Sections 5(a) and (c) of the Securities Act**

184.     The Commission realleges paragraphs 1 through 158, above.

185.     Sason, Manuel, the Magna Entities, and the Pallas Defendants each violated

Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

186.     In or about 2013 and 2014, these defendants, directly or indirectly, and

notwithstanding the fact that there was no applicable exemption: (a) made use of the means or

instruments of transportation or communication in interstate commerce or of the mails to sell,

through the use or medium of a prospectus or otherwise, securities as to which no registration

statement was in effect; (b) for the purpose of delivery after sale, carried or caused to be carried

through the mails or in interstate commerce, by means or instruments of transportation, securities

as to which no registration statement was in effect; and/or (c) made use of means or instruments

of transportation or communication in interstate commerce or of the mails to offer to sell,

through the use or medium of a prospectus or otherwise, securities as to which no registration

statement had been filed.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Enter judgment in favor of the Commission finding that Sason, Manuel, the Magna

Entities, and the Pallas Defendants each violated the federal securities laws and Commission

rules as alleged in this Complaint;

**II.**

Permanently enjoin all defendants from violating, directly or indirectly, Sections 5 and

17(a) of the Securities Act [15 U.S.C. §§ 77e, 77(q)(a)] and Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**III.**

Order the Magna Entities, on a joint and several basis with Sason, and the Pallas

Defendants, to disgorge all illegal trading profits, commissions, fees, payments and other ill-

gotten gains that they obtained as a result of their fraudulent misstatements, acts or courses of

conduct described in this Complaint, and to pay prejudgment interest thereon;

**IV.**

Order Sason, Manuel, the Magna Entities, and the Pallas Defendants to pay civil

monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78 u(d)(3)];

**V.**

Bar Sason, Manuel, Sharma, and Salviola from participating in any offering of penny

stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of

the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

**VI.**

Grant such other and further relief as this Court deems just, equitable, or necessary in

connection with the enforcement of the federal securities laws and for the protection of investors.

## <u>DEMAND FOR JURY TRIAL</u>

The Commission hereby demands a trial by jury pursuant to Rule 38(b) of the Federal

Rules of Civil Procedure.


Dated:          February 15, 2019
                New York, New York


                                        Respectfully submitted,

                                        By:   /s/ Sanjay Wadhwa
                                              Marc Berger
                                              Sanjay Wadhwa
                                              Sheldon L. Pollock
                                              John O. Enright
                                              Alexander M. Vasilescu
                                              Philip A. Fortino
                                              Lee A. Greenwood
                                              Attorneys for Plaintiff
                                              SECURITIES AND EXCHANGE
                                              COMMISSION
                                              New York Regional Office
                                              Brookfield Place
                                              200 Vesey Street, Suite 400
                                              New York, NY 10281-1022
                                              (212) 336-1014 (Fortino)