UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #.
DATE FILED  1-14-2020
```

- - - - - - - - - - - - - - - - - - - - - - - - - - -

SECURITIES AND EXCHANGE COMMISSION,

             Plaintiff,

      - v. -

JOSHUA SASON, MARC MANUEL, KAUTILYA
(a/k/a TONY) SHARMA, PERIAN
SALVIOLA, MAGNA MANAGEMENT, LLC
(f/k/a MAGNA GROUP, LLC), MAGNA
EQUITIES II, LLC (f/k/a HANOVER
HOLDINGS I, LLC), MG PARTNERS, LTD.,
and PALLAS HOLDINGS, LLC,

           Defendants.

19 Civ. 1459 (LAP)

MEMORANDUM & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

    In this securities case, the United States Securities and
Exchange Commission ("SEC") alleges that Defendants Magna
Management, LLC, Magna Equities II, LLC, MG Partners, LTD.,
Jason Sason, Marc Manuel (together, the "Magna Defendants"),
Kautilya Sharma, Perian Salviola, and Pallas Holdings, LLC
(together, the "Pallas Defendants") engaged in a raft of
fraudulent and illegal transactions in unregistered securities.
(Complaint dated Feb. 15, 2019 ("Compl.") [dkt. no. 1].)  The
SEC asserts claims for primary and secondary violations of the
antifraud provisions in Section 17(a) of the Securities Act of
1933 ("Securities Act"), Section 10(b) of the Securities
Exchange Act of 1934 ("Exchange Act"), and the corresponding

Rule 10b-5, as well as violations of the registration provisions contained in Section 5 of the Securities Act.

The Magna Defendants and Pallas Defendants have both moved to dismiss the Complaint under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. (Magna Defendants' Notice of Motion to Dismiss dated May 6, 2019 [dkt. no. 49]; Pallas Defendants' Notice of Joint Motion to Dismiss dated May 6, 2019 [dkt. no. 53].) As explained below, the motions to dismiss are GRANTED in part and DENIED in part.

## I.  Background

The following facts are taken from the Complaint and assumed to be true for purposes of deciding Defendants' motions.

### a. Magna's Business Model

Magna Management, LLC ("Magna"), Magna Equities II, LLC ("Hanover"), and MG Partners, Ltd. ("MGP," and together with Magna and Hanover, the "Magna Entities") were three companies whose businesses involved acquiring and liquidating common stock in publicly-traded microcap companies. (Compl. ¶ 39.) Jason Sason was the owner and CEO of Magna and Hanover and an owner and director of MGP. (Id. ¶ 20.) Marc Manuel was a Magna executive who negotiated and ran diligence on deals for the Magna Entities. (Id. ¶¶ 2, 21.)

As part of their business strategy, the Magna Entities would often acquire stock by buying debt and converting it into

2

stock, often at prices pre-agreed with the issuer, and then sell the stock to public investors. (Id. ¶¶ 40-41.)  To minimize the risk of market volatility, the Magna Entities only pursued transactions where they could unload their stock right after acquiring it.  (Id. ¶¶ 42-43.)  For this to work when dealing in unregistered stock, the Magna Entities needed to take advantage of exemptions from the requirements imposed by Securities Act § 5, which prohibits parties from selling securities unless they are first registered with the SEC.  (Id. ¶ 29; 15 U.S.C. § 77e.)

    b. Relevant Registration Exemptions

    As discussed below, the Complaint alleges that the Magna Defendants fraudulently structured transactions so they would facially appear to qualify for the registration exemptions provided by Securities Act §§ 4(a)(1) and 3(a)(10).

    Section 4(a)(1) provides an exemption for "transactions by any person other than an issuer, underwriter, or dealer." Compl. ¶ 30; 15 U.S.C. § 77d(a)(1).  Under a safe harbor created by Securities Act Rule 144, if a person holds unregistered securities in microcap issuers for at least six months, that person is not considered an "underwriter" and therefore qualifies for the § 4(a)(1) exemption from the registration requirement.  (Compl. ¶¶ 32-33); 17 C.F.R. § 230.144.

    For purposes of meeting the Rule 144 holding period requirement, parties may "tack" the prior owner of the stock's

3

holding time onto their own.   (Compl. ¶ 34.)   Tacking is only permitted, however, if the purchaser buys the securities from a person who is not affiliated with the issuer.   (Id. ¶ 34.)   If the prior owner was an affiliate, the six-month holding clock restarts when the buyer acquires the securities.   (Id.)

In addition to the § 4(a)(1) exemption, Securities Act § 3(a)(10) creates an exemption for the sale of securities issued in exchange for bona fide claims against the issuer. (Id. ¶ 38.)   For a party to utilize the § 3(a)(10) exemption, a court must first approve the fairness of the terms and conditions of the claims-for-securities exchange.   (Id.)

### c. Lustros Transactions

#### i. Lustros Notes

The first set of challenged transactions involves a mining company called Lustros, Inc. ("Lustros") and a fraudulent scheme to sneak unregistered Lustros stock through the § 4(a)(1) exemption.   During the time period at issue in the Complaint, Lustros was run by a man named Izak Zirk de Maison ("Zirk"), who later pleaded guilty to criminal bribery and market manipulation charges related to Lustros and other companies he ran and is now serving a 151-month prison sentence.   (Id. ¶¶ 28, 48.)

Magna was introduced to Lustros in late 2012 when Lustros was in the process of lining up financing for its mining operations.   (Id. ¶¶ 50-51.)   Consistent with the business model

4

discussed above, Magna proposed as one financing option the possibility of purchasing up to $550,000 in convertible Lustros notes.  (Id. ¶ 52.)  To set the table for a future § 4(a)(1) exemption, Magna stipulated that it would need to buy the notes from an unaffiliated third party who had held them for six months, even though that an arrangement would seemingly not have satisfied Lustros' financing needs, as Magna would be paying the third party--not Lustros--to acquire the debt.  (Id. ¶ 53-54.)

In December 2012, Zirk and Manuel met one-on-one to discuss the details of the financing.  (Id. ¶ 55.)  Zirk indicated to Manuel that the purchasing arrangement Magna had proposed was not viable because Lustros had no non-affiliated debt holders and no outstanding convertible debt.  (Id. ¶¶ 57-58.)  Zirk told Manuel, however, that Lustros owed approximately $550,000 to Zirk and/or one of his affiliated companies, Suprafin Ltd. ("Suprafin").  Zirk's description of that $550,000 debt matched disclosures Lustros had made in prior SEC filings.  (Id. ¶ 56.)

Because Lustros had no outstanding debt that could tee up a future § 4(a)(1) exemption, Zirk and Manuel devised a workaround:  Zirk would transfer the debt Lustros owed him and/or Suprafin to a purportedly non-affiliated third party so it would look like that party, and not Zirk, held the debt. (Id. ¶ 59.)  Following their meeting, Zirk told Manuel that another of Zirk's entities, "Company-1," would stand in as the

unaffiliated party.  (Id. ¶ 61.)  To disguise Zirk's control of Company-1, Zirk instructed his personal assistant to pretend to serve as its sole owner, officer, and director.  (Id. ¶ 62.)

After the December 2012 meeting, Zirk had Lustros' CFO create a fake convertible note purportedly issued by Lustros to Zirk, Suprafin, and Company-1, with a face value of roughly $550,000 (the "Lustros I Note").  (Id. ¶ 63.)  The CFO backdated the Lustros I Note to make it appear as if the debt Lustros previously disclosed in its SEC filings had always been held, in part, by Company-1.  (Id. ¶¶ 64-65.)  Although Zirk's debt had no stock conversion rights, the fake note did.  (Id. ¶ 66.) Zirk signed the note on behalf of all its purported holders, including Company-1, even though Zirk's assistant was Company-1's only purported owner and executive. (Id. ¶ 67.)

Around the time Lustros' CFO created the Lustros I Note, she also created a fake instrument assigning to Company-1 Zirk's and Suprafin's share of the note.  (Id. ¶ 68.)  The assignment was backdated so it looked like Company-1 had been holding the debt for six months, thereby paving the way for a § 4(a)(1) exemption.  (Id. ¶ 68.)  After the fake documents were in place, Magna bought the Lustros I Note from Company-1.  (Id. ¶ 69.)

Later, in June 2013, Magna bought another tranche of purported Lustros convertible debt held by Company-1.  (Id. ¶ 71.)  The schematic for this transaction was largely the same

6

as the first:  Lustros' CFO created a fake note (the "Lustros II Note") and assignment, backdating both to cover the scheme, and then Magna bought the note from Company-1.  (Id. ¶¶ 72-83.)

After buying the Lustros Notes, Magna exchanged them for newly issued convertible debt from Lustros, then converted the debt to stock and secured legal opinions stating that the stock qualified for the § 4(a)(1) exemption.  (Id. ¶¶ 84-85.)  Magna eventually sold over 2.5 million Lustros shares to the public for total proceeds of roughly $900,000.  (Id. ¶¶ 88-89.)

The Lustros deals were marked by red flags beyond those noted above indicating that that Company-1 was affiliated with Zirk and Lustros, making the § 4(a)(1) exemption inapplicable. For instance, when running deal diligence, Magna directed all its questions about Company-1 to Lustros and received emails indicating that Company-1's principal was Zirk's assistant or a Lustros employee.  (Id. ¶¶ 107-08.)  Similarly, when Magna asked where the Lustros I Note was disclosed in Lustros' SEC filings, Lustros pointed to a disclosure showing only that Zirk and/or Suprafin held Lustros debt.  (Id. ¶¶ 109.)  And although Magna was buying the Lustros Notes from Company-1, Lustros told Magna on several occasions what Lustros planned to do with the cash from the transaction and confirmed to Magna that Lustros had received the funds purportedly wired to Company-1.  (Id. ¶¶ 78-82.)  The SEC therefore alleges that Magna knew or should have

7

known that the Lustros Notes were phony and that the
unregistered Lustros stock sales did not qualify for the
§ 4(a)(1) exemption.  (See, e.g., id. ¶¶ 2, 69, 79.)

### i. Further Unregistered Lustros Stock Deals

In addition to the Lustros Notes transactions, Magna also
bought a block of Lustros shares (the "Lustros Block") from
Company-1, an affiliate of Lustros, which Magna then sold in
allegedly illegal unregistered offerings.  (Id. ¶¶ 93-104.)

### d. NewLead Transactions

The second set of challenged transactions involves another
alleged scheme to sell illegally unregistered shares, this time
in a shipping company named NewLead Holdings Ltd. ("NewLead").
(Id. ¶ 113.)  Although the Magna Defendants were marginally
involved in these transactions, the key participants were the
other group of Defendants: Kautilya Sharma, Perian Salviola, and
their company, Pallas Holdings, LLC ("Pallas"), which operated a
mining business in Kentucky.  (Id. ¶¶ 25-27.)

Beginning in 2012, NewLead undertook to expand its shipping
business to include mining services.  (Id. ¶ 113.)  In 2013, it
entered an agreement with Pallas to purchase two of Pallas'
mining assets for a total price of $45 million: $15 million for
a coal mine (the "Viking Mine") and $30 million for a coal prep
plant (the "Viking Plant").  (Id. ¶ 117-19.)  The Complaint
alleges that NewLead never had the ability to pay that price in

cash, so it hatched a scheme with the Pallas Defendants to use
fake promissory notes as subterfuge for raising capital through
public offerings of NewLead stock.   (Id. ¶¶ 120-21, 124-25.)
The SEC asserts claims related to three promissory notes: one
issued on September 13, 2013 (the "NewLead I Note"), a second on
October 13, 2013 (the "NewLead II Note"), and a third on
December 9, 2013 (the "NewLead III Note").  Because the claims
regarding the NewLead I and NewLead III Notes are similar, the
Court will discuss them together.

> i.  NewLead I and III

The NewLead I Note required NewLead to pay Pallas $15
million for the Viking Mine, and the NewLead III Note required
it to pay Pallas $24 million as partial consideration for the
Viking Plant.  (Id. ¶¶ 122-23.)  Both notes permitted NewLead to
make payments in either cash or NewLead Stock.  (Id.)

The SEC alleges, on information and belief, that the
parties knew NewLead would not be able to make payments in cash,
thereby forcing NewLead to pay Pallas in stock, which Pallas
would then sell to the investing public.  (Id. ¶ 124.)  Sharma
and NewLead's CEO also agreed that Pallas would secretly kick
back some of the proceeds from its stock sales to inject NewLead
with additional working capital.  (Id. ¶¶ 126-27.)  The parties
therefore intended that NewLead would obtain financing through
an unregistered stock offering, with Pallas acting as an

underwriter.  (Id. ¶¶ 125, 127.)  Over a three-year period,
NewLead issued millions of shares to Pallas, which Pallas sold
to the public in unregistered offerings.  (Id. ¶¶ 128-29.)

       ii.   NewLead II Note

    The NewLead II Note involved different pattern of
transactions and included Hanover, one of the Magna Entities,
and an allegedly fraudulent scheme to exploit the § 3(a)(10)
registration exemption.  The note, which NewLead issued to
Pallas in October 2013 but backdated by several weeks, had a
face value of $6 million and a maturity date of October 21,
2013. (Id. ¶¶ 133-34 138.)  Pursuant to a preexisting agreement,
NewLead did not make any payments on the note, and after it
matured, Pallas sold it at face value to Hanover.  (Id. ¶¶ 133,
137-38.)  Pallas then kicked back to NewLead $1.3 million of the
$6 million it had received from Hanover. (Id. ¶¶ 156-57.)

    After acquiring the NewLead II Note, Hanover entered into
an agreement with NewLead to settle the debt--along with other
NewLead debt Hanover acquired in unrelated transactions--in
exchange for newly-issued NewLead stock. (Id. ¶ 149.)  To take
advantage of the § 3(a)(10) exemption, Hanover petitioned the
New York State Supreme Court to approve the settlement
agreement.  (Id. ¶ 150.)  In connection with its petition,
Hanover and Sason allegedly made false statements that Hanover
had bona fide claims against NewLead for the payment of overdue

debts.  (Id. ¶ 150.)  The court approved the proposed settlement, thereby allowing Hanover to obtain NewLead common stock, which Hanover assigned to MGP.  (Id. ¶ 152.)  MGP then sold the unregistered stock under the § 3(a)(1) exemption for over $60 million, roughly $8 million of which was traceable to shares from the NewLead II Note.  (Id. ¶ 153.)

As with the Lustros deals, the SEC alleges that red flags accompanied the NewLead II Note transactions and signaled that the note did not truly reflect a bona fide debt.  For example, the NewLead II Note stated that it was consideration for the Viking Mine and attached the Viking Mine sale contract as an exhibit, but the Viking Mine had already been sold via the NewLead I Note.  (Id. ¶ 135.)  In another mix-up of the relevant asset, NewLead told Hanover that, contrary to the deal documents, the NewLead II Note was consideration for the Viking Plant, not the mine. (Id. ¶ 140.)  Press releases NewLead issued around the time of the NewLead II Note transactions also conflicted with the deal documents and NewLead's representation that the note was issued for the Viking Plant.  (Id. ¶¶ 141-45.)

## II.  Legal Standard

On a Rule 12(b)(6) motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in favor of the pleader.  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).  To survive

11

a motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556). Put differently, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." Twombly, 550 U.S. at 557 (internal quotation marks omitted).

In addition, securities fraud claims must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). The SEC need not, however, meet the Private Securities Litigation Reform Act's ("PSLRA") pleading requirements. SEC v. China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d 379, 387 (S.D.N.Y. 2014). Under Rule 9(b), a fraud claim must "must state with particularity the circumstances constituting fraud," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b)'s particularity requirement "serves to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant

12

against the institution of a strike suit." <u>Rombach v. Chang</u>, 355 F.3d 164, 171 (2d Cir. 2004) (citation and internal quotation marks omitted).

## III.  **Discussion**

### a.  <u>Timeliness</u>

In two preliminary attacks, the Magna Defendants contend that the SEC's claims are precluded by the SEC's noncompliance with purported timing restrictions imposed by the Dodd-Frank Act and barred by the applicable statute of limitations.  (<u>See</u> Memorandum of Law in Support of the Magna Defendants' Motion to Dismiss, dated May 6, 2019 ("Magna Br.") [dkt. no. 50] at 9-13.) Both arguments are unavailing.

### i.  Dodd-Frank Act

Section 929U of the Dodd-Frank Act contains a timing provision stating that "[n]ot later than 180 days after the date on which Commission staff provide a written Wells notification to any person, the Commission staff shall either file an action against such person or provide notice to the Director of the Division of Enforcement of its intent to not file an action." 15 U.S.C. § 78d-5(a)(1).[1]

---

[1]     The SEC sends a Wells notification at the close of an investigation to advise the recipients that the SEC's Division of Enforcement plans to recommend filing a lawsuit against them and inviting them to explain why they should not be sued.  <u>See</u> <u>In re Lions Gate Entm't Corp. Sec. Litig.</u>, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016).

Based on Section 929U, the Magna Defendants argue that the Complaint should be dismissed because the SEC filed it over 180 days after sending them a Wells notice.  (Magna Br. at 9-10.) But the Magna Defendants cite no on-point authority in support of their view that failure to comply with the 180-day clause requires dismissal, and the Court is aware of none.  To the contrary, the cases analyzing the issue have unanimously held that expiration of the 180-day period is an "internal directive" for the SEC and "not a jurisdictional bar" to suit.  See SEC v. Fiore, No. 18 Civ. 5474, 2019 WL 4688538, at *15 n.6 (S.D.N.Y. Sept. 25, 2019) (collecting cases).  The Court therefore rejects the Magna Defendants' Dodd-Frank Act argument.

### i. Statute of Limitations

The Magna Defendants next contend that the SEC's claims concerning Lustros I are barred by the five-year statute of limitations contained in 28 U.S.C. § 2462.  (Magna Br. at 11-13.)  Courts may decide a statute of limitations defense "on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 n.12 (2d Cir. 2014).

Taking into account the tolling agreement the Magna Defendants entered with the SEC, the parties agree that all claims that accrued before February 16, 2013 are time-barred. (Magna Br. at 12; SEC's Memorandum of Law in Opposition to

14

Defendants' Motion to Dismiss, dated June 5, 2019 ("Opp.") [dkt. no. 61] at 9.)  They diverge, however, on how that bookend affects the timeliness of claims arising from the Lustros I scheme, parts of which fall before February 16, 2013, parts of which fall after.  In particular, the December 2012 meeting where Zirk and Manuel allegedly agreed to pass off a Zirk-controlled company as a non-affiliated entity occurred outside the limitations period (Compl. ¶¶ 55-60), while at least some Magna's sales of the Lustros stock that flowed from that agreement took place within the period.  (Id. ¶ 88; see also Magna Br. at 12-13; Opp. at 9.)

The Court agrees with the SEC that given the alleged timeline, the SEC may pursue claims predicated on post-February 16, 2013 stock sales arising from Lustros I.  "[T]he standard rule is that a claim accrues when the plaintiff has a complete and present cause of action." Gabelli v. SEC, 568 U.S. 442, 448 (2013) (citation and internal quotation marks omitted).  "[A] claim based on fraud accrues--and the five-year clock begins to tick--when a defendant's allegedly fraudulent conduct occurs." Id.  The Magna Defendants' theory that all the fraudulent conduct needed for the SEC's Lustros I claims to crystalize occurred at the December 2012 meeting is incorrect.  (See Magna Br. at 13; Reply Memorandum in Support of the Magna Defendants' Motion to Dismiss, dated June 17, 2019 ("Reply") [dkt. no. 62]

15

at 3.)   The fraud claims involve a scheme to sell illegally unregistered Lustros stock.   Although the December 2012 meeting put the scheme in motion, the fraud on which the SEC bases its claims could not have occurred--and the claims could not have accrued--unless the Magna Defendants actually sold the unregistered shares.   Because the sales themselves are integral to accrual, all claims tied to sales post-dating February 16, 2013 accrued within the limitations period and are timely.[2]

    b. Lustros I and II Transaction: Scheme Liability

With respect to the Lustros I and II transactions, the SEC asserts claims against Magna and Manuel under Exchange Act

---

[2]    None of the Magna Defendants' cases support a different result.   For example, in SEC v. Cohen, 332 F. Supp. 3d 575, 591 (E.D.N.Y. 2018), the court observed that "the statute of limitations runs from when Defendants allegedly engaged in misconduct, not when they received compensation in connection with that misconduct."   That line-drawing principle has no bearing here, as the misconduct and receipt of compensation occurred simultaneously when the Magna Defendants fraudulently sold unregistered stock.   Similarly misplaced is the Magna Defendants' reliance on Grondahl v. Merritt & Harris, Inc., 964 F.2d 1290 (2d Cir. 1992), which teaches that the limitations period in securities cases starts running once the parties "committed themselves"--"in the classical contractual sense"-- "to complete the purchase or sale" of the relevant securities, id. at 1294 (quoting Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 891 (2d Cir. 1972)).   The December 2012 meeting only concerned Magna and Zirk's plan to put the Lustros I Note scheme in motion:   it did not involve any agreements contractually committing Magna to sell Lustros securities to future investors, which is the "commitment" that matters under Grondahl.   As such, Grondahl does not help the Magna Defendants.

§ 10(b), Rule 10b-5(a) and (c), and Securities Act §§ 17(a)(1)
and (3).  (Compl. ¶¶ 165-70; Opp. at 10-14, 17-18.)[3]

Exchange Act § 10(b) and Rule 10b-5(a) and (c) prohibit
using any "device, scheme, or artifice to defraud" or any "act,
practice, or course of business which operates . . . as a fraud
or deceit upon any person, in connection with the purchase or
sale of any security."  15 U.S.C. § 78j(b); 17 C.F.R.
§ 240.10b-5.  Likewise, Securities Act §§ 17(a)(1) and (3)
prohibit any "device, scheme, or artifice to defraud" and any
"transaction, practice, or course of business which operates
. . . as a fraud or deceit."  15 U.S.C. § 77q(a)(1), (3).

Together, Exchange Act § 10(b), Rule 10b-5(a) and (c), and
Securities Act § 17(a)(1) and (3) "create what courts have
called 'scheme liability' for those who, with scienter, engage
in deceitful conduct."  SEC v. Jean-Pierre, No. 12 Civ. 8886
(LGS), 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015).  Scheme
liability requires showing that "[d]efendants . . . participated

---

[3]    In their brief, the Magna Defendants claim that they cannot
decipher how the SEC's claims map onto the various transactions
challenged in the Complaint, because the Complaint's "Counts"
section does not address the claims on a transaction-by-
transaction basis.  (Magna Br. at 10-11.)  Although the Court
agrees that the "Counts" section is not an exemplar of clarity,
the Complaint, taken as a whole, gives adequate notice as to
which causes of actions relate to each transaction.  To the
extent the SEC seeks to amend its Complaint in the wake of this
decision, the Court nevertheless recommends that the SEC replead
its "Counts" section or otherwise make explicit which
transactions are targeted in each cause of action.

in an illegitimate, sham or inherently deceptive transaction where [their] conduct or role ha[d] the purpose and effect of creating a false appearance." SEC v. CKB168 Holdings, Ltd., 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016) (citation and internal quotation marks omitted).  To state a scheme liability claim, the SEC must allege "that defendants: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." Id. (citation and internal quotation marks omitted).

### i. Deceptive or Manipulative Conduct

Manuel and Magna argue that the scheme liability claims against them should be dismissed as to Lustros I and II because neither Defendant engaged in any deceptive or manipulative conduct.  (Magna Br. at 13 n.6, 13-15.)  The Court disagrees. Although Zirk and his associates were the ones who allegedly created the fake Lustros documents, the Complaint need not establish that Magna and Manuel "participated in each and every aspect of the fraudulent scheme" to withstand a Rule 12(b)(6) motion. SEC v. Wey, 246 F. Supp. 3d 894, 916 (S.D.N.Y. 2017). Rather, the SEC must only allege that Magna and Manuel engaged in deceptive conduct that contributed to the larger scheme. Id. The Complaint meets that burden by alleging that Magna and Manuel condoned the creation of the falsified Lustros documents and used them to facilitate the sale of Lustros shares through

18

bogus registration exemptions.  (See, e.g., Compl. ¶¶ 55-61, 69, 78, 80, 82, 85-87, 106, 108.)

ii. Scienter

Scheme liability under § 17(a)(1) and Rule 10b-5(a) and (c) requires alleging scienter or facts giving rise to a "strong inference of fraudulent intent." Wey, 246 F. Supp. 3d at 916 (quoting Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)). For claims under § 17(a)(3), the SEC must only plead negligence, not scienter. Id. at 917.

The SEC may establish scienter either by alleging "that defendants had both motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." Novak, 216 F.3d at 307 (quoting Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995)). The Court of Appeals has defined recklessness as "highly unreasonable" conduct demonstrating "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. at 308 (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978)).

In the Complaint, the SEC does not allege scienter through an improper motive theory, relying instead on circumstantial evidence of conscious misbehavior and recklessness. See ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase

19

Co., 553 F.3d 187, 198-99 (2d Cir. 2009) (noting that if the plaintiff "cannot make the motive showing . . . , the strength of the circumstantial allegations must be correspondingly greater" to support a finding of scienter (citation and internal quotation marks omitted)).

Disregarding the allegations pleaded on information and belief, the Court finds that the SEC has adequately alleged scienter against Magna and Manuel with respect to the Lustros I and II transactions.[4]  Most significantly, the SEC alleges that Manuel and Magna had actual knowledge that the Lustros Notes were fake based on the December 2012 meeting where Zirk told Manuel that Lustros had no outstanding convertible debt and that Zirk would transfer debt Lustros owed him to Company-1, a purported third-party.  (Compl. ¶¶ 55-59, 61.)  The Complaint also alleges glaring red flags alerting Magna that the Lustros Notes were fraudulent.  See Novak, 216 F.3d at 309 (plaintiffs may plead recklessness by showing that the defendant "ignored obvious signs of fraud").  Among other things, Magna sent all

---

[4]    Fraud allegations based on information and belief typically only satisfy Rule 9(b) if they concern matters "peculiarly within the opposing party's knowledge" and if the plaintiff provides "a statement of facts upon which the belief is founded."  Luce v. Edelstein, 802 F.2d 49, 55 n.1 (2d Cir. 1986) (citation and internal quotation marks omitted).  The SEC makes several information-and-belief allegations unaccompanied by a statement of foundational facts.  (See, e.g., Compl ¶¶ 56, 92, 95, 106.)  The Court declines to consider those allegations.

its diligence questions regarding Company-1 to Lustros, received indicators that Company-1's purported owner and executive was tied to Lustros, and was told that Lustros was the entity receiving the proceeds from the note transactions. (Compl. ¶¶ 78-82, 107-08.)   Taken together, these allegations raise a strong inference of conscious misbehavior as to Manuel and Magna, thereby satisfying § 17(a)(1) and Rule 10b-5(a) and (c)'s scienter standard and § 17(a)(3)'s negligence standard.   See Wey, 246 F. Supp. 3d at 917 (allegations establishing scienter necessarily established negligence).

> iii.   Whether the SEC Alleged that Purchasers Were Defrauded Under § 17(a)(3)

The Magna Defendants also argue that the § 17(a)(3) claims fail because the SEC does not allege that the Lustros transactions "operate[d] . . . as a fraud or deceit on the purchaser," as the statute requires.   15 U.S.C. § 77q(a)(3); (Magna Br. at 22-24; Magna Reply at 7-8).   But as the Magna Defendants acknowledge, the SEC pleads that they sold stock to investors who were "unaware that the new shares were flooding the market as a result of transactions that violated the federal securities laws."   (Compl. ¶ 3.)   That is sufficient under § 17(a)(3).   See SEC v. Softpoint, Inc., 958 F. Supp. 846, 863 (S.D.N.Y. 1997) (Sotomayor, J.) (finding that intentionally selling unregistered securities falls within the scope of

Section 17(a)(3) because it "deceive[s] purchasers as to the legality of the stock issue and the financial stability of their investment"), aff'd, 159 F.3d 1348 (2d Cir. 1998).

Nor is there merit to the Magna Defendants' claim that if the Court finds their alleged conduct to fall within § 17(a)(3)'s purview, it would convert every § 5 claim into a fraud claim. (Magna Br. at 23-24.) Section 5 is a strict liability statute, meaning even unwitting sales of impermissibly unregistered stock constitute violations. See Softpoint, 958 F. Supp. at 859-60. To violate § 17(a)(3), however, the defendant also needs to engage in deceptive conduct, which, as alleged here, can include "[p]ulling the wool over the eyes of investors as to the registration status of the securities." Dietrich v. Bauer, 76 F. Supp. 2d 312, 332-33 (S.D.N.Y. 1999) (sustaining claims under Section 10(b) and Rule 10b-5).

c. NewLead II Transactions: Fraud Claims

With respect to the NewLead II transactions, The SEC asserts scheme liability claims against Hanover, MGP, Manuel, and the Pallas Defendants under Exchange Act § 10(b), Rule 10b-5(a) and (c), and Securities Act §§ 17(a)(1) and (3). (Compl. ¶¶ 165-170; see also Opp. at 10, 14-17.) The SEC also asserts § 10(b), Rule 10b-5(b), and § 17(a)(2) misstatement claims against Sason and Hanover and aiding and abetting claims against

Manuel and the Pallas Defendants.  (Compl. ¶¶ 159-64, 176-83;
see also Opp. at 18-20.)  All these claims are dismissed.

### i. Scheme Liability

The Court finds that the SEC's NewLead II scheme liability
claims do not adequately allege deceptive acts or scienter.
Those claims are therefore dismissed.

### 1. Deceptive or Manipulative Conduct

As noted above, stating a claim for scheme liability
requires pleading that the defendants contributed to a deceptive
or sham transaction.  CKB168 Holdings, Ltd., 210 F. Supp. 3d at
445.  Although the Complaint pleads that the NewLead II deal
displayed a number of irregularities, it has not alleged enough
factual content to support an inference of fraud.

The key to the NewLead II scheme was an alleged agreement
whereby NewLead would issue a fake $6 million note to Pallas
that NewLead never intended to pay down, knowing the debt would
be sold to Hanover at face value and then exchanged for NewLead
stock, and that Pallas would kick back to NewLead part of the $6
million it received from Hanover.  (See Compl. ¶¶ 132-33, 136,
138.)  But unlike its Lustros allegations, the SEC does not lay
out any specific factual details regarding the alleged agreement
to implement this scheme, including, for example, when it was
discussed or finalized.  Subject to the caveats discussed below,
the SEC simply alleges in conclusory fashion that the NewLead II

transactions were a sham designed to facilitate a public offering of NewLead stock.  By themselves, those vague and factually unsubstantiated allegations fall short of establishing fraud under Rule 9(b).  Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) ("A plaintiff cannot base securities fraud claims on speculation and conclusory allegations.").

Cutting out its conclusory allegations, the Complaint primarily alleges that the NewLead II Note's fraudulence is exposed by inconsistencies about which asset--the Viking Plant or Mine--was being sold in exchange for the note.  For example, the NewLead II Note allegedly stated that it was payment for the Viking Mine and attached the mine sale contract as an exhibit, but the mine had already been sold in the NewLead I transaction. (Compl. ¶¶ 135-36.)  Relatedly, when Hanover bought the NewLead II Note, NewLead told Manuel that the plant, not the mine, was the underlying asset. (Id. ¶ 140.)  And in a press release issued after the NewLead II Note allegedly matured, NewLead described the consideration it paid for the mine and planned to pay for the plant but did not mention the note.  (Id. ¶ 144.)

The Court finds that these and related allegations do not support a plausible inference of fraud.  The Court reaches this conclusion for a few reasons.  First, notwithstanding the mixed signals about what consideration supported the NewLead II Note, the SEC itself pleads that the note represented "$6 million in

24

financing related to the Viking Prep Plant," not the Viking
Mine. (Id. ¶ 132.) That allegation is supported by NewLead's
statement to Manuel that the plant was the relevant asset (id.
¶ 140), as well as allegations describing how the three NewLead
Notes fit together as a $45 million package deal for two assets:
$15 million for the Viking Mine and $30 million for the Viking
Plant. (Id. ¶ 119.) Specifically, the NewLead I Note had a
value of $15 million and fully paid for the Viking Mine, and the
NewLead III Note was "partial consideration" for the Viking
Plant and had a face value of $24 million--i.e, $6 million less
than the full $30 million price for the Viking Plant. (Id.
¶¶ 122-23.) To round out the full $45 million purchase price,
the NewLead II Note had a value of $6 million: the exact balance
left on payment for the Viking Plant after accounting for
NewLead III. (Id. ¶¶ 132-33.)

With the foregoing in mind, the Court concludes that the
confusion in the NewLead II documents regarding the underlying
asset reflects a significant abnormality but, without more, does
not plausibly support the SEC's much larger inference that
"there was no $6 million debt" and that the note was part of a
deceptive scheme to "obtain[] money from unsuspecting investors"
(Opp. at 13). See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
("Where a complaint pleads facts that are merely consistent with
the defendant's liability, it stops short of the line between

possibility and plausibility of entitlement to relief."
(citation and internal quotation marks omitted)).

The SEC also alleges that on September 26, 2013--the date
that appears on the face of the NewLead II Note--NewLead
published a press release stating that it had only entered
"advanced negotiations" concerning the Viking Plant.  (Compl.
¶ 135, 143.)  Building on those allegations, the SEC implies
that the NewLead II Note could not have been consideration for
the plant, as the note was allegedly issued before negotiations
for the plant were complete.  (See Opp. at 15.)  But any
inference of fraud arising from the timing of the September 26
press release is neutralized by the SEC's allegation that the
actual issuance date for the NewLead II Note was October 13,
2013--weeks after NewLead reported that it was in "advanced
negotiations" for the plant--and that the note was then
backdated to September 26.  (Compl. ¶¶ 133-34.)  This alleged
timeline shows that the note was issued after negotiations
concluded and, without more, does not plausibly cast doubts on
the note's legitimacy.[5]

---

[5]    The Court notes that although backdating contributed to an
inference of fraud on the Lustros Notes, where exemption from
the registration requirements depended on satisfying holding
period requirements, the SEC has not alleged why backdating the
NewLead II Note was inherently deceptive.

## 1. Scienter

The Complaint also falls short in pleading a strong inference of fraudulent intent.  The allegations against Pallas, Sharma, and Salviola hinge on the inconsistencies examined above regarding what asset underlies the NewLead II Note and are otherwise entirely conclusory. (See, e.g., Compl. ¶¶ 136-37.)

As to Manuel and Hanover, the SEC also alleges that NewLead sent Manuel an email calling the NewLead II Note "cash" and that Manuel deliberately or recklessly failed to review NewLead press releases regarding the Viking asset transactions and to perform diligence on Sharma, who had a prior fraud conviction.  (Compl. ¶¶ 142-47.)  But the SEC does not allege any facts as to why the "cash" reference was suspicious, and, with respect to the diligence failures, even if the SEC had plausibly alleged that the NewLead II transactions formed part of a deceptive scheme, alleging that Manuel "would have uncovered the truth" if he "had performed due diligence adequately" establishes "negligence at best," not scienter.  In re WRT Energy Sec. Litig., No. 96 Civ. 3610 (JFK), 1999 WL 178749, at *10 (S.D.N.Y. Mar. 31, 1999); see also Hart v. Internet Wire, Inc., 145 F. Supp. 2d 360, 368-39 (S.D.N.Y. 2001) ("[E]ven an egregious failure to gather information will not establish 10b-5 liability as long as the

defendants did not deliberately shut their eyes to the facts."
(citation and internal quotation marks omitted).[6]

### ii. Misstatement Liability

The SEC asserts that Sason and Hanover violated § 10(b),
Rule 10b-5(b), and § 17(a)(2) by misrepresenting that the
NewLead debts were legitimate in an affidavit Sason submitted at
the fairness proceedings for the § 3(a)(10) exemption.  (Compl.
¶¶ 150-51.)  Like the NewLead II scheme liability claims, the
misstatement claims also fail.

To state a claim under § 10(b) and Rule 10b-5(b), the SEC
must allege that Sason made a material representation or
omission with scienter in connection with the purchase or sale
of securities.  SEC v. Frohling, 851 F.3d 132, 136 (2d Cir.
2016).  The elements are essentially the same under § 17(a)(2),
except that the SEC need not prove scienter.  SEC v. Wey, 246 F.
Supp. 3d 894, 910 (S.D.N.Y. 2017).  A defendant makes a false
statement with scienter when he has "intent to deceive,
manipulate, or defraud."  Frohling, 851 F.3d at 136 (quoting SEC
v. Obus, 693 F.3d 276, 286 (2d Cir. 2012)).

The SEC's misstatement claims fail for two reasons.  First,
as held above, the SEC failed plausibly to allege that the

---

[6]     Although a finding of negligence satisfies the culpability
standard under § 17(a)(3), that claim still fails based on the
SEC's failure adequately to allege that NewLead II was a
deceptive scheme.

NewLead II Note was a sham.  That finding is fatal to the misstatement claims because Sason's representation as to the bona fides of the NewLead II debt cannot have been false or misleading unless the note was illegitimate.  Second, with respect to the § 10(b) and Rule 10b-5(b) claims, the SEC failed to allege that Sason and Hanover acted with scienter.  As with the scheme liability claim against Manuel, the SEC tries to predicate scienter on Sason's alleged failure to review the NewLead II documents and diligence file. (Compl. ¶¶ 149-51.) Those allegations, however, fall short of establishing intentional or reckless misconduct.  See In re WRT Energy Sec. Litig., 1999 WL 178749, at *10.

### iii.  Aiding and Abetting Liability

The SEC asserts aiding and abetting claims against Manuel and the Pallas Defendants in connection with the NewLead II transactions.  To state an aiding and abetting claim, the plaintiff must plead: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009) (citation and internal quotation marks omitted).  Because the SEC failed to state claims for scheme or misstatement liability, there is no primary

violation to support aiding and abetting liability.  The aiding
and abetting claims are therefore dismissed.

      d. Section 5 Claims

To state a claim for a violation of § 5, the SEC must
allege that (1) no registration statement was in effect for the
securities at issue; (2) the defendant sold or offered the
securities; and (3) interstate transportation, communication, or
the mails were used in connection with the offer or sale.  SEC
v. Bronson, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014).  Section 5
is a strict liability statute requiring no showing of scienter
or negligence.  Id.  Once the SEC alleges a prima facie
violation of § 5, the defendant bears the burden of proving the
applicability of an exemption.  SEC v. Cavanagh, 445 F.3d 105,
111 n.13 (2d Cir. 2006).

Defendants may violate § 5 even if they themselves do not
offer or sell securities, provided they were "necessary
participant[s]" in the unregistered distribution.  SEC v.
Mattera, 11 Civ. 8323 (PKC), 2013 WL 6485949, at *10 (S.D.N.Y.
Dec. 9, 2013).  The "necessary participant" inquiry assesses
"whether, but for the defendant's participation, the sale
transaction would not have taken place--in other words, whether
the defendants' acts were a substantial factor in the sale
transactions."  Id. (citation and quotation marks omitted)).

The Magna and Pallas Defendants do not dispute that the SEC discharged its prima facia burden by alleging that the Lustros and NewLead securities were unregistered, offered for sale, and that interstate communications were used in connection with the sale.  Instead, they make two limited objections:  Manuel and Sason contend that the SEC has not pleaded their status as necessary participants in any stock distribution, and the Pallas Defendants argue that the SEC failed to establish the inapplicability of registration exemptions.  (See Magna Br. at 33-34; Memorandum of Law in Support of the Pallas Defendants' Motion to Dismiss, dated May 6, 2019 ("Pallas Br.") [dkt. no. 54] at 13-16.)  The Court considers each argument in turn.

First, the Court concludes that Sason and Manuel were necessary participants in each distribution because they played key roles in the chain of debt and stock acquisitions needed to bring the distributions to fruition.  Among other things, Sason approved each of those transactions (Compl. ¶¶ 70, 83, 99, 148) and Manuel either originated, negotiated, or assisted in them (see, e.g., id. ¶¶ 55-61, 69, 78, 95, 97, 106, 108, 139-40, 145, 146, 148).  That degree of involvement is enough for § 5 liability to attach.  See SEC v. Mattera, No. 11 Civ. 8323 (PKC), 2013 WL 6485949, at *10-11 (S.D.N.Y. Dec. 9, 2013) (defendant "was a substantial factor" in unregistered securities transactions and subject to § 5 liability by acting as a liaison

31

with broker-dealers and assisting in the creation of an LLC for purchasing securities); Frohling, 851 F.3d at 137 (lawyer who wrote opinion letters that facilitated unregistered stock sales was a necessary participant).

The Court also rejects the Pallas Defendants' argument as to the applicability of an exemption. As noted above, the SEC is only required to establish a prima facie § 5 violation, which it has done. "Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption." Cavanagh, 445 F.3d at 111 n.13. On a motion to dismiss, courts may only dismiss § 5 claims based on a registration exemption if the exemption's applicability is clear on the face of the complaint. SEC v. Bronson, 14 F. Supp. 3d. 402, 411-12 (S.D.N.Y. 2014). Although the Court has found that the SEC failed to establish that the NewLead II scheme was a fraud, it cannot conclude from the Complaint that a registration exemption clearly applied to any transaction, including the NewLead II deal. Accordingly, the § 5 claims are sustained.

e. Control Person Liability

The SEC asserts control person liability against Sason under Exchange Act § 20(a) for the Magna Entities' violations of § 10(b) and Rule 10b-5. To state a claim for control person liability, the SEC must plead facts showing: "(1) a primary violation by the controlled person, (2) control of the primary

32

violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A., No. 17 Civ. 4576, 2019 WL 4600934, at *7 (S.D.N.Y. Sept. 23, 2019) (quoting Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014)).

With respect to the Lustros fraud claims, the SEC has established a primary violation by Magna (see supra § III.b) and Sason's control of Magna (Compl. ¶¶ 20, 22, 44), but not Sason's culpable participation in Magna's fraud. See Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) (establishing "culpable participation" requires "particularized facts of the controlling person's conscious misbehavior or recklessness" (citation and internal quotation marks omitted)). The SEC's only allegations as to Sason's culpability are that he approved the Lustros Notes transactions without reviewing the deal documents or diligence materials. (Compl. ¶¶ 70, 83.) At most, that establishes negligence, not conscious misbehavior or recklessness. See In re WRT Energy Sec. Litig., No. 96 Civ. 3610 (JFK), 1999 WL 178749, at *10 (S.D.N.Y. Mar. 31, 1999). The Lustros-related control person claim is therefore deficient.

The SEC has also failed to establish Sason's control person liability for the alleged NewLead II fraud. As discussed above,

the SEC has not stated a primary violation of the securities laws with respect to the NewLead II transactions.  (See supra § III.c.)  Without a primary violation, the § 20(a) claim necessarily collapses.  See In re Merrill Lynch Auction Rate Sec. Litig., 851 F. Supp.2d 512, 530 (S.D.N.Y. 2012).

## IV. Conclusion

To the extent they are not addressed above, the Court has considered the parties' other arguments and finds them unavailing.  Defendants' motions to dismiss are GRANTED in part and DENIED in part.  The scheme liability claims under Exchange Act § 10(b), Rule 10b-5(a) and (c), and Securities Act §§ 17(a)(1) and (3) are sustained as to the Lustros I and II Note transactions, and the § 5 claims are sustained as to all transactions.  All other claims are dismissed.  The Clerk of the Court is directed to close the open motions [dkt. nos. 49, 53].


SO ORDERED.


Dated:    New York, New York
          January 14, 2020

          _____
          LORETTA A. PRESKA
          Senior United States District Judge