- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | No. 19 Civ. 1459 (LAP) |
| Plaintiff, | |
| v. | |
| JOSHUA SASON, MARC MANUEL, KAUTILYA (a/k/a TONY) SHARMA, PERIAN SALVIOLA, MAGNA MANAGEMENT, LLC (f/k/a MAGNA GROUP, LLC), MAGNA EQUITIES II, LLC (f/k/a HANOVER HOLDINGS I, LLC), MG PARTNERS, LTD., AND PALLAS HOLDINGS, LLC, | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### MEMORANDUM OF LAW IN SUPPORT OF THE MAGNA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Marjorie J. Peerce
David L. Axelrod
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200

*Attorneys for Defendant Marc Manuel*

Michael H Ference
D. Scott Furst
SICHENZIA ROSS FERENCE LLP
1185 Avenue of the Americas, 31st Floor
New York, NY 10036
(212) 930-9700

*Attorneys for Defendants Joshua Sason, Magna Management, LLC (f/k/a Magna Group, LLC), Magna Equities II, LLC (f/k/a Hanover Holdings I, LLC), and MG Partners, Ltd.*

# TABLE OF CONTENTS

                                                                **Page**

I.    INTRODUCTION ................................................................................................. 1

II.   PROCEDURAL HISTORY.................................................................................. 3

III.  APPLICABLE LAW .......................................................................................... 3

     A.   Legal Standard at Summary Judgment ...................................................... 3

     B.   Scheme Liability Under Section 10(b) and Section 17(a)(1)-(3)................. 5

     C.   Section 5 of the Securities Act of 1933 ..................................................... 6

IV.  THE FACTS DEMONSTRATE MANUEL AND THE MAGNA ENTITIES WERE UNWITTING VICTIMS IN ZIRK'S LUSTROS FRAUD................................. 7

     A.   There is No Credible Evidence Manuel or the Magna Entities Used a Fraudulent Device ......................................................................................................... 7

     B.   There is No Credible Evidence that Manuel and the Magna Entities Possessed Scienter ...................................................................................................... 10

         1.   Zirk's Testimony is Contradicted by His Numerous Prior Statements ............... 11

         2.   Zirk's Testimony Is Not Corroborated by any Documentary Evidence............. 14

         3.   Zirk's Testimony is Not Supported by any Other Witness ................................ 17

         4.   Zirk's Testimony is Entirely Self-Serving and He Engaged in New Lies During His Deposition.................................................................. 18

     C.   There is No Evidence Supporting Recklessness........................................ 21

V.   THE EVIDENCE ESTABLISHES THAT THE NEWLEAD TRANSACTION WAS EXEMPT FROM REGISTRATION ................................................................. 23

VI.  NEITHER SASON NOR MANUEL WAS A "NECESSARY PARTICIPANT" AND A "SUBSTANTIAL FACTOR" IN ANY SALE OF LUSTROS OR NEWLEAD STOCK.. 24

         1.   Sason Was Not a Necessary Participant for Magna's Sale of Any Lustros Stock ................................................................................. 26

         2.   Sason Was Not a Necessary Participant for Magna's Sale of Any NewLead Stock .............................................................................. 27

         3.   Manuel Was Not a Necessary Participant for Magna's Sale of Any Lustros Stock ................................................................................. 28

         4.   Manuel Was Not a Necessary Participant for Magna's Sale of Any NewLead Stock .............................................................................. 30

VII. CONCLUSION................................................................................................ 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).............................................4

*Aziz Zarif Shabazz v. Pico*,
994 F. Supp. 460 (S.D.N.Y. 1998) (Sotomayor, J.)...................................................4

*Bentley v. AutoZoners*,
935 F.3d 76 (2d Cir. 2019).....................................................................................5, 14

*Brucker v. Thyssen–Bornemisza Europe N.V.*,
424 F. Supp. 679 (S.D.N.Y. 1976) ........................................................................7, 24

*Chapel Investments, Inc. v. Cherubim Interests, Inc.*,
177 F. Supp. 3d 981 (N.D. Tex. 2016) ........................................................................7

*D'Amico v. City of N.Y.*,
132 F.3d 145 (2d Cir. 1998).........................................................................................4

*Frost v. New York City Police Department*,
980 F.3d 231 (2d Cir. 2020)...................................................................................... 4-5

*Gill v. Teva Respiratory, LLC*,
No. 3:16-cv-00299 (JAM), 2017 U.S. Dist. LEXIS 212072 (D. Conn. Dec. 27,
2017) ..............................................................................................................................5

*Hart v. Internet Wire, Inc.*,
145 F. Supp. 2d 360 (S.D.N.Y. 2001)..................................................................21, 22

*Hawkins v. Shapiro*,
No. 9:06-CV-1518 (NAM/GHL), DE 40 (N.D.N.Y. Mar. 12, 2009).......................5

*Jeffreys v. City of N.Y.*,
426 F.3d 549 (2d Cir. 2005)............................................................................... *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)...........................................4

*Oceana Capitol Grp. v. Red Giant Intm't, Inc.*,
150 F. Supp. 3d 1219 (D. Nev. 2015)................................................................7, 23, 24

*Omor v. City of N.Y.*,
   No. 13-CV-2439 (RA), 2015 U.S. Dist. LEXIS 24135 (S.D.N.Y. Feb. 27,
   2015) ...........................................................................................................................4, 10

*Rojas v. Roman Catholic Dioceses of Rochester*,
   660 F.3d 98 (2d Cir. 2011)..........................................................................................4

*SEC v. Bio Defense Corporation*,
   No. 12 Civ. 11669 (DPW), 2019 WL 7578525 (D. Mass. Sept. 6, 2019) .............................27

*SEC v. Boock*,
   No. 09 Civ. 8261, 2011 U.S. Dist. LEXIS 95363 (S.D.N.Y. Aug. 25, 2011) ........................25

*SEC v. Bremont*,
   954 F. Supp. 726 (S.D.N.Y. 1997) ...............................................................................6

*SEC v. Cavanagh*,
   155 F.3d 129 (2d Cir. 1998)..................................................................................6, 28

*SEC v. CKB168 Holdings, Ltd.*,
   210 F. Supp. 3d 421 (E.D.N.Y. 2016) .........................................................................25

*SEC v. Elliott*,
   No. 09-civ-7594 (RJH), 2011 U.S. Dist. LEXIS 91946 (S.D.N.Y. Aug. 11,
   2011) ..........................................................................................................................6

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996).......................................................................................5

*SEC v. Frohling*,
   851 F.3d 132, 137 (2d Cir. 2016).................................................................................29

*SEC v. Gallison*,
   No. 15 Civ 5456 (GBD), 2022 U.S. Dist. LEXIS 35810 (S.D.N.Y. March 1,
   2022) ........................................................................................................................25

*SEC v. Genovese*, 2021 U.S. Dist. LEXIS 58323 (S.D.N.Y. Mar. 26, 2021).........................25, 28

*SEC v. Holschuh*,
   694 F.2d 130 (7th Cir. 1982) .......................................................................................29

*SEC v. Jammin Java Corp.*,
   No. 2:25 Civ 08921, 2016 U.S. Dist. LEXIS 184773 (C.D. Ca. July 18, 2016) ...................27

*SEC v. Mattera*,
   No. 11 Civ. 8323, 2013 U.S. Dist. LEXIS 174163 (S.D.N.Y. Dec. 9, 2013)...................25, 29

*SEC v. Monarch Funding Corp.*,
192 F.3d 295 (2d Cir. 1999)..................................................................5

*SEC v. Nadel*,
97 F. Supp. 3d 117 (E.D.N.Y. 2015) .......................................................5

*SEC v. Roor*,
99 Civ. 3372 (HB), 2004 U.S. Dist. LEXIS 17416 (S.D.N.Y. 2004)...................5, 6

*SEC v. Sason*,
433 F. Supp. 3d 496 (S.D.N.Y. 2020).................................................. 24-25

*SEC v. Sourlis*,
851 F.3d 139 (2d Cir. 2016)...................................................................6

*SEC v. StratoComm Corp.*,
2 F.Supp.3d 240 (N.D.N.Y. 2014) .........................................................25

*SEC v. Treadway*,
430 F. Supp. 2d 293 (S.D.N.Y. 2006).......................................................6

*SEC v. Universal Express, Inc.*,
2007 U.S. Dist. LEXIS 65009 (S.D.N.Y. Aug. 30, 2007) ......................6, 25

*SEC v. Verdiramo*,
890 F. Supp.2d 257 (S.D.N.Y. 2011).......................................................25

*Torres v. Carry*,
800 F. Supp. 2d 577 (S.D.N.Y. 2011)...................................................5, 14

*Walker v. Carter*
210 F. Supp. 3d 487 (S.D.N.Y. 2016).......................................................5

**Statutes**

18 U.S.C. § 1001 ...................................................................................14

Equal Access to Justice Act, 28 U.S.C. § 2412 .........................................2

Securities Act Section 3(a)(10), 15 U.S.C. § 77c(a)(10) .......................6, 23

Securities Act Section 5, 15 U.S.C. § 77e ......................................... *passim*

Securities Act Section 17(a)(1) and (3), 15 U.S.C. § 77q(a)(1) and (3) .....3, 5

Securities Exchange Act ...........................................................................7

Securities Exchange Act Section 10(b), 28 U.S.C. § 78j..........................3, 5

**Other Authorities**

Fed. R. Civ. P. 56(c) ..................................................................................................3

Fed. R. Civ. P. 56(e) ..................................................................................................4

Fed. R. Crim. P. 35 ........................................................................................19, 20, 21

Rule 10b-5 ..............................................................................................................3, 5

Rule 17(a)(1) and (3) ..................................................................................................3

## <u>Commonly Used Terms and Definitions in this Memorandum</u>

Plaintiff United States Securities and Exchange Commission ("SEC" or the "Commission")

United States Department of Justice ("DOJ")

Defendant Marc Manuel ("Manuel")

Defendant Joshua Sason ("Sason")

Defendant Magna Management, LLC f/k/a Magna Group, LLC ("Magna")

Defendant Magna Equities II, LLC (f/k/a Hanover Holdings I, LLC ("Hanover")

Defendant MG Partners, Ltd. ("MGP")

Magna, Hanover, and MGP collectively are the "Magna Entities"

FBI Interview Report Form 302 ("302")

Lustros, Inc. ("Lustros") was a U.S. entity engaged in mining operations in Chile at all relevant times.

NewLead Holdings Ltd. ("NewLead") was an entity based in Greece engaged in the shipping and mining industries.

Izak Zirk de Maison/Engelbrecht ("Zirk") was at all relevant times, Lustros' Chief Executive Officer and/or the a member of the Board of Directors for Lustros.

Trisha Malone ("Malone") was at all relevant times Lustros' Chief Financial Officer.

Gonzalo Troncoso ("Troncoso") was at all relevant times, Lustros' Chief Executive Officer and/or President

Larry Zielke ("Zielke") was at all relevant times Lustros' General Counsel

Ari Sason ("Ari") was Magna's Co-Head of Structured Investments responsible for Lustros.

Matthew Turlip ("Turlip") was a due diligence researcher at Magna.

Andrew Reggev ("Reggev") was a due diligence researcher at Magna.

James Alfaro ("Alfaro") was a broker-dealer working for Maxim Group LLC ("Maxim") who first introduced Magna to Lustros.

Statement of Undisputed Material Fact ("SUMF")

Walker River Investments ("Walker River") was a company that Zirk controlled but, according to paperwork filed with the State of Wyoming, was owned and controlled by Margaret Jameson ("Jameson").

The United States Attorney's Office for the Southern District of New York ("USAO-SDNY").

Defendants Sason, Manuel, and the Magna Entities (collectively, the "Magna Defendants") submit this Memorandum of Law in support of their motion for summary judgment in their favor as to Counts 3, 4, 6, and 8 of the Complaint.

## I.    <u>INTRODUCTION</u>

Discovery has established that the SEC has no case against the Magna Defendants and the Court should put an end to this ill-conceived pursuit. The SEC's Complaint alleges that in 2012 and 2013 the Magna Defendants participated in two separate penny stock securities fraud schemes involving different issuers—Lustros and NewLead. Before discovery even began this Court dismissed the NewLead-related fraud claims, finding that the SEC failed to "adequately allege deceptive acts or scienter" and dismissed all fraud claims against Sason. Dkt. 67 at 23, 29 and 33. Discovery has established that the remaining Lustros-related fraud claims are just as faulty.

The SEC's Lustros fraud theory is simple. The SEC alleges that in December 2012, Manuel, on behalf of the Magna Defendants, agreed to a scheme whereby Lustros created a sham note held by an alleged non-affiliate of Lustros that it would sell to Magna, who could then convert the note to Lustros stock to sell on the open market. Dkt. 67 at 4-6. The SEC's entire Lustros theory relies on the wholly inconsistent, uncorroborated, and self-serving lies of a convicted securities fraudster looking for a sentencing reduction. Since 2014 when that fraudster, Zirk, was arrested for numerous wholly unrelated securities fraud schemes (carried out at the exact same time as the transactions at issue here), he has told a web of lies about Manuel, the Magna Defendants, and all the other witnesses in this case that are not corroborated by any documents or other witness testimony. Unbothered by facts, documents, truth, or even logic, Zirk's goal is unmistakable: relief from his 151-month prison sentence.

Discovery has fully exposed Zirk's lies.[1] The record shows that the Magna Defendants were Zirk's unwitting victims in a scheme that defrauded Magna for Zirk's and Lustros' benefit. Besides Zirk's fraught testimony, there is not a single piece of evidence that supports the conclusion the Magna Defendants were complicit in Zirk's fraud. To the contrary, the record shows the Magna Defendants conducted legitimate and serious due diligence and Zirk directed his Lustros team to lie to Magna to convince Magna that the deal complied with the securities laws. Discovery produced by the Commission even demonstrated that years earlier Zirk had engaged in the exact same type of fraud scheme, contrary to his sworn testimony that Manuel had concocted the Lustros scheme and Zirk had never engaged in anything like it.

The Second Circuit has repeatedly found that a trial court need not accept at summary judgment testimony that is "largely unsubstantiated by any other direct evidence" and "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made[.]" *See, e.g.*, *Jeffreys v. City of N.Y.*, 426 F.3d 549, 555 (2d Cir. 2005). That is exactly the conclusion the facts compel here. Zirk's testimony is so untrustworthy that it does not create a genuine dispute of material fact.

The record also demonstrates the Magna Defendants did not violate Section 5(a) or 5(c) with respect to the sale of NewLead stock, and that Sason and Manuel were not necessary participants and substantial factors in the sale of Lustros or NewLead securities.

---

[1] These lies were fully apparent to the SEC and USAO-SDNY prior to filing this lawsuit. Zirk attempted to sell this story to the USAO-SDNY who declined to bring a criminal case. In the pre-filing Wells process, the SEC permitted the Magna Defendants to review select parts of the SEC's file but refused to allow the Magna Defendants to review the 302s and even worse did not disclose Zirk's 2016 sworn SEC investigative testimony that contradicts the allegations in the Complaint. SUMF ¶ 61 n.3. At the close of this case, the Magna Defendants will seek the payment of attorney's fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## II.    PROCEDURAL HISTORY

The Complaint originally charged the Magna Defendants with securities violations in relation to: (1) Magna's 2012-2013 purchase of Lustros debt and subsequent sale of Lustros stock, and (2) Magna's 2013 purchase of NewLead debt and subsequent sale of NewLead stock. With respect to both, the SEC alleged primary and secondary violations of Section 10(b) of the Securities Exchange Act and Rules 10b-5(a) and (c) thereunder, Section 17(a)(1) and (3) of the Securities Act, and Section 5 of the Securities Act. Subsequently, the Court granted *in part* the Magna Defendants' motion to dismiss. Accordingly, the only claims remaining are scheme liability claims related to the Lustros debt transaction against Manuel and Magna under Section 10(b), Rule 10b-5(a) and (c), and 17(a)(1) and (3), and the Section 5 claims against all Magna Defendants for both transactions.

Despite being interviewed and re-interviewed by DOJ and the SEC from 2014 to 2018 and admitting that he directed his Lustros team to create notes to sell to Magna and lie about Walker River, the SEC did not commence an enforcement action against Zirk based on the facts alleged in the Complaint. *See* SUMF ¶ 96. Likewise, the Commission did not commence an enforcement action against Malone, Troncoso, or anyone else from Lustros that Zirk claimed was involved in the fraud. *See id*. ¶¶ 97-103. Nor has DOJ charged Zirk with any crimes based on these alleged facts. *See id*. ¶ 95.

## III.    APPLICABLE LAW

### A.    Legal Standard at Summary Judgment

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To defeat a summary judgment motion, the opposing party must

"come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56(e)). A genuine issue is present when the record would enable a reasonable trier of fact to return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Assertions that are "incoherent, contradictory, illogical, and unsupported" do not "establish a genuine dispute for trial[.]" *Omor v. City of N.Y.*, No. 13-CV-2439 (RA), 2015 U.S. Dist. LEXIS 24135, at *24-25 (S.D.N.Y. Feb. 27, 2015) (citing *Rojas v. Roman Catholic Dioceses of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011)).

Determining a witness' credibility is ordinarily the fact finder's responsibility and thus not appropriate for summary judgment. *See Jeffreys*, 426 F.3d at 553. However, at summary judgment the Court need not accept a version of events that is unreliable. *See id.* at 555. Rather, the nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998).[2]

In making this inquiry, courts are sensitive to whether the unsubstantiated testimony at issue is also self-serving. *See Frost v. New York City Police Department*, 980 F.3d 231, 245 (2d

---

[2] Indeed, it is appropriate for a court to disregard a witness' statements at summary judgment where those statements are "largely unsubstantiated by any other direct evidence" and "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made[.]" *Jeffreys*, 426 F.3d at 555 (2d Cir. 2005) (citation omitted); *see also Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 468-71 (S.D.N.Y. 1998) (Sotomayor, J.) ("when the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court at summary judgment may] pierce the veil of the complaint's factual allegations . . . and dismiss the claim.").

Cir. 2020). In such cases, "it will be impossible for a district court to determine whether the jury could reasonably find for the [non-movant], [] and thus whether there are any 'genuine' issues of material fact, without making some assessment of the [witness'] account." *Jeffreys*, 426 F.3d at 554. The *Jeffreys* standard applies to the testimony of any witness. *See, e.g.*, *Walker v. Carter* 210 F. Supp. 3d 487, 503-04 (S.D.N.Y. 2016) (disregarding at summary judgment non-party testimony that was contradictory, self-serving, and incredible). Courts in the Second Circuit have repeatedly granted summary judgment based on a credibility determination when, as is the case here, it is warranted by the evidence.[3]

### B.    Scheme Liability Under Section 10(b) and Section 17(a)(1)-(3)

"[T]he same elements required to establish a section 10(b) violation and a Rule 10b-5 violation suffice to establish a violation under sections 17(a)(1)-(3) of the [Securities] Act[.]" *SEC v. Nadel*, 97 F. Supp. 3d 117, 122 (E.D.N.Y. 2015). To prevail on a claim of scheme liability under Sections 10(b) and 17(a), the plaintiff must establish the defendant: (1) used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

Scienter "means intent to deceive, manipulate, or defraud, or at least knowing misconduct." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996). Scienter can also be established by "willful blindness." *SEC v. Roor*, 99 Civ. 3372 (HB), 2004 U.S. Dist. LEXIS 17416, *15

---

[3] *See, e.g.*, *Bentley v. AutoZoners*, 935 F.3d 76, 88 (2d Cir. 2019) (affirming summary judgment where witness' original and successive testimonies reflected contradictions without plausible explanation); *Torres v. Carry*, 800 F. Supp. 2d 577, 584 (S.D.N.Y. 2011) (granting summary judgment against plaintiff whose claims were supported only by the inmate's contradictory testimony); *Gill v. Teva Respiratory, LLC*, No. 3:16-cv-00299 (JAM), 2017 U.S. Dist. LEXIS 212072, at *4, 10 (D. Conn. Dec. 27, 2017) (granting summary judgment where evidence "quite devastatingly contradict[ed]" witness' account); *Hawkins v. Shapiro*, No. 9:06-CV-1518 (NAM/GHL), DE 40 at 22-23 (N.D.N.Y. Mar. 12, 2009).

(S.D.N.Y. 2004). Reckless conduct is "conduct that is highly unreasonable and represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at *21. This can be found through an "egregious refusal to see the obvious[,]" *SEC v. Treadway*, 430 F. Supp. 2d 293, 331-32 (S.D.N.Y. 2006), and/or the "fail[ure] to make even the slightest attempt to verify" a fraudulent transaction. *SEC v. Bremont*, 954 F. Supp. 726, 730 (S.D.N.Y. 1997).

C.      **Section 5 of the Securities Act of 1933**

Section 5 of the Securities Act makes it unlawful, directly or indirectly, to offer publicly or sell unregistered stock not covered by an exemption. *See* 15 U.S.C. § 77e; *SEC v. Sourlis*, 851 F.3d 139, 143 (2d Cir. 2016). To establish a prima facie Section 5 violation, the SEC must establish "(1) lack of a required registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." *Id.* (internal quotations and alterations omitted). Registration of a security is "transaction-specific" and applies to each offering or sale. *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998).

Liability for violations of Section 5 extends to those "necessary participants" who have "engaged in steps necessary to the distribution of [unregistered] security issues." *SEC v. Universal Express, Inc.*, 2007 U.S. Dist. LEXIS 65009, at *10 n.3 (S.D.N.Y. Aug. 30, 2007) (citations omitted). However, liability for violating Sections 5(a) and 5(c) attaches *only* if a defendant was a "necessary participant" and a "substantial factor" in the sale of the unregistered securities. *See, e.g.*, *SEC v. Elliott*, No. 09-civ-7594 (RJH), 2011 U.S. Dist. LEXIS 91946, *19 (S.D.N.Y. Aug. 11, 2011).

The Securities Act also provides, in Section 3(a)(10), an exemption for the sale of securities issued in exchange for bona fide claims against an issuer. 15 U.S.C. § 77c(a)(10). To obtain this

exemption from registration, the party seeking to sell the securities must obtain approval from a court following a fairness hearing. *See Oceana Capitol Grp. v. Red Giant Intm't, Inc.*, 150 F. Supp. 3d 1219, 1223 (D. Nev. 2015). Securities issued following a fairness hearing under Section 3(a)(10) are ***not*** subject to the requirements of the Exchange Act. *See Brucker v. Thyssen– Bornemisza Europe N.V.*, 424 F. Supp. 679, 691–92 (S.D.N.Y. 1976) (requirements of Exchange Act "were not meant to apply to judicially approved settlement agreements," because investors are "more than adequately protected by the procedures followed in the . . . judicially-approved settlement"); *see also Chapel Investments, Inc. v. Cherubim Interests, Inc.*, 177 F. Supp. 3d 981, 987 (N.D. Tex. 2016) (3(a)(10) exemption falls "entirely within the purview of the long-established court system").

## IV.  THE FACTS DEMONSTRATE MANUEL AND THE MAGNA ENTITIES WERE UNWITTING VICTIMS IN ZIRK'S LUSTROS FRAUD

Overwhelming documentary and testimonial evidence show that rather than being culpable participants, Manuel and the Magna Entities were unwitting victims in a fraud. The evidence also shows that this fraud was perpetrated by Zirk, a convicted securities fraudster serving a 151-month sentence, a serial liar, and a perjurer. Accordingly, the SEC cannot show that Manuel and the Magna Entities used a fraudulent device or possessed the requisite scienter.

### A.  There is No Credible Evidence Manuel or the Magna Entities Used a Fraudulent Device

The SEC claims that, on December 6, 2012, Zirk and Manuel met for the first time in person, having previously spoken once on the phone for about a minute the day before, SUMF ¶¶ 17-16, and immediately agreed that Lustros would create a fraudulent backdated note that Magna could buy and convert to Lustros shares that Magna could sell on the open market. The facts do not support this theory.

On November 15, 2012, Maxim's James Alfaro, a respected investment advisor, SUMF ¶ 7, introduced Magna to Lustros "for a smallish bridge financing." SUMF ¶ 9. Thereafter, Ari Sason—Magna's Co-Head of Structured Investments—provided Manuel terms for three deal options. *Id.* ¶ 12. On November 16, 2012, Manuel forwarded the three LOIs to Alfaro, who forwarded them to Zirk and Lustros' CEO, Gonzalo Troncoso. *Id.* Magna proposed three separate funding options for Lustros: (1) a direct investment in Lustros; (2) Magna's purchase of Lustros' debt; and (3) an equity line. *Id.* ¶¶ 12-13.

Lustros initially declined all three funding options. SUMF ¶ 14. Thereafter, Ari (not Manuel) worked with Alfaro (not Lustros) to restructure the deal options, sending three revised LOIs to Alfaro on November 30, 2012. *Id.* Then, after another round of Magna-Lustros negotiations, Magna forwarded the same LOIs for the three deal options to Alfaro on December 4, 2012. *Id.* ¶ 15. On December 5, 2012, Alfaro proposed that Zirk meet with Manuel, who was in Los Angeles for a conference. *Id.* ¶ 16. There is no evidence that Zirk spoke with anyone from Magna prior to December 5, 2012, when Zirk and Manuel had a one-minute call to schedule their meeting the next day. *Id.* ¶ 17.

On the morning of December 6, 2012, Matthew Turlip sent Manuel all three LOIs, SUMF ¶ 18, because Lustros and Magna had not reached a decision on a path forward and Manuel wanted to be prepared to discuss all three options with Zirk at the meeting, *see id.* Manuel met with Zirk the morning of December 6, 2012 in Los Angeles. *Id.* ¶ 19. Zirk testified during discovery that during this meeting,[4] where he met Manuel for the *first time*, he told Manuel that Lustros had no non-affiliated debt. *Id.* ¶ 20. Zirk also testified that Manuel suggested that Zirk create a note

---

[4] As discussed below, this testimony directly contradicted Zirk's prior testimony and other times he recounted his versions of these events.

showing the existence of non-affiliated debt that Magna could buy, and the two men agreed to move forward with this fraudulent note scheme. *Id.* ¶¶ 20, 65-66. Manuel testifies that no such conversation took place. *Id.* ¶ 86.b. But this discrepancy is irrelevant as Zirk's testimony is completely unreliable.

On December 7, 2012, Manuel sent Zirk and Alfaro, once again, all three separate deal LOIs, reflecting the fact that Zirk and Manuel had reached no agreement on how to proceed, and certainly had not agreed to commit a fraud the day before. SUMF ¶ 22. Zirk forwarded all three proposals to Troncoso. *Id.* ¶ 23. All of this shows that Manuel and Zirk continued to negotiate all three deals as potential options, and the men had reached no agreement. When confronted with this unimpeachable documentary evidence at his deposition, Zirk conceded that "by December 7th there had not yet been a final decision by Lustros whether to do a deal with Magna at all[.]" *Id.* ¶ 21.

Then, on December 10, 2012, three days later, Zirk forwarded the three LOIs to Lustros' Larry Zielke, Troncoso, and Trisha Malone, with an urgent request for a conference call. *Id.* ¶ 23. Troncoso, who the SEC has not alleged was involved in any fraud, testified that as of December 10, Lustros was still evaluating which deal(s), if any, to pursue; and Zielke had not heard about a potential debt purchase before that email and conference call. *Id.*

Later that day, Manuel, Ari, and Troncoso had a final call, where Troncoso, on behalf of Lustros, agreed to move forward with the debt purchase agreement. Zirk was not on this call. SUMF ¶ 24. Thereafter, Manuel sent Troncoso (copying others at Lustros), just the debt purchase LOI, along with due diligence and document requests. *Id.*

In short, Zirk and Manuel did not agree to anything at the December 6, 2012, initial meeting between Zirk and Manuel, and the SEC's claim that Manuel agreed to a fraud, *i.e.*, to use a

fraudulent device on December 6, 2012, is wholly unsupported by any credible evidence and is false. The Court should not credit factual assertions like Zirk's that are illogical and contradicted by the record, which shows the true negotiations between Lustros and Magna. *See Omor*, 2015 U.S. Dist. LEXIS 24135, at *24-25.

> **B. There is No Credible Evidence that Manuel and the Magna Entities Possessed Scienter**

There is no credible evidence that Manuel (and the Magna Entities) intentionally engaged in a fraud. Manuel joined Magna in July 2012 with three years of experience in the securities industry and no disciplinary history. SUMF ¶ 5. Thereafter, Manuel and Magna developed a "blossoming" business relationship with Alfaro, who was and is a reputable and legitimate investment banker, and who regularly showed Magna potential transactions. *Id.* ¶ 7.

Maxim had a placement agreement with Lustros to help Lustros secure financing, SUMF ¶ 8, and Alfaro himself eventually performed a due diligence visit to Lustros' Chilean mining operation, which he deemed successful. *Id.* Alfaro gave Magna a presentation and executive summary of Lustros and its Chilean mining operation. *Id.* ¶ 10. On November 15, 2012, Alfaro emailed Lustros and proposed that Magna could potentially provide financing. *Id.* ¶ 9. Magna had not previously done business with Zirk or Lustros, and Manuel viewed the potential Lustros relationship like any other legitimate business opportunity generated by a trusted partner. *Id.* ¶ 11. Alfaro participated in the negotiations, demonstrating their arms-length nature from Magna's perspective. *See id.* ¶¶ 10-16. Alfaro even set up the December 6 meeting between Manuel and Zirk. *Id.* ¶ 16. Manuel had no reason to suspect that Zirk was a securities fraudster. *Id.* ¶ 7.

Manuel had no motive to engage in the Lustros fraud. As of November 2012, Manuel was a salaried Magna employee. SUMF ¶ 6. He received no incentive compensation connected to the deal closing, *id.* ¶ 11.

The SEC's scienter allegations are based *entirely* on Zirk's incredible testimony that on December 6, 2012, for reasons unknown, Manuel agreed to a fraud with someone he had never met before. Discovery has revealed no other basis for the SEC's fraud theory. As discussed below, Zirk's testimony does not create a genuine issue of fact, because it is: (1) directly contradicted by Zirk's prior statements; (2) contradicted by all the documentary evidence in the case; (3) unsupported by any other witness testimony; and (4) entirely self-serving and perjurious. The overwhelming credible evidence shows that Manuel and the Magna Entities lacked scienter.

1. <u>Zirk's Testimony is Contradicted by His Numerous Prior Statements</u>

The SEC's scienter allegations are entirely premised on Zirk's claims about the December 6, 2012 meeting with Manuel. *See* SUMF ¶¶ 20, 65-66, 70-77. One of the reasons why Manuel and Magna are entitled to summary judgment on the Lustros fraud is that Zirk's current version of events is directly contradicted by what he previously told (or didn't tell) the government on multiple occasions.

The FBI arrested Zirk on September 18, 2014 for securities frauds unrelated to the fraud scheme the SEC alleges in this case. SUMF ¶ 46. After Zirk's arrest, he met with the government for no fewer than eighteen proffer sessions, conversations, or under oath depositions prior to the instant litigation. Since November 19, 2014, Zirk's chimera-like narrative has changed so many times, and is so obviously untrue, that no jury would credit his allegations against Manuel and the Magna Entities.

In Zirk's first story, there was no Lustros note fraud at all. Zirk met with the government for proffer sessions on November 19, 2014; December 8, 2014; January 12, 2015; February 17, 2015; and July 17, 2015. SUMF ¶¶ 50-52. During these proffer sessions, Zirk said he was there to "accept full responsibility" and "tell everything of the things 'I am guilty of.'" *Id.* ¶ 50. Thereafter, Zirk told the government about the many different securities fraud schemes he had concocted. *See*

*id.* ¶¶ 50-52. He even told the government that Walker River was "an investment vehicle that belonged to Margaret Jameson but was run by" himself. *Id.* ¶ 50. However, during these first five meetings with the government, Zirk never once said he engaged in the Lustros fraud scheme alleged in the Complaint. *See id.* ¶¶ 50-52. Zirk did not even mention Manuel until the fourth proffer on February 17, 2015. *Id.* ¶ 52.

Most tellingly, on December 8, 2014, Zirk met with the government for a lengthy interview session that is summarized in a 10-page 302. SUMF ¶ 51. During that interview, Zirk named 28 people he alleged were involved in "penny stock" frauds. *Id.* That list included Troncoso and Lustros' various attorneys involved in the Lustros fraud *but it did not include* Manuel or anyone from Magna. *See id.*

On December 14, 2015, Zirk executed a lengthy declaration in support of the SEC's case in another action: *SEC v. Cope.* SUMF ¶ 53-54. In that declaration, Zirk detailed how he used Lustros to commit fraud in 2012 and 2013. *Id.* Again, Zirk did not mention the Lustros fraud alleged in this case, and his declaration makes no mention of Manuel or Magna in any way. *Id.*

Two years after his arrest, on December 5, 2016, Zirk sat for sworn testimony before the SEC. SUMF ¶ 57. Zirk testified, in great detail to the following facts: (1) the Lustros fraud scheme was birthed at an August 2012 meeting at Magna's offices in New York, attended by Zirk, Manuel, and Ari Sason, *id.* ¶ 58; (2) Zirk called his attorney Ken Eade in the middle of the meeting to discuss the deal, *id.*; and (3) Eade carefully drafted the paperwork for the deal because Magna had a "Wall Street" law firm, *id.* ¶¶ 59-60.

Shortly after Zirk's testimony, the SEC issued an investigative subpoena to Magna. *See* SUMF ¶ 61. Magna then produced documents (the same documents that Manuel and the Magna Entities rely upon today, *see, e.g.*, *id.* ¶¶ 9-24) showing that ***Magna and Lustros representatives***

***(Zirk did not participate) did not even discuss a possible transaction until November 2012,*** demonstrating *Zirk had lied under oath in December 2016.* Notably, the SEC concedes that Zirk's December 2016 testimony is inconsistent with the SEC's allegations in the Complaint. *Id.* ¶ 61.

Zirk spun a third story on October 26, 2017, nearly a year after his SEC deposition, and eight months after a court sentenced him to 151 months' imprisonment. *See* Section IV.B.5, *infra*. In this new version of events, Zirk abandoned his claim that Zirk, Manuel, and Ari Sason hatched the scheme at a meeting in New York, and Zirk now claimed that the fraud was discussed at multiple in-person meetings with Manuel, Joshua Sason, and others, in both Los Angeles and New York. SUMF ¶ 62. However, the evidence did not support this version, either: there was only one in-person meeting between Zirk and Manuel before closing the first note transaction, and Zirk did not meet with Joshua Sason or anyone else anywhere before the deal closed. *See id.* ¶¶ 7-24. This story was apparently a bridge too far for the SEC, who has not alleged that Joshua Sason met with Zirk to discuss a fraud.

Four months later, in a meeting with the DOJ and SEC, Zirk crafted yet another, updated, version of events, with the hopes of earning a sentencing reduction with these new "facts." On January 22, 2018, Zirk gave up on connecting Ari or Joshua Sason to the fraud, and stated instead that he and Manuel "concocted the plan[.]" SUMF ¶ 64. The next day, Zirk for the first time declared that Manuel was the mastermind behind the fraud, and "was the person who gave [Zirk] the idea of creating the note." *Id.* ¶ 65.

On November 16, 2018, Zirk gave his sixth and final story, which the SEC has now cynically adopted, ignoring all of the glaring inconsistencies. In the summer of 2018, the SEC informed the Magna Defendants of its intent to pursue an enforcement action. In response to this notice, counsel for the Magna Defendants provided a memorandum, also known as a "Wells

Response," and made a presentation to numerous SEC lawyers, including the Co-Director of Enforcement, demonstrating why Zirk's story was incredible. SUMF ¶ 70. Faced with irrefutable evidence the Magna Defendants engaged in no fraud, less than two weeks after the presentation, the SEC attorneys flew to California to interview Zirk in prison.

At this meeting, the SEC attorneys, inexplicably, and in direct contravention of custom, practice, and guidance, took no notes of their meeting. *Id.* ¶ 74. Instead, the SEC attorneys elected to craft a short SEC internal email days after the meeting with Zirk. *Id.* In that summary, Zirk allegedly tailored his story to the SEC's new needs, and for the first time claimed that he and Manuel alone hatched the scheme *at a meeting in Los Angeles on December 6, 2012. Id.* ¶¶ 75-76. The SEC, for reasons unknown, embraced and adopted this last story in the Complaint, but it is entirely false as demonstrated by the chronology detailed above.

The discrepancies, lies, and twists-and-turns in the five-year evolution of Zirk's narrative, given once under oath, and each time subject to 18 U.S.C. § 1001, make it impossible for a reasonable person to believe a single word he uttered. As in *Bentley* and *Torres*, where the courts granted or affirmed summary judgment due to the implausible contradictions in the sole witnesses' various accounts, the Court cannot credit Zirk's testimony. *See id*. 935 F.3d at 88, 800 F. Supp. 2d at 584, respectively.

          2.        Zirk's Testimony Is Not Corroborated by any Documentary Evidence

The SEC's claim that Manuel and Magna intentionally engaged in a fraud scheme with Zirk (based entirely on Zirk's testimony) is not corroborated by any documentary evidence. Indeed, the record entirely undercuts this assertion.

After Lustros and Magna decided on December 10, 2012 that Magna would buy Lustros' debt, Magna engaged in rigorous due diligence. To begin this due diligence process, Manuel sent Magna's standard diligence questions and document requests to Troncoso. SUMF ¶ 24. Turlip

facilitated the entire due diligence process, which he testified he took "very seriously[.]" *Id.* ¶ 26. To that end, Turlip communicated with Lustros multiple times seeking confirmation of information he needed to verify. *See id.* ¶¶ 26-36.

Magna's due diligence sought to confirm that Lustros had a legal note held by a non-affiliate. SUMF ¶ 27. To this end, Magna sought, among other things: (1) Lustros' SEC filings evidencing the debt; (2) Walker River's bank statements confirming the debt; (3) a copy of the promissory note; and (4) confirmation that Walker River, the purported note-holder, was a non-affiliate of Lustros. *Id.* It makes no sense for Magna to have engaged in "serious" due diligence if the whole transaction was a sham.

Discovery showed that after receiving these due diligence requests, Lustros personnel scrambled to create documents to convince Magna that the note was legitimate and Walker River was not affiliated with Lustros. For instance, after receiving Turlip's request for a copy of the note, Malone wrote to Zirk and Zielke: "[the note] is an assignment of the Suprafin Note (which we don't have a physical note for just advances so I need to document this one too)[.]" SUMF ¶ 30. Malone did not include Magna personnel on any of these internal emails or tell Magna there was no note because Lustros did not want Magna to know that it had no debt held by a non-affiliate. Instead, in December 2012, Malone created a note and assignment that was backdated to April 27, 2012, which she provided to Magna, and Zirk instructed Malone to tell Magna that Zirk's company, Walker River, was a "non-affiliate" of Lustros. *Id.* ¶ 31. Lustros would have no reason to create lie to Magna about the non-affiliate status of Walker River if any of the Magna Defendants were in on the fraud.

Further undercutting the SEC's contention that Magna was in on the fraud, Magna engaged in additional due diligence for each of the subsequent transactions with Lustros. *See* SUMF ¶¶ 38-

43. There is no evidence showing the due diligence was a fraud or that it otherwise failed to conform to any applicable standard. In any event, the unchallenged evidence demonstrates that Magna regularly declined transactions where due diligence was not satisfactory. *Id.* ¶ 26. The two Magna employees responsible for conducting due diligence at this time—Turlip and Reggev—testified uniformly that Magna took the due diligence process seriously, *id.*, and that the Lustros due diligence was not a sham. *See id.*

Finally, Zirk's claim that Magna knowingly participated in a fraud is demolished by his own contemporaneous written communications. On multiple occasions, Zirk confirmed that Magna purchased legitimate notes and that Walker River was a non-affiliate of Lustros. SUMF ¶¶ 38-42. For example, on June 4, 2013, Zirk proposed that Magna buy a second Lustros debt. In that email, Zirk told Magna that Walker River had aged debt available for purchase and  said that if Magna bought the debt, Walker River had told Zirk it would use that money to re-invest in Lustros' Chilean mine. *Id.* ¶ 38.[5] Zirk clearly wrote this email as if Walker River was an independent third party, not a shell that Magna knew Zirk controlled.

Then on August 7, 2013, Zirk wrote to Manuel saying:

> I am calling a board meeting to ask that there will be no further conversions of the loan you bought from Walker River Investments. I have already spoken to the principals at Walker and they are in agreement with my proposal. ***None of the parties on my side deny that your group has bought a legitimate note***.

---

[5] In his effort to conceal his fraud, Zirk made clear in this email that if Magna bought Walker River's note, Walker River would reinvest a portion of its prior debt into the Chile plant. SUMF ¶ 38. So later, when Malone requested updates on Magna's wire to complete the transaction and made reference to funds going to Chile, *id.* ¶ 41, there was no "red flag" supporting the SEC's assertion of recklessness. *See* Section IV.C, *infra*. Magna wired the funds to Walker River's account, not Lustros'. SUMF ¶ 41. Malone confirmed the wire on Walker River's behalf as an ordinary intermediary, and Walker River would then invest in Chile—all perfectly legitimate, from Magna's point of view. *See* Section IV.C, *infra*.

*Id.* ¶ 42 (emphasis added). There is simply no logical reason Zirk would write that Magna had purchased a "legitimate note" if Manuel and the Magna Entities knowingly participated in Zirk's fraud and bought a backdated note from an affiliate.

### 3. Zirk's Testimony is Not Supported by any Other Witness

Zirk's testimony is also contradicted by the testimony of every other witness in this case. In discovery, Zirk testified that there was "no secrecy" about the deal's true nature, such that everyone knew it was a fraud. SUMF ¶ 78. Zirk testified that many people at Magna knew about the fraud, and Lustros' CEO Troncoso and General Counsel Zielke also were complicit. *Id.*

***But nine other witnesses from both sides of the transaction say the opposite.*** They all believed the transactions were legitimate and that Manuel and Magna could rely upon the information Lustros provided.[6]

1. **Lustros' General Counsel, Zielke**, testified he was not "aware of anything that was wrong or illegal with the deal" and never had any conversations with Zirk where Zirk discussed or suggested that Magna was involved in a fraud. *See* SUMF ¶ 80.

2. **Lustros' CEO, Troncoso**, testified Zirk never told him the Walker River debt sale was "illegal," he did not understand what Walker River was, he did not know the due diligence form completed by Malone contained any "errors[,]" and he understood the parties were "obligated to comply with the securities laws[.]" *Id.* ¶ 83.

3. **Lustros' Malone**, who prepared the note in December 2012 at Zirk's direction, testified she was not "aware of Magna engaging in any wrongdoing in connection with" the Lustros transaction, believed that the transactions met the SEC's non-affiliation rule, *id.* ¶ 82, and she never told Magna or Manuel the assignments of the notes had been backdated. *Id.*

4. **Zirk's personal assistant, Margaret Jameson**, testified she formed Walker River and its accounts, but she never told Manuel that Zirk controlled Walker River. *Id.* ¶ 81.

---

[6] Attorney Jolie G. Kahn, Esq., hired by Lustros, issued an opinion letter that related to both Lustros Note 1 and Lustros Note 2, opining that the restrictive legend on the note should be removed. SUMF ¶ 40. There is no evidence that Kahn's opinion letter regarding the non-affiliate debt held by Walker River was wrong or that she purposefully ignored any facts. Indeed, the SEC has not filed an action against Kahn or even asserted that she did anything wrong as it concerns the two (2) Lustros notes.

5. Manuel denied discussing Walker River or what nonaffiliated debt Lustros had available for purchase at the December 6, 2012 meeting with Zirk. *Id.* ¶ 86. He also never learned in the course of the Lustros transactions that Walker River was affiliated with Zirk or that Maggie Jameson was Zirk's personal assistant. *Id.*

6. **Magna's Turlip**, testified he "didn't have any knowledge of any malfeasance" by anyone at Lustros, and that he and Andrew Reggev "took pride in our work in preventing transactions" where due diligence warranted it. *Id.* ¶ 87.

7. **Magna's Reggev**, testified he had no "concern while [he was] working on the Lustros transaction that any of the individuals may have been engaged in criminal conduct" or "fraudulent conduct[.]" *Id.* ¶ 88.

8. **Magna's Ari Sason**, testified unequivocally that Magna did not participate in backdating notes, that he never discussed with Zirk the creation of the note Magna purchased, and he never discussed with anyone whether the assignment of the note was created later than the document showed. *Id.* ¶ 84.

9. **Magna's Joshua Sason**, testified he knew nothing about Walker River, did not discuss Walker River with anyone, and did not know anything about Jameson. *Id.* ¶ 85.

The testimonial evidence, in addition to the documentary evidence, universally refutes Zirk's story that any of the Magna Defendants' were involved in Zirk's fraud. As in *Jeffreys* and its progeny, Zirk's standalone account is so riddled with contradiction in the record as to cast doubt on its basic plausibility. Therefore, an assessment must be made of Zirk's credibility to determine whether a genuine dispute of fact actually exists in this case—which it does not.

4.     Zirk's Testimony is Entirely Self-Serving and He Engaged in New Lies at His Deposition

Zirk's evolving story bears all the hallmarks of a convicted felon trying to reduce his sentence by providing the government false information. From the moment Zirk was arrested, he has done everything he can to that end—including, it seems, concocting Manuel's participation in his fraud. Zirk stated in his first proffer that mitigating his "prison sentence as much as possible to be back with his family as soon as possible" was one of his main priorities. SUMF ¶ 50. After the proffers with the N.D. Ohio, but before Zirk's sentencing, Zirk reached out proactively through his attorney seeking to "assist the SEC." SUMF ¶ 55-56. Before that, Zirk had only told his first

story—where there was no mention of the alleged Lustros note fraud. Zirk's second story about a meeting in New York that never occurred only emerged a year *after* he requested a meeting with the SEC and was finally deposed, two months before his sentencing on January 25, 2017. *Id.* ¶¶ 47, 57. The timing is not coincidental: Zirk was seeking to curry as much favor as possible with the government prior to sentencing.[7]

Unhappy about his lengthier-than-expected sentence, *see* SUMF ¶ 72, and in the evergreen hope of a Rule 35 sentence reduction, Zirk sought to provide information to the SEC and DOJ. The SEC **admitted Zirk was seeking a sentence reduction**. *Id.* ¶ 73. When the SEC sought to interview Zirk on November 6, 2018, Zirk's attorney responded by asking the SEC to "keep track of your meetings with Zirk so he can get credit for everything[,]" to which the SEC agreed by saying "[w]e'll . . . *continue* to keep track of our meetings, etc." *Id.* ¶ 72 (emphasis added). It is clear Zirk has pursued leniency with single-minded focus. That makes Zirk's testimonies entirely self-interested to the same extent as the plaintiffs who have lost summary judgment in this circuit due to the sole reliance on their own testimony. *See* Section III.A, *supra*. Zirk's stories are simply too self-serving to survive summary judgment.

That Zirk has changed his story multiple times in an attempt to please the SEC, regardless of the truth or the harm his lies might cause, is not surprising. Zirk lived a life of crime involving numerous companies, schemes, and co-conspirators. *See* SUMF ¶ 46. Additionally, every single

---

[7] There is little doubt that Judge Benita Y. Pearson, who sentenced Zirk, questioned Zirk's credibility. He lost at least one acceptance point in sentencing, SUMF ¶ 48, and was sentenced to the top end of the applicable range, receiving a sentence of 151 months' imprisonment, rather than a low-end sentence of 108 months. *Id.* While the Magna Defendants could not determine why Zirk lost an acceptance point or why the Court in Ohio sentenced him to 151 months—their motion to unseal Zirk's plea and sentencing materials was denied, and Zirk claimed a lack of recollection on these issues, *id.*—the circumstances strongly suggest the sentencing court did not fully credit his cooperation.

Lustros witness testified to Zirk's deceptive and abusive character. Malone and Jameson testified that Zirk verbally and emotionally abused them, and others working at the Lustros office, with alarming frequency. *Id.* ¶ 90-91. Malone testified Zirk lied to her and Jameson about the reason he asked Jameson to set up Walker River, *id.* ¶ 82.a, purposefully and intentionally hid things from his staff, *id.* ¶ 90.c, was calculating and manipulative, *id.* ¶ 90.b, and otherwise lied to Malone regularly. *Id.* ¶ 90.e. Troncoso testified Zirk threatened his family and accused him of falsehoods. *Id.* ¶ 92. And Zielke testified Zirk feigned religious fealty to gain people's trust. *Id.* ¶ 93. No reasonable jury would credit the testimony of a person like Zirk.

To top it all off, Zirk clearly lied on at least two occasions during his deposition in discovery. First, Zirk repeatedly and falsely denied ever seeking a Rule 35, testifying "[i]t was never a thought in my mind that cooperating against Magna [and Manuel] with the SEC . . . there could be any Rule 35 for me." SUMF ¶ 73. This is contradicted by his attorneys' request that the SEC keep track of his cooperation. *Id.* ¶ 72. Second, under cross-examination about the origin of the Lustros scheme, Zirk fingered Manuel as the mastermind, and claimed this was a "brand new" crime for him and he had "[n]ever . . . created backdated documents and transferred something for services rendered . . . that was freely-tradeable stock."

*Id.* ¶ 66. ***This was a documented lie***. Three years before the Lustros note fraud, Zirk engaged in an almost identical fraud.

For a brief period in 2009, Zirk was the Chief Executive Officer of a penny-stock company called Mobicom, Corp. ("Mobicom"). SUMF ¶ 67. At that time, years before Zirk ever met Manuel or Magna, Zirk engaged in a backdated note scheme involving Mobicom. *Id.* Mobicom had debt allegedly held by a company called Bridges Investments ("Bridges"). *Id.* ¶ 68. Bridges was nominally owned by Zirk's wife, much like Suprafin. *Id.* Despite purportedly resigning as CEO in

April 2009, *id.*, in December 2009, Zirk had Mobicom's board approve a transaction whereby (a) Mobicom agreed to extinguish a debt of over $800,000 owed to Bridges, (b) in exchange for Mobicom's issuance of 50,000,000 shares of stock to a company called Equivest LLC, which had purportedly acquired Mobicom's debt to Bridges. *Id.* To accomplish this transaction, Zirk created a backdated note between Mobicom and Bridges. *Id.* Zirk's lie was so blatant that, years after starting its investigation and years after commencing this lawsuit, the SEC was forced to admit that Zirk "participated in a backdated note scheme involving Mobicom Corp. in 2009." *Id.* ¶ 69.

Here, all the hallmarks of *Jeffreys* are present: the SEC's fraud claim against Manuel and the Magna Entities rests entirely on Zirk's testimony, which is unsupported by any other evidence; Zirk's testimony has shifted constantly regarding Manuel and Magna's knowledge of and participation in the Lustros fraud; documentary and testimonial evidence flatly contradict Zirk's testimony; and Zirk testified for the self-serving purpose of earning a reduced sentence via Federal Rule of Criminal Procedure 35, akin to the self-serving motivation of a plaintiff relying solely upon her own testimony to bring a claim. That alone would be sufficient to disregard Zirk's story under *Jeffreys*. But, on top of it all, Zirk is also a convicted serial fraudster and known liar who manipulated and abused the people around him. As no jury would suspend their disbelief, which a jury would have to do to credit any of Zirk's story, his story must be disregarded.

### C.    There is No Evidence Supporting Recklessness

The evidence that any of the Magna Defendants acted recklessly is just as wanting as the evidence that any of the Magna Defendants intentionally engaged in fraud. There is no evidence that Manuel or the Magna Entities acted recklessly; that is, that they blinded themselves to what they knew was the truth. *See, e.g.*, *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 365 (S.D.N.Y. 2001). Indeed, just the opposite is true. As discussed above, discovery shows Magna engaged in extensive due diligence, but Lustros simply misrepresented the note's provenance and that Walker

River was not affiliated with Lustros. Rather than being reckless, Manuel and Magna were the victims of a serial fraudster.

The SEC's recklessness claims survived dismissal by alleging "Magna sent all its diligence questions regarding [Walker River] to Lustros, received indicators that [Jameson] was tied to Lustros, and was told that Lustros was the entity receiving the proceeds from the note transactions." Dkt. No. 67 at 20-21. Discovery has blown up these supposed "red flags."

It was not unusual for Magna to send its due diligence requests to Lustros. Turlip, Reggev, and Manuel all testified that it was common for an issuer (like Lustros) to act as intermediary with the transacting party (like Walker River), including for due diligence, where the issuer was "the one maintaining [the] relationship." SUMF ¶ 41. Reggev testified he viewed Malone as the "middleman between us and Walker River," *id.*, and it was Magna's understanding "that [Walker River] had filled out their appropriate section" and provided it through Lustros. *Id.* ¶ 35. Manuel testified that, in 2012-2013, "it wasn't our policy to contact" debt holders in situations like this. *Id.* ¶ 41. In light of this, it is clear Magna was ***not*** aware Lustros received any transaction funds, because Lustros communicated about the funds on Walker River's behalf. *See* n.6, *supra*. Indeed, there is no record evidence demonstrating otherwise.

Finally, ***there is no evidence any of the Magna Defendants knew Jameson was a personal assistant to Zirk***. The SEC contends that Manuel must have known that Jameson was affiliated with Lustros, because Manuel received out-of-office emails identifying Maggie Jameson as Zirk's assistant. *See* Complaint ¶ 108. Discovery exposed this as a red herring. Manuel only received these trivial documents, which most people commonly ignore, long after the first Lustros transaction. SUMF ¶ 45. Moreover, Manuel did not conduct the due diligence on Lustros, so there

is no reason that seeing the name "Jameson" months later would have had an impact. *See id.* ¶¶ 25-45.

Besides the SEC's baseless assertions of willful blindness, there is no competent evidence that anyone at Magna knew or even suspected that Walker River was affiliated, and ignored the obvious so that Magna could complete the transaction. *See* SUMF ¶¶ 45, 87-88 (Turlip and Reggev, who were lower level Magna employees responsible for due diligence, testified they did not know Jameson was Zirk's personal assistant and had no knowledge of any wrongdoing at Lustros).

## V. THE EVIDENCE ESTABLISHES THAT THE NEWLEAD TRANSACTION WAS EXEMPT FROM REGISTRATION

The competent evidence conclusively establishes that the Magna Defendants did not violate Sections 5(a) and (c) of the Securities Act with respect to the sale of NewLead stock. To establish a sale of stock is entitled to an exemption under Section 3(a)(10), the defendant must show that the securities were issued in exchange for bona fide outstanding securities, claims, or property interests and a court or other competent authority approved the issuance and exchange after a fairness hearing. 15 U.S.C. §77c(a)(10); *see also Oceana Capitol*, 150 F. Supp. 3d at 1222.

The evidence clearly establishes that Magna's sale of NewLead stock qualified for this exemption. *First*, the evidence shows Magna obtained NewLead's shares in exchange for satisfaction of NewLeads' debt to forty creditors, including Pallas Holdings, LLC. SUMF ¶ 130. The evidence shows this debt was bona fide and outstanding in December 2013. *See id.* at ¶¶ 118-121, 130-33. Despite the SEC allegations, the SEC has developed no evidence in discovery establishing that these debts were anything other than legitimate. *Second*, the New York State Supreme Court held "a hearing on the fairness of the exchange." *See id.* at ¶¶ 139-40; *see also Oceana Capitol*, 150 F.Supp.3d at 1223. *Third*, as to "a finding of fairness," the stipulation of

settlement the parties to that transaction filed with the court represented a negotiated agreement between sophisticated commercial parties represented by competent counsel. *See id.* On the record, Hanover, MGP, and NewLead acknowledged their full understanding of the benefits and risks of the contemplated exchange. *See id.* ¶ 139.

Accordingly, these factors were determined by the New York State Supreme Court to be sufficient to find the stipulation of settlement was fair, and the exchange of debt for the issuance of shares was approved by the court effective December 2, 2013. *See* SUMF ¶ 140; *see also Oceana Capitol*, 150 F.Supp.3d at 1224-25. When the Magna Entities received and then sold NewLead shares, Section 3(a)(10) was satisfied, and the transaction was exempt from registration. Importantly, the SEC never challenged the 2013 settlement for the issuance and exchange of NewLead debt for unrestricted shares.

In discovery, the SEC failed to develop any evidence demonstrating that the court arrived at the wrong result or that the process was somehow compromised. S*ee Brucker*, 424 F.Supp. at 691–92 (emphasizing that "investors are 'more than adequately protected by the procedures followed in the . . . judicially-approved settlement'"). Consequently, on this record, the NewLead shares and subsequent sales were exempt pursuant to Section 3(a)(10).

## VI. NEITHER SASON NOR MANUEL WAS A "NECESSARY PARTICIPANT" AND A "SUBSTANTIAL FACTOR" IN ANY SALE OF LUSTROS OR NEWLEAD STOCK

After years of investigation and discovery, which included a twenty-five investigative on-the-record examinations and twelve depositions and reams of documents, the uncontroverted evidence all points to one conclusion: neither Sason nor Manuel was a "necessary participant" and a "substantial factor" in any of the sales of Lustros or NewLead stock by the Magna Entities.

In determining whether a defendant should be liable as a "necessary participant," courts in this jurisdiction assess whether, "but for the defendant's participation, the sale transaction would

not have taken place." *SEC v. Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020). "[S]ubstantial participation, to be sure it is a concept without precise bounds, but one who plans a scheme, or, at the least, is a substantial motivating factor behind it, will be held liable as a seller." *Genovese*, 2021 U.S. Dist. LEXIS 58323, at *10 (citation omitted). In analyzing the "necessary participant" and "substantial factor" test to determine whether a party is a seller under the securities laws, the law in this Circuit emphasizes that **"participation must be necessary and substantial, and not de minimis."** *Universal Exp.*, 2007 U.S. Dist. LEXIS 65009, at *10 n.3 (emphasis added).

Courts in the Second Circuit have evaluated numerous cases regarding what constitutes a necessary participant for determining Section 5 liability. From these cases, it is clear that necessary participant liability is likely to be found for: (1) individuals who "authorized, directed, and managed the issuance of securities to investors," *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 452 (E.D.N.Y. 2016); *see also SEC v. StratoComm Corp.*, 2 F.Supp.3d 240, 264 (N.D.N.Y. 2014); *SEC v. Verdiramo*, 890 F. Supp.2d 257, 271-272 (S.D.N.Y. 2011) (granting summary judgment against defendant for personally authorizing and directing the issuance of an issuer's shares to specific individuals who, in turn, sold them in unregistered transactions); (2) individuals who formed entities to facilitate the sale of securities and liaisoned with brokers, *see SEC v. Mattera*, No. 11 Civ. 8323, 2013 U.S. Dist. LEXIS 174163, at *9-12 (S.D.N.Y. Dec. 9, 2013); (3) individuals who promoted the stock and served as transfer agents, *SEC v. Boock*, No. 09 Civ. 8261, 2011 U.S. Dist. LEXIS 95363, at *47-52 (S.D.N.Y. Aug. 25, 2011); and (4) individuals who provide critical services, including overseeing issuance of opinion letters, necessary to execute the sale of the stock, *SEC v. Gallison*, No. 15 Civ 5456 (GBD), 2022 U.S. Dist. LEXIS 35810, at*17-22 (S.D.N.Y. March 1, 2022).

Sason's and Manuel's involvement in the sales of Lustros and NewLead stock stands in stark contrast to the actions where courts have found necessary participant liability. Moreover, while scienter is not an element of Section 5, counsel could find no case in the Second Circuit that imposed liability under Section 5, where an individual did not knowingly participate in the sale of unregistered securities, or where an individual was an innocent pawn in another's fraud scheme.

1.  Sason Was Not a Necessary Participant for Magna's Sale of Any Lustros Stock

To effectively everyone involved with each of the Lustros transactions – Alfaro, Malone, Zirk, Jameson, Zielke and Troncoso – Sason was a stranger. *See* SUMF ¶¶ 80.g, 81.d, 82.c, 105-06, 109-110. He did not originate, structure, negotiate, supervise, monitor or otherwise engage in any of the sales at issue. *See id.* at ¶¶ 104-113. He did not personally review, sign or authorize his electronic signature that Magna affixed to any of the operative transactional documents to purchase or sell Lustros securities. *See id.* at ¶ 112. Whomever needed access to Sason's electronic signature in or around December 2012 and into 2013 and 2014 in order to perform whatever her job demanded had access to Sason's electronic signature. *See id.* at ¶ 111. Sason did not even see, review or authorize any of the notices of conversion remitted to Lustros' transfer agent or take any action to sell Lustros shares. *See id.* at ¶ 112. Likewise, the record is devoid of any evidence that Sason played any role in any sales.

Instead, the record evidence makes clear that during the relevant period of time, Sason's responsibilities were to create and implement the broader Magna organization's overall vision, mission and culture as it diversified its business lines into multiple, other sectors, including other, focused investment strategies and operating businesses: Magna Ventures, which was formed in 2012 and invested in private start-ups and launched new businesses out of its captive, in-house venture studio; Magna Entertainment, which was launched in 2013 and invested in media and

entertainment assets in film, music, television and digital; and later on Magna Real Estate, which acquired multi-family residential properties throughout the tri-state area. *See id.* at ¶ 104.

Sason's utter lack of involvement in Magna's sales of Lustros stock is dispositive and uncontroverted by any evidence. The SEC's case against Sason is not saved by his title. *See SEC v. CMKM Diamonds*, 729 F.3d 1248, 1258 (9th Cir. 2013) ("A participant's title, standing alone, cannot determine liability under Section 5, because the mere fact that a defendant is labeled as an issuer, a broker, a transfer agent, a CEO, a purchaser, or an attorney, does not adequately explain what role the defendant actually played in the scheme at issue."); *SEC v. Bio Defense Corporation*, No. 12 Civ. 11669 (DPW), 2019 WL 7578525, at *15 (D. Mass. Sept. 6, 2019) (same); *SEC v. Jammin Java Corp.*, No. 2:25 Civ 08921 (SVW-MRW), 2016 U.S. Dist. LEXIS 184773, at *50 (C.D. Ca. July 18, 2016) (same).

2.  Sason Was Not a Necessary Participant for Magna's Sale of Any NewLead Stock

Likewise, the record evidence irrefutably establishes that Sason was not a necessary participant and substantial factor in the sale of NewLead's securities. *See* SUMF ¶¶ 123-24, 126-40. The evidence is overwhelming and unchallenged. Sason's only involvement in the NewLead transaction as a whole, was his execution of an affidavit that was prepared entirely by outside counsel at Greenberg Traurig LLP, which attested to the validity of each of the forty creditor claims that Magna submitted at the fairness hearing to secure a judicially-approved settlement of debt in exchange for the issuance of shares. *See id*. MGP received and sold those free-trading NewLead shares. Sason played no role in the sales. *See id*. ¶¶ 126, 140.

As there is no evidence that Sason was a participant (much less a necessary participant) in the NewLead stock ***sales***, he plainly was not a "substantial factor" in the NewLead sales after a court of competent jurisdiction approved of the fairness of the transactions that allowed for the

receipt and sale of New Lead shares. With fact discovery concluded, there is no evidence of Sason offering to sell or selling securities. *See Cavanagh*, 445 F.3d at 111 n.13 ("To state a cause of action under Section 5, one must show '(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale.'")

3.    Manuel Was Not a Necessary Participant for Magna's Sale of Any Lustros Stock

There is no evidence that, but for Manuel's participation in Magna's sales of stock, they "would not have taken place." Indeed, the record shows that Manuel's involvement in Magna's sale of Lustros stock was minimal. Manuel would give his opinion about trading Lustros shares when asked, but had "no role" in the trading itself. SUMF ¶ 114. At times, Manuel discussed Magna's trading patterns with Zirk in an effort to alleviate his concerns as an ongoing business partner. *Id.* ¶ 115. However, Manuel did not control the trading or play any role in how trading was conducted. *Id.* ¶ 114. Indeed, Manuel was not even involved in converting Lustros' debt into stock for Magna to sell. *Id.* ¶ 117.

Conversely, the record shows that Magna employee James McDade conducted the trading. *See id.* ¶ 116. Manuel's participation in the stock sales was negligible, at most. *See Genovese*, 2021 U.S. Dist. LEXIS 58323, at *9-10 (declining to find defendant Mirman was a "necessary participant" because "his actions were peripheral to consummation of [the unregistered] sale," even though he "had a degree of direct involvement in the [sale].").

That Manuel participated in Magna's acquisition of Lustros' debt, which Magna subsequently converted to shares, does not alter this analysis.[8] Section 5's plain language only

_____

[8] In denying Manuel's motion to dismiss the Section 5 claims against him, this Court "conclude[d] that . . . Manuel [was a] necessary participant[] in each distribution" because he "either originated,

creates liability for the "sell[ing]" or "sale" of unregistered securities. 15 U.S.C. § 77e. Section 5 solely pertains to sale of stock—it says nothing about transactions preceding the sale. Nor does it create broader scheme liability for the sale of unregistered securities. *Compare with* Section 10(a). Counsel for the Magna Defendants could find no case in this Circuit that expands Section 5 liability beyond the sale of unregistered securities to precursor transactions.

The Second Circuit's case law pertaining to "necessary participants" is in accord. Only those involved in the *sale* of unregistered securities have been found liable under Section 5 as a necessary participant. Indeed, the cases cited by the SEC in opposition to defendants' motion to dismiss support Manuel's argument. In *SEC v. Frohling*, the Second Circuit affirmed Section 5 liability for Frohling on the basis that the securities seller would not have been able to ***sell*** shares on the market without the opinion letters he drafted. 851 F.3d 132, 137 (2d Cir. 2016). The opinion letters were essential to effecting sales without registration in *Frohling* and had nothing to do with purchase of securities or convertible debt prior to that sale. Similarly, in *SEC v. Holschuh*, the defendant president of the issuing corporation was liable as a necessary participant because he determined the corporation's fund raising strategy and hired a broker for the purpose of issuing securities he helped design. 694 F.2d 130, 140 (7th Cir. 1982); *see also SEC v. Mattera*, 2013 U.S. Dist. LEXIS 174163 *8-9, 36 (S.D.N.Y. Dec. 6, 2013) (finding Section 5 liability where defendant acted as liaison between a private fund and broker-dealers who *sold* the fund's unregistered securities to investors).

Expanding Section 5 liability to cover earlier non-sale transactions would create significant unintended consequences. For instance, it would create potential Section 5 liability for anyone

_____

negotiated, or assisted in" "the chain of debt and stock acquisitions needed to bring the distributions to fruition." Dkt. No. 67 at 31. Respectfully, we submit that the statute and case law only pertain to the sale of stock and not any preceding transaction.

involved in a legitimate stock acquisition, regardless of whether or not the person was later involved in the unregistered sale of securities.

<blockquote>4.   <u>Manuel Was Not a Necessary Participant for Magna's Sale of Any NewLead Stock</u></blockquote>

Similarly, there is no evidence that Manuel had any role in Magna's sale of NewLead stock. Manuel testified that he does not recall being involved, SUMF ¶ 142, and there is no evidence that rebuts this. At most, Manuel communicated with NewLead about Magna's trading because the trading parameters had been ordered by the court, *see id.* ¶¶ 143-44; but this hardly made him a "substantial factor" in the sales themselves. *See id.* ¶¶ 141-47. The SEC also has ***not*** alleged Section 5 violations against anyone at Magna who was actually involved in stock sales, or NewLead itself. *See* Complaint. Further, as with Lustros, Manuel's role in Magna's acquisition of NewLead's debt is irrelevant for the necessary participant analysis.

# VII.   <u>CONCLUSION</u>

For the foregoing reasons, summary judgment should be GRANTED in favor of the Magna Defendants, and plaintiff Securities Exchange Commission's claims against the Magna Defendants in its Complaint should be DISMISSED, with prejudice.

DATED:  June 17, 2022

| | |
|---|---|
| */s/ Marjorie J. Peerce* | */s/ Michael H. Ference* |
| Marjorie J. Peerce | Michael H. Ference |
| David L. Axelrod | D. Scott Furst |
| BALLARD SPAHR LLP | SICHENZIA ROSS FERENCE LLP |
| 1675 Broadway, 19th Floor | 1185 Avenue of the Americas, 37th Floor |
| New York, NY 10019 | New York, NY 10036 |
| (212) 223-0200 | (212) 930-9700 |
| | |
| *Attorneys for Defendant Marc Manuel* | *Attorneys for Defendants Joshua Sason, Magna Management, LLC, Magna Equities II, and MG Partners, Ltd.* |