UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

          - v. -                              19 Civ. 1459 (LAP)

JOSHUA SASON, MARC MANUEL, KAUTILYA          OPINION & ORDER
(a/k/a TONY) SHARMA, PERIAN
SALVIOLA, MAGNA MANAGEMENT, LLC
(f/k/a MAGNA GROUP, LLC), MAGNA
EQUITIES II, LLC (f/k/a HANOVER
HOLDINGS I, LLC), MG PARTNERS, LTD.,
and PALLAS HOLDINGS, LLC,

                    Defendants.

LORETTA A. PRESKA, Senior United States District Judge:

     Before the Court are cross motions for summary judgment.

Defendants Joshua Sason, Marc Manuel, Magna Management, LLC

(f/k/a Magna Group, LLC) ("Magna"), Magna Equities II, LLC

(f/k/a Hanover Holdings I, LLC) ("Hanover"), and MG Partners,

Ltd. ("MGP") (together, the "Magna Defendants") move for summary

judgment, seeking dismissal of all remaining counts against

them.[1] The United States Securities and Exchange Commission

("SEC") opposes the Magna Defendants' motion.[2]

At the same time, the SEC moves for partial summary

judgment against both the Magna and Pallas Defendants regarding

the unregistered offering claims.[3] The Magna Defendants[4] and

Defendants Kautilya Sharma, Perian Salviola, and Pallas

---

[1] (Notice of Motion for Summary Judgment by the Magna Defendants, dated June 17, 2022. [Dkt. no. 138.] Memorandum of Law in Support of the Magna Defendants' Motion for Summary Judgment ("Magna Br.") dated June 17, 2022. [Dkt. no. 139.] Local Rule 56.1 Statement of Facts in Support of Motion for Summary Judgment by the Magna Defendants ("Magna 56.1") dated June 17, 2022. [Dkt. no. 140.] Magna Defendants' Omnibus Memorandum of Law in Further Support of Their Motion for Summary Judgment and in Opposition to Plaintiff SEC's Motion for Partial summary Judgment ("Magna Omnibus") dated August 29, 2022. [Dkt. no. 165.] Supplemental Local Civil Rule 56.1 Statement of Material Facts in Further Support of Motion for Summary Judgment by Magna Defendants ("Magna Supp. 56.1") dated August 29, 2022. [Dkt. no. 166.])

[2] (Plaintiff SEC's Omnibus Memorandum of Law in Support of its Motion for Partial Summary Judgment and in Opposition to the Magna Defendants' Motion for Summary Judgment ("SEC Omnibus") dated July 29, 2022. [Dkt. no. 152.] Plaintiff SEC's Response and Pursuant to Local Civil Rule 56.1(b) ("SEC 56.1 Opp.") dated July 29, 2022. [Dkt. no. 155.])

[3] (SEC Omnibus. Plaintiff SEC's Corrected Statement Pursuant to Local Civil Rule 56.1 ("SEC 56.1") dated August 12, 2022. [Dkt. no. 162.] Plaintiff SEC's Reply Memorandum of Law in Further Support of its Motion for Partial Summary Judgment ("SEC Reply") dated September 26, 2022. [Dkt. no. 179.] Plaintiff SEC's Additional Response Pursuant to Local Civil Rule 56.1 ("SEC Supp. 56.1") dated September 26, 2022. [Dkt. no. 180.])

[4] (Magna Omnibus. Magna Defendants' Response to Plaintiff SEC's Corrected Statement Pursuant to Local Civil Rule 56.1(b) ("Magna 56.1 Opp.") dated August 29, 2022. [Dkt. no. 168.])

Holdings, LLC (together, the "Pallas Defendants")[5] oppose the motion. For the reasons below, the Magna Defendants' motion is DENIED. The SEC's motion is GRANTED in part and DENIED in part.

## I.   Procedural History

On February 15, 2019, the SEC filed a complaint against the Magna and Pallas Defendants containing eight claims for relief. (Dkt. no. 1 (the "Comp.") ¶¶ 159-86.) The first and second claims charged Sason and Hanover with violating Section 17(a)(2) of the Securities Act, (id. at ¶¶ 159-61), and Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b), (id. at ¶¶ 162-64). The Court has previously referred to these claims as the "misstatement claims." SEC v. Sason, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020).

The third and fourth claims charged Manuel, the Magna Entities, and the Pallas Defendants with violating Sections 17(a)(1) and (3) of the Securities Act, (id. at ¶¶ 165-67), Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) (id. at ¶¶ 168-70). The Court has previously referred to these claims as the "scheme liability" claims. Sason, 433 F. Supp. 3d at 508.

_____

[5] (The Pallas Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Pallas Opp.") dated August 29, 2022. [Dkt. no. 174.] Pallas Defendants' Response to Plaintiffs' Corrected Rule 56.1 Statement ("Pallas 56.1 Opp.") dated August 29, 2022. [Dkt. no. 171.])

The fifth claim charged Sason with control person liability for the Magna Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5. (Id. at ¶¶ 171-75.) The sixth claim charged Manual with aiding and abetting the other Magna Defendants' violations of Section 10(b) of the Securities Act, Rule 10b-5, and Section 17(a) of the Securities Act. (Id. at ¶¶ 176-79.) The seventh claim charged the Pallas Defendants with aiding and abetting Hanover, MGP, Sason, and Manuel's violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5. (Id. at ¶¶ 180-83.) The eighth claim charged all Defendants with violating Sections 5(a) and (c) of the Securities Act. (Id. at ¶¶ 184-86.)

Both the Magna and Pallas Defendants moved to dismiss the complaint. (Dkt. nos. 49 and 53.) In an opinion on January 14, 2020, the Court granted the motions to dismiss in part and denied in part. Sason, 433 F. Supp. 3d at 515. The SEC had alleged several schemes to illegally sell unregistered shares of two different companies: a mining company called Lustros, Inc. ("Lustros") and a shipping company called NewLead Holdings Ltd. ("NewLead"). Id. at 503-06. The Court denied the motions to dismiss the scheme liability claims as to certain Lustros Transactions and all the Section 5 claims but dismissed all other claims. Id. at 515. Regarding the NewLead Transactions, the Court dismissed the scheme liability claims against Hanover,

4

MGP, Manuel, and the Pallas Defendants; the misstatement claims against Sason and Hanover; and the aiding and abetting claims against Manuel and the Pallas Defendants. Id. at 510. The Court also dismissed the control person liability claims against Sason. Id. at 514-15.

On June 17, 2022, the Magna Defendants moved for summary judgment, (dkt. no. 138.), seeking the dismissal of the remaining scheme liability claims against Manuel and Magna regarding the Lustros Transactions and the Section 5 claims against all Magna Defendants for both the Lustros and NewLead Transactions, (see Magna Br.). On July 29, 2022, the SEC filed its omnibus motion opposing the Magna Defendants' motion for summary judgment regarding the scheme liability claims and moving for summary judgment against all Defendants regarding the Section 5 claims. (See SEC Omnibus.) On August 29, 2022, the Magna Defendants, (see Magna Omnibus), and the Pallas Defendants, (see Pallas Opp.), filed their oppositions to the SEC's motion for partial summary judgment as to the Section 5 claims. The SEC filed its reply on September 26, 2022. (See SEC Reply.)

## II.  **Legal Standard on Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). "'It is the movant's burden to show that no genuine factual dispute exists.'" I.M. v. United States, 362 F. Supp. 3d 161, 189 (S.D.N.Y. 2019) (quoting Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)). A genuine dispute of material fact exists if "'the evidence is such that a reasonable jury could return a judgment for the nonmoving party.'" Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene, 746 F.3d 538, 544 (2d Cir. 2014).

"'In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.'" In re AXA Equitable Life Ins. Co. COI Litig., 595 F. Supp. 3d 196, 215 (S.D.N.Y. 2022) (quoting Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)). In ruling on a motion for summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences

against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks and citations omitted).

"If the movant meets its burden, 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'" Kayo v. Mertz, 531 F. Supp. 3d 774, 787 (S.D.N.Y. 2021) (quoting Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)). "The non-moving party 'cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'" In re AXA, 595 F. Supp. 3d. at 215 (quoting Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996)). The nonmoving party must "create more than a 'metaphysical' possibility that his allegations [a]re correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial.'" Wrobel v. County of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

"When, as in this case, both sides move for summary judgment, the district court is 'required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party.'" Nieblas-Love v.

7

New York City Hous. Auth., 165 F. Supp. 3d 51, 64-65 (S.D.N.Y. 2016) (quoting Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

On summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Brod, 653 F.3d at 164 (internal quotation marks omitted). "[A] court's goal should be 'to isolate and dispose of factually unsupported claims.'" I.M., 362 F. Supp. 3d at 190 (quoting Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 495 (2d Cir. 2004)). "[A] district court should consider only evidence that would be admissible at trial." Id. (citing Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998)).

III. **The Lustros Scheme Liability Claims**

    A. **Factual Background on the Three Lustros Transactions**

Joshua Sason formed Magna as a Texas LLC in January 2010; he was its managing member, only significant owner, and CEO. (SEC 56.1 ¶¶ 6-7, 10.) Initially, Magna's business was almost exclusively focused on trading stocks in publicly traded microcap and small cap companies. (Magna 56.1 Opp. at 3-4.)

Magna insiders called the public company investment business the "equities business" or "equities division." (Id. at 5.)

In July 2012, Sason hired Manuel as Magna's Head of Origination and Research. (Id. at 14.) In that role, Manuel: 1) supervised due diligence for transactions by the equities division, including the Lustros Transactions; 2) supervised Magna's "originators" who sourced transactions by calling public companies to gauge their interest in receiving financing from Magna; and 3) originated transactions himself. (SEC 56.1 ¶¶ 22-24.) Magna employees in the origination and research groups reported directly to Manuel. (Id. ¶ 25.)

In November 2012, James Alfaro, the managing director of Maxim Group LLC ("Maxim"), introduced to Magna to Lustros, a publicly traded company that "claimed to be in the business of mining copper sulfate in Chile." (Magna 56.1 ¶ 7; SEC 56.1 ¶ 114.) Alfaro "regularly introduced Magna to potential transactions," all of which were "completed without issue." (Magna 56.1 ¶ 7.) Alfaro proposed and organized a conference call between Magna and Lustros. Magna was represented by Marc Manuel, Magna's Head of Origination & Research, and Ari Sason, Magna's Co-Head of Structured Investments; Lustros was represented by Gonzalo Troncoso, Lustros's CEO, and Larry Zielke, Lustros's General Counsel. (Id. ¶¶ 6, 9-10.)

On November 16, 2012, Magna created letters of intent ("LOIs") for three Lustros deal structures, including a debt purchase, direct investment, and equity line; Lustros rejected them all on November 22, 2012. (Id. ¶¶ 12-14.) On December 4, 2012, Manuel forwarded the same three proposed LOIs to Alfaro, and on December 5, 2012, Alfaro introduced Manuel and Izak Zirk de Maison ("Zirk") for the first time. (Id. ¶¶ 15-16.) At the time, Zirk was Lustros's Chairman. (Id. at ¶ 9). Zirk controlled various entities including Suprafin Ltd., which did not have any business operations and was used by Zirk to pay his personal bills and make payments that he directed. (SEC 56.1 ¶¶ 70-71.)

On December 5, Manuel and Zirk spoke on the phone and agreed to meet in person in Los Angeles the next day. (Magna 56.1 ¶ 17.) Prior to that call, Manuel had never spoken to Zirk. (Id.) On December 6, 2012, at 10:30 AM PT, Manuel and Zirk met at the Luxe Hotel in Los Angeles (the "Luxe Meeting"). (Id. ¶ 19.) Manuel testified that he had a "vague idea" of what he and Zirk discussed at the Luxe Meeting and that he thought they discussed all three LOIs that Magna had prepared. (Id.) Manuel was "definitive that at this 'introductory meeting' he did not agree or even discuss a potential fraud scheme with Zirk." (Id.) By contrast, Zirk testified that he told Manuel at the Luxe Meeting that Lustros had "no non-affiliated debt," so "he and Manuel 'agreed to engage in [a] backdating note scheme,' whereby

10

Lustros would create sham documents and Magna would purchase affiliated debt." (Id. ¶ 20.)

Following a call between Troncoso, Manuel, and Ari Sason on December 10, 2012, Manuel emailed Troncoso with an the LOI for the debt purchase, a due diligence request list, and "Standard 'non-customized' Documents" that included a statement of non-affiliation. (Id. ¶ 24.) Trish Malone, Lustros's CFO, (id. ¶ 20), testified that "no note existed as of December 10th of 2012," (id. ¶ 29). In one email on December 10, Zielke emailed Malone saying "Let's go ahead and use Walker River. I don't want to raise the issue of Suprafin being an affiliate because of Zirk's positions as owner, director etc." (Id.) Margaret Jameson, Zirk's personal assistant, was listed as the president and secretary of Walker River. (Id. ¶ 33.) Zirk testified that he "creat[ed] a sham where to the outside world it looked like Maggie Jameson owned the company, but, in fact, [Zirk] owned it." (Id.) Zirk wanted Walker River to appear to the world to be a non-affiliate. (Id.) Zirk had directed Jameson to form Walker River in September 2011 for the benefit of Zirk and his family. (SEC 56.1 ¶ 79.)

At Zirk's direction, Malone created the note at the heart of the First Lustros Transaction (the "First Lustros Note"). (Magna 56.1 ¶ 31.) The nature of the debt outlined in the First Lustros Note is disputed. (See SEC 56.1 Opp. at 17.) For this

factual background, it is sufficient to say that the note was meant to reflect that Walker River held Lustros debt. Lustros got a "Rule 144 letter from a securities attorney opining that the transaction was legitimate," (Magna 56.1 ¶ 34), and filed a Form 10-K that "disclosed the $570,988 loan assigned by Suprafin to Walker River," (id. ¶ 37). In its Form 10-Q for the period ending March 31, 2012, Lustros had disclosed a loan in that same amount from Zirk to Lustros. (SEC 56.1 ¶ 103.) This previous Form 10-Q had not disclosed any convertible debt owed by Lustros or any debt owed by Lustros to Walker River. (Id. ¶ 104.)[6]

Malone also responded to Magna's due diligence request, representing that Walker River was not a Lustros affiliate. (Magna 56.1 ¶ 32; dkt. no. 145-4 at SEC-SASON-7750.) Zirk testified that if Malone had not made these misrepresentations, "the deal could not have gone forward." (Magna 56.1 ¶ 32.) Malone testified that she never revealed to Magna that Lustros created a backdated note and assignment of the note to Walker River. (Id. ¶ 34.)

On December 17, 2012, Matthew Turlip, a Magna employee responsible for doing diligence on the Lustros transaction, emailed Manuel, Ari Sason, and Michael Abitebol, Magna's

---

[6] Other Form 10-Qs from the periods ending in June 30, 2012, and September 30, 2012, similarly failed to identify any convertible debt owed by Lustros or any debt owed by Lustros to Walker River. (SEC 56.1 ¶¶ 105-111.)

COO/CFO, to notify them that the Lustros due diligence was complete. (Id. ¶ 36.) Turlip testified he performed searches on Zirk. (Id. ¶ 28.) Andrew Reggev, another Magna employee responsible for Lustros due diligence, testified that the pre-funding memo he and Turlip co-authored, (dkt. no. 144-34 at SEC-Sason-271219), reflected that "no adverse results were found on the officers and directors" of Lustros, (Magna 56.1 ¶ 28).

Ari Sason then approved the wire to complete the transaction, and Abitebol executed the purchase of $570,000 of Lustros debt by wiring money to a bank account controlled by Walker River. (Id. ¶ 36.) Magna purchased the First Lustros Note in five tranches between December 2012 and February 2013, exchanging each tranche of the note for a new convertible promissory note issued by Lustros to Magna that was convertible into stock at a 37.5% discount from the lowest trading price the day prior to the execution of the note. (SEC 56.1 ¶ 135-36, 144-57.) Magna converted the new promissory notes into Lustros stock, which it then sold through its brokerage accounts at Cantor and Grace. (Id. ¶ 137.) Magna received over one million shares of Lustros stock through the First Lustros Transaction, which it sold for proceeds of nearly seven hundred thousand dollars. (Id. at ¶ 145.)

At various times, different Magna employees received emails from Lustros employees that identified Jameson as being

13

something other than Walker River's president. (Magna 56.1
¶ 45.) For example, Reggev received an out-of-office email from
Malone in September 2013 that contained Jameson's name but
testified he "did not know Jameson was Zirk's assistant." (Id.)
Manuel received several similar emails in January 2013, December
2013, and April 2014, but testified that he "did not make any
connection at those later dates with the Jameson on Walker River
documents." (Id.)

In June 2013, Lustros and Magna executed the Second Lustros
Transaction. Zirk emailed Manuel saying that he had "pledged a
portion of [his] debt to Walker River," that the pledge had
"been in place for 6 months," and asked if Magna would be
interested in buying $250,000 of the notes Walker River owned.
(Magna 56.1 ¶ 38.) Ari Sason approved the transaction, and
Turlip asked Malone to provide the new Walker River note that
Magna would be buying (the "Second Lustros Note"). (Id. ¶ 39.)
For this transaction, Lustros obtained a legal opinion letter
confirming Lustros's representations and stating that pursuant
to Rule 144, the restrictive legend on the 217,789 Lustros
shares purchased by Magna "should be removed." (Id. ¶ 40.)

The Second Lustros transaction then proceeded much like the
first. Lustros issued a new convertible note to Magna that
covered the remaining balance owed on the First Lustros Note,
plus two hundred and fifty thousand dollars for the second. (SEC

14

56.1 ¶ 166.) The note specified that it was convertible into
Lustros stock at a discount of thirty-five percent from the
lowest trading price in the five days prior to the execution of
the note. (Id.) Magna then converted the new note into Lustros
stock, which it sold through its brokerage account at Cantor and
Grace. (Id. ¶ 168.) Through the Second Lustros Transaction,
Magna received nearly one and a half million Lustros shares
through six conversion notices which it sold for proceeds of
over three hundred thousand dollars. (Id. ¶ 169.)

As part of the Second Lustros Transaction, Malone emailed
Magna following up on the status of the wire to Walker River and
Magna sent the funds to Walker River's account. (Magna 56.1
¶ 41.) Reggev said he viewed Malone as the "middleman" between
Magna and Walker River. (Id.) Manuel testified that it "wasn't
[Magna's] policy to contact" debt holders in such situations,
and Turlip and Reggev testified it was "common at that time not
to deal directly with debt holders where the issuer was 'the one
maintaining that relationship.'" (Id.)

On August 7, 2013, shortly after the Second Lustros
Transaction was completed, Zirk emailed Manuel to "stop the
destruction that ha[d] happened" to Lustros's value and stock
price and ask that there be "no further conversions of the loan
[Magna] bought from Walker River Investments." (Id. ¶ 42.) In
the same email, Zirk wrote that he had "spoken to the principals

15

at Walker" and they agreed with his request. (Id.) He wrote that "[n]one of the parties on [his] side deny" that Magna "bought a legitimate note." (Id.) He then said he wanted to discuss a "fair repurchase of the debt" Magna bought or "go to court to seek a fair solution to this matter." (Id.) Magna and Lustros ultimately negotiated a deal by which Lustros bought back from Magna the remaining balance of the Second Lustros Note for nearly two hundred and eighty thousand dollars. (SEC 56.1 ¶¶ 171-72.)

In January 2014, Lustros and Magna executed the Third Lustros Transaction. (Magna 56.1 ¶ 43.) Magna conducted diligence, and Lustros again confirmed Walker River was a non-affiliate. (Id.) Magna purchased a block of one million unrestricted shares of Lustros stock from Walker River for one hundred and fifty thousand dollars. (SEC 56.1 ¶ 173.) Magna then sold more than four hundred and forty thousand Lustros shares for proceeds of more than seventy-five thousand dollars. (Id. ¶ 175.)

### B. **Legal Standard**

#### i.   **Scheme Liability under Section 10(b) and Section 17(a)(1)-(3)**

To prove scheme liability under Section 10(b), Rule 10b-5, and Section 17(a)(1), "the SEC must show that defendants: (1) committed a deceptive or manipulative act; (2) in

furtherance of the alleged scheme to defraud; (3) with scienter." SEC v. CKB168 Holdings, Ltd., 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016) (quotation marks and citation omitted). Scienter is defined as "'a mental state embracing intent to deceive, manipulate or defraud.'" United States v. Litvak, 808 F.3d 160, 178 (2d Cir. 2015) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)). "'[S]cienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.'" SEC v. Frohling, 851 F.3d 132, 136 (2d Cir. 2016) (quoting SEC v. Obus, 693 F.3d 276, 286 (2d Cir. 2012)). "To prove liability under Securities Act Section 17(a)(3), however, the SEC only has to prove negligence rather than scienter." CKB168 Holdings, 210 F. Supp. 3d at 445 (quotation marks and citation omitted).

### ii.  Credibility Determinations on Summary Judgment

"It is a bedrock rule of civil procedure that 'a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented.'" Frost v. New York City Police Department, 980 F.3d 231, 245 (2d Cir. 2020) (quoting Agosto v. INS, 436 U.S. 748, 756, 98 S. Ct. 2081, 56 L. Ed. 2d 677 (1978)). In Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005), the Court of Appeals articulated a

"narrow exception" to this "bedrock rule." Frost, 980 F.3d at

245. The Court of Appeals wrote:

> While it is undoubtedly the duty of district courts not
> to weigh the credibility of the parties at the summary
> judgment stage, in the rare circumstance where the
> plaintiff relies almost exclusively on his own
> testimony, much of which is contradictory and
> incomplete, it will be impossible for a district court
> to determine whether "the jury could reasonably find for
> the plaintiff," Anderson, 477 U.S. at 252, 106 S. Ct.
> 2505, and thus whether there are any "genuine" issues of
> material fact, without making some assessment of the
> plaintiff's account.

Jeffreys, 426 F.3d at 554. The Court of Appeals ultimately held

that where a district court: 1) finds "nothing in the record to

support plaintiff's allegations other than plaintiff's own

contradictory and incomplete testimony," and 2) determines that

"no reasonable person could believe" the plaintiff's testimony

"even after drawing all inferences in the light most favorable

to the plaintiff," the district court may disregard the

plaintiff's testimony and award summary judgment against the

plaintiff. Id. at 555.[7] "[I]f there is a plausible explanation

for discrepancies in a party's testimony, the court considering

a summary judgment motion should not disregard the later

testimony because an earlier account was ambiguous, confusing,

or simply incomplete." Jeffreys, 426 F.3d at 555 n.2 (quoting

---

[7] Later case law has clarified that the Jeffreys analysis can
apply to any witness's testimony. See, e.g., Walker v. Carter
210 F. Supp. 3d 487, 503-04 (S.D.N.Y. 2016).

Langman Fabrics v. Graff Californiawear, Inc., 160 F.3d 106, 112
(2d Cir. 1998)).

   C. **Discussion**

      i.   **The Testimony of Izak Zirk de Maison**

   The Magna Defendants argue that the testimony of Izak Zirk
de Maison, Magna's alleged partner in the Lustros fraud, is so
"inconsistent, uncorroborated, and self-serving" that the Court
should not accept his testimony on summary judgment. (Magna Br.
at 1, 11-21.) Before turning to the scheme liability claims
analysis, the Court will resolve Magna's challenge to Zirk's
testimony. To assess Magna's arguments, further facts must be
stated regarding Zirk and the various statements he gave to the
Government over the course of his cooperation. In restating the
facts, the Court shall construe them "in the light most
favorable to the non-moving party" and "resolve all ambiguities
and draw all reasonable inferences against the movant." Brod,
653 F.3d at 164.

      a. **Zirk's Cooperation with the Government**

   From 2001 to 2014, Zirk "committed numerous frauds related
to microcap publicly traded companies." (Magna 56.1 ¶ 46.) On
September 18, 2014, Zirk was arrested and "charged with
securities fraud, among other crimes." (Id.) In April 2015, Zirk
pled guilty "pursuant to a cooperation guilty plea" to charges
related to broker bribery and market manipulation schemes

involving Lustros and other microcap companies he controlled. (Magna 56.1 ¶ 47; SEC 56.1 ¶ 67.) On January 25, 2017, Zirk was sentenced to 151 months imprisonment. (Magna 56.1 ¶ 47.) Zirk started cooperating with the Government after his 2014 arrest. (Id. ¶ 49.)

On November 19, 2014, Zirk made his first proffer to the Government. (Id. ¶ 50.) Zirk told the Government he was there to "accept responsibility, mitigate his 'prison sentence as much as possible to be back with his family as soon as possible' and 'provide all information.'" (Id.) Zirk identified "people and entities 'that have to be looked at'" and outlined the schemes that he engaged in. (Id.) Zirk said Walker River belonged to Jameson but was run by him. (Id.) Zirk did not say that he engaged in fraud with Magna and Manuel, did not discuss a backdated note fraud, and "never mentioned Manuel's name or anyone else from Magna." (Id.)

On December 8, 2014, Zirk provided the Government with a list of twenty-eight people who he "eventually wanted to talk about because he believed they were involved in various penny stock fraud schemes." (Id. ¶ 51.) The list included Troncoso, Lustros's CEO, and the attorneys who provided opinion letters for the Lustros transactions at issue here but did not include any Magna employee. (Id.)

During his fourth proffer with the Government on February 17, 2015, Zirk said Manuel did "toxic deals" and that "Magna will buy a note, get a legal opinion to get the shares free trading, sell the shares and then convert the note to shares. . . . Magna bought notes from [Zirk's] nominees." (SEC 56.1 Opp. at 28.) In his fifth proffer on July 17, 2015, Zirk said that "Manuel knew that Jameson was not involved in any discussions, despite Walker River being utilized" and that Zirk "worked with [Magna] to possibly do some type of cash infusion into [Zirk's] companies through the Walker River Investments entity in the name of Jameson." (Id. at 27-28.) Zirk also approximated the amount of the First Lustros Transaction and said that Magna knew Jameson was his "clerical assistant." (Id.) Handwritten notes from the July 2015 proffer reflect that Zirk stated "Magna said they can't do the deal with an insider + Z said no problem, I have a vehicle we can use" and that "[Magna] [d]id transaction w/Walker River. $ went to WR. Magna knew Maggie [Jameson] was [Zirk's] front person." (Id.)

On December 14, 2015, Zirk submitted a sworn declaration in SEC v. Jason Cope, et al., Case No. 14 Civ. 7575 (DLC) (S.D.N.Y.), in which Zirk admitted that he and others "engaged in an unrelated Lustros fraud scheme" at the same time as the Lustros transactions at issue here. (Magna 56.1 ¶¶ 53-54.)

However, in that declaration, Zirk did not identify any Magna employee as a participant in a Lustros fraud. (Id.)

On December 6, 2016, Zirk testified under oath before the SEC. (Id. ¶ 57.) He said that he agreed to the fake note scheme during an in-person meeting with Marc Manuel and Ari Sason in New York and that the meeting was in "late 2012" and that "August [2012] [wa]s a good guess." (SEC 56.1 Opp. at 30.)

On October 26, 2017, Zirk told the Government that he met with Manuel more than once at the Luxe Hotel in Los Angeles, that the first such meeting was between Zirk and Manuel, and that the second such meeting was years later and involved Manuel, Sason, and another person. (Id. at 33.)

On January 22, 2018, Zirk told the Government that he and Manuel agreed to the fraud and Malone and Zirk's lawyer, Ken Eade, prepared the documents. (Magna 56.1 ¶ 64.) The next day, Zirk told the Government that Manuel gave Zirk the idea of creating the note. (Id. ¶ 65.)

On November 6, 2018, Zirk told the SEC that he told Manuel prior to the First Lustros Transaction that Lustros did not have any non-affiliate debt, the debt identified in Lustros's SEC filings was debt owed to Zirk, and that he discussed transferring that debt to a third party with Manuel at the Luxe Meeting. (Id. ¶ 75.) In his November 2018 meeting with the SEC, Zirk also said that he had participated in discussions with

Magna prior to the Luxe Meeting, that a third-party debt purchase was the presumed deal structure by the time he met with Manuel, and that the purpose of the Luxe Meeting was to discuss the mechanics of the deal. (Id. ¶ 76.)

### b. **Magna's Arguments Against Zirk's Testimony**

#### 1. **Magna and Lustros Did Not Agree to the Debt Purchase at the Luxe Meeting.**

The Magna Defendants assert that the SEC's evidence that Magna engaged in a deceptive or manipulative act is based on Zirk's testimony that he and Manuel agreed to the fraudulent backdated note scheme at the Luxe Meeting. (Magna Br. at 7.) They argue that Zirk's account of this agreement is contradicted by the facts in the record. The Magna Defendants point to an email from December 7, 2012, where Manuel sent Zirk and Alfaro three LOIs reflecting three different deal arrangements, only one of which related to a debt purchase. (Id. at 9; Magna 56.1 ¶ 22.) They write that this email showed continuing discussion after December 6 on multiple transaction types, indicating that Manuel and Zirk had not agreed to any specific transaction on December 6, contrary to Zirk's testimony. (Magna Br. at 9.) In further support of their asserted contradiction, the Magna Defendants cite: 1) Troncoso's testimony that as of December 10, 2012, Lustros was still evaluating what type of transaction to do with Magna; and 2) Zielke's testimony that Zirk had never

23

discussed a potential debt purchase transaction with him prior to December 10. (Magna 56.1 ¶ 23.)

The Magna Defendants assert that Magna and Lustros agreed to the debt purchase deal on December 10, 2012, after a call between Troncoso, Manuel, and Ari Sason. (Magna Br. at 9.) They cite as evidence of the agreement an email Manuel sent Troncoso after the call that attached the debt purchase LOI, a due diligence request list, and "Standard 'non-customized' Documents" that included a statement of non-affiliation. (Magna 56.1 ¶ 24.) The Magna Defendants believe this discrepancy is important because if Zirk and Manuel had agreed to a fraud on December 6, there would have been no need for the firms to negotiate other structures over the following days, and Zirk would have had his team create the documents to affect the fraud immediately following the meeting rather than waiting until December 11, 2012. (Magna Omnibus at 5.)

## 2. **Zirk's Deposition Testimony is Inconsistent with his Past Statements**

The Magna Defendants also assert that they did not intentionally engage in fraud, challenging the SEC's evidence of scienter. They write that the SEC's scienter allegations are based "entirely on Zirk's incredible testimony" regarding the December 6 meeting, which they say is inconsistent, uncorroborated, and self-serving. (Magna Br. at 11.)

Initially, the Magna Defendants contend that Zirk's deposition testimony in this case is "contradicted by his numerous prior statements." (Id. at 11.) They assert that during Zirk's first five meetings with the Government, including on February 17 and July 17, 2015, Zirk did not discuss the Lustros fraud scheme alleged in the Complaint. (Id. at 12.) The SEC disputes this assertion, citing notes from the February 17 and July 17 proffers that reflect Zirk's discussing the Lustros-Magna transactions. (SEC 56.1 Opp. at 28.) For the purposes of this motion, the Court shall assume that Zirk did not discuss the Lustros fraud alleged here in his first three meetings with the Government but did discuss the relevant fraud starting at the February 17, 2015 meeting.

Separate from the issue of when Zirk first raised the Lustros fraud, the Magna Defendants write that Zirk's account of the fraud is absent from relevant prior discussions of his Lustros frauds. First, the Magna Defendants point to Zirk's December 8, 2014 proffer with the Government in which Zirk named twenty-eight people he "eventually wanted to talk about because he believed they were involved in various penny stock fraud schemes." (Magna 56.1 ¶ 51.) Zirk's list of people included Troncoso and Lustros attorneys who provided opinion letters for their transactions but did not include any Magna employee. (Id.) The SEC says Zirk testified that in putting together the list he

25

discussed at the December 8 proffer, he "sat down . . . and rattled off a list of names;" he did not make a deliberate decision to exclude any names from his list. (SEC Omnibus at 39.) Further, the SEC points out that Zirk subsequently provided information regarding other parties who were not listed by the agent taking notes on the proffer, so Zirk's omissions were not limited to Magna. (Id.)

Second, on December 14, 2015, Zirk executed a declaration in the case SEC v. Cope in which he discussed "how he used Lustros to commit fraud in 2012 and 2013" but did not mention Magna or the Lustros fraud alleged in the Complaint. (Magna Br. at 12.)

Third, on December 5, 2016, Zirk testified under oath before the SEC that the Lustros fraud scheme originated from an August 2012 meeting at Magna's offices in New York attended by Zirk, Manuel, and Ari Sason. (Id.) The Magna Defendants write that the documentary evidence shows that Magna and Lustros did not begin discussing a possible transaction until November 2012 and conclude that Zirk lied under oath during his December 2016 testimony. (Id. at 12-13.) The SEC disputes this characterization of Zirk's December 2016 testimony. The SEC writes that without the benefit of documents, Zirk testified that the meeting took place in "late 2012" and that "August [2012] is a good guess." (SEC 56.1 Opp. at 30; dkt. no. 156-12

26

at 20:13-19.) The Magna Defendants note that at other times in Zirk's December 2016 testimony, the SEC showed Zirk documents to refresh his recollection, so the SEC "had materials available to refresh Zirk's recollection about meetings if they thought it would have helped." (Magna Omnibus at 11, n.3 (citing dkt. no. 156-12 at 18:1-19:7.)) The Magna Defendants' bottom line is that Zirk could have testified that he did not remember the details of the meetings but, instead, he "asserted under oath and without reservation to a set of facts that are irreconcilable with his current story." (Magna Omnibus at 11.)

Fourth, the Magna Defendants write that during a proffer with the Government on October 26, 2017, Zirk changed his story and said the fraud was discussed at "multiple in-person meetings with Manuel, Joshua Sason, and others, in both Los Angeles and New York." (Magna Br. at 13.) The SEC contends that the Magna Defendants misunderstand Zirk's statements. The SEC writes that Zirk said he met with Manuel more than once and that another meeting "years later" involved Manuel, Sason, and another person. (SEC 56.1 Opp. at 33.) The SEC also asserts that the notes of the October 2017 proffer do not indicate that Zirk said all the meetings with Magna he described occurred before the First Lustros Transaction. (SEC Omnibus at 37-38.) Fifth, on January 22, 2018, Zirk told the Government that he and Manuel "concocted the plan," and on January 23, 2018, he said that

27

Manuel "was the person who gave [Zirk] the idea of creating the note." (Magna Br. at 13.)

The Magna Defendants then describe the final proffer between Zirk and the Government as resulting from the Magna Defendants' presenting to the SEC "irrefutable evidence the Magna Defendants engaged in no fraud." (Id. at 14.) The Magna Defendants go on to claim that Zirk "allegedly tailored his story to the SEC's new needs, and for the first time claimed that he and Manuel alone hatched the scheme at a meeting in Los Angeles on December 6, 2012." (Id.)

The SEC writes that the accounts Zirk gave the Government over time were "remarkably consistent," including the same basic facts. (SEC Omnibus at 36.) First, Zirk said that Magna proposed purchasing third-party debt. Second, Zirk met with Manuel to discuss the transaction. Third, Zirk told Manuel that Lustros had no third-party debt. Fourth, Zirk and Manuel discussed transferring Zirk's debt to a third party. (Id.) The SEC says that the Magna Defendants' claims regarding inconsistencies in Zirk's prior statements boil down to a prior inconsistent statement from December 2016 and a delay in disclosing the full account of his dealings with Magna. (Id.)

For its part, the SEC acknowledges that Zirk made a prior inconsistent statement in his December 2016 testimony that the Lustros fraud was agreed to at an August 2012 meeting at Magna's

offices in New York attended by Zirk, Manuel, and Ari Sason. (Id. at 37.) The SEC notes that the date, location, and attendees to the initial meeting are not in dispute. (Id.) The SEC then goes on to discuss Zirk's explanation for the discrepancy: Zirk confused a later, in-person meeting with Magna that happened in 2013 with his first meeting with Manuel alone in late 2012. (Id.) The SEC says this explanation is plausible because the December 2016 inconsistent statement was given more than four years after the December 2012 meeting, Zirk had not reviewed any documents to refresh his recollection of the initial meeting when he gave his December 2016 statement, and Zirk did later meet with Manuel and Ari Sason in New York in March 2013. (Id.)

### 3. Zirk's Deposition Testimony is Uncorroborated by Documentary Evidence

Next, the Magna Defendants claim that the SEC's case is based "entirely on Zirk's testimony" which is "not corroborated by any documentary evidence." (Magna Br. at 14.) The Magna Defendants rely on Turlip's testimony regarding Magna's due diligence process, which he said he took "very seriously." (Id. at 15.) They also point to: 1) internal Lustros communications that followed Magna's due diligence requests and discussed their need to create documents meant to legitimize the fraudulent note; 2) external representations from Lustros to Magna that

Walker River was a non-affiliate; and 3) Magna's further due diligence on the Second and Third Lustros Transactions. (Id. at 15-17.) The Magna Defendants argue that Lustros and Magna would not have had to take these steps if Magna had been a knowing and willing participant in the Lustros fraud.

The Magna Defendants also argue that Zirk's deposition testimony is contradicted by his contemporaneous written communications to Magna in which he "confirmed that Magna purchased legitimate notes and that Walker River was a non-affiliate of Lustros." (Id. at 16.) For example, they cite an email Zirk sent to Manuel on August 7, 2013, months after the First and Second Lustros Transactions, in which Zirk complained about the amount of Lustros shares Magna had sold into the market and wrote that he had "spoken to the principals at Walker [River]" and "[n]one of the parties on my side deny that your group has bought a legitimate note." (Magna Omnibus at 6.) The Magna Defendants also contend that, though Zirk testified that many people at Lustros and Magna were aware of the fraud, "nine other witnesses from both sides of the transaction" believed it was legitimate. (Magna Br. at 17.)[8]

---

[8] The Magna Defendants cite testimony from Zielke, Troncoso, Malone, Jameson, Manuel, Turlip, Reggev, Ari Sason, and Joshua Sason. (Magna Br. at 17-18.)

The SEC responds that Zirk's testimony is plausible and corroborated by substantial evidence. (SEC Omnibus at 34.) The SEC highlights that Manuel admits he met Zirk in Los Angeles on December 6, 2012, and admits that he and Zirk likely discussed Magna's proposed purchase of up to $550,000 of third-party Lustros debt at the meeting. (Id.) The SEC writes that the Magna Defendants contest whether the discussion of the debt purchase included an agreement to execute a fraudulent transaction. (Id.)

The SEC also points to contemporaneous communications that they argue corroborate Zirk's testimony regarding what was said at the December 6 meeting. (Id. at 35.) It cites an email from Manuel to Turlip instructing Turlip to email Zirk a copy of Magna's third-party debt purchase due diligence questionnaire, which the SEC says is evidence that Manuel and Zirk discussed the proposed debt purchase and the due diligence requirements for the deal. (Id.) The Magna Defendants assert this email "only suggests that Zirk and Manuel discussed a debt transaction during their in-person meeting—it does not corroborate Zirk's assertion of a fraudulent conspiracy." (Magna Omnibus at 6-7.)

The SEC also points to an email that Manuel sent to Zirk on December 7, 2012, which included a revised debt purchase proposal that Manuel drafted based on his discussion with Zirk. The proposal eliminated a reference to the purchase of "promissory notes" and replaced it with a reference to "debt,"

31

which the SEC says corroborates Zirk's testimony that Zirk told
Manuel that the only existing debt was his Lustros loan account
and not an existing convertible note. (SEC Omnibus at 35) The
Magna Defendants assert that this change in Magna's LOI
regarding the debt purchase does not corroborate Zirk's
testimony because: 1) Ari Sason drafted the term sheets without
Manuel's input; 2) the change does not suggest that Manuel
agreed to a fraud; and 3) the language was consistent with other
LOIs executed at the time of the First Lustros Transaction.
(Magna Omnibus at 7.)

The SEC further references emails from December 11, 2012,
between Zirk and other Lustros employees in which Zirk agreed
with Zielke to "explain [to Magna] exactly what [we] are doing
and why." (SEC Omnibus at 35; dkt. no. 159-31.) The SEC notes
that Zirk and Manuel spoke over the phone before and after this
communication. (SEC Omnibus at 35.) The Magna Defendants say
that the email from Zirk to Zielke was merely an agreement to
"advance documents and information to Magna that the SEC now
contends were fraudulent." (Magna Omnibus at 8.)

Later on December 11, Zielke forwarded an email to Manuel
that the SEC says indicated the note Magna intended to purchase
was "still being prepared." (SEC Omnibus at 35.) The Magna
Defendants dispute that these emails informed Manuel that the
note was still being prepared. (Magna Omnibus at 8.) The email

Zielke forwarded to Manuel showed that Zielke said to Malone "How is it going with the DD doc and note?" and Malone responded "Dotting I's and crossing T's – will be done today." (Dkt. no. 159-33.) The Magna Defendants assert that these communications do not indicate Malone was creating a note at the time but, rather, that she was completing the due diligence package requested by Magna. (Magna Omnibus at 8.) They also point to Lustros's 10-K filing from December 2012 as an attempt by Lustros to cover up the fraud so that "Magna could not learn the truth." (Id. at 9.)

### 4. **Zirk's Deposition Testimony is Self-Serving Because Zirk Was Seeking a Sentence Reduction and Unreliable Because He Lied Under Oath**

The Magna Defendants assert that Zirk changed the allegations he made against them to try to curry favor with the Government in the hopes that his prison sentence would be reduced. (Magna Br. at 18.) To support this assertion, the Magna Defendants note that in Zirk's first proffer with the Government, he said that one of his goals was to mitigate his "prison sentence as much as possible to be back with his family as soon as possible." (Id.) The Magna Defendants also point out that Zirk proactively reached out to "assist the SEC" in October 2015; that Zirk's December 2016 testimony before the SEC came about two months before his sentencing; and that in November

2018, Zirk's lawyer reached out to the SEC to ask that it "keep track of [its] meeting with Zirk so he can get credit for everything." (Id. at 18-19.) It is undisputed that Zirk was seeking a sentence reduction around the time that he proffered the information that would form the allegations in the Complaint. (SEC 56.1 Opp. at 36-37.)

When Zirk was pressed on his pursuit of a sentence reduction, Zirk said it was "never a thought in [his] mind that cooperating against Magna [and Manuel] with the SEC . . . there could be any Rule 35 for [him]." (Magna Br. at 20.) The Magna Defendants say this was a lie on his part given his attorney's request from November 2018. (Id.) The SEC contends that the Magna Defendants have offered no evidence that Zirk was lying about his motivation. (SEC Omnibus at 39.) The SEC also notes Zirk's explanation that he believed he could not get a sentence reduction by cooperating with the SEC because he thought only DOJ could move to adjust his sentence. (Id. at 39-40.)

The Magna Defendants argue that Zirk also lied during his deposition testimony when he testified that he had never "created backdated documents and transferred something for services rendered . . . that was freely-tradeable stock." (Magna Br. at 20.) The Magna Defendants assert that three years before the Lustros note fraud, Zirk engaged in an "almost identical

fraud" concerning a penny-stock company he ran called Mobicom. (Id.)

The SEC has admitted that Zirk "participated in a backdated note scheme involving Mobicom Corp. in 2009" and had "completed a transaction involving the issuance of shares of Mobicom, Corp. utilizing a backdated note." (SEC 56.1 Opp. at 35-36.) However, the SEC disputes that Zirk "created a backdated note between Mobicom and Bridges," a company nominally owned by Zirk's wife. (Id.) The SEC explains that it has not admitted that Zirk knowingly participated in the Mobicom transaction or lied about it at his deposition. (SEC Omnibus at 40.) The SEC notes that the Magna Defendants failed to confront Zirk with evidence of the Mobicom transaction during his deposition and "multiple potential plausible explanations" exist for the apparent discrepancy, including that Zirk was not aware that the note in the Mobicom transaction was backdated or that he forgot about the Mobicom transaction when he was deposed. (Id.) More generally, the SEC characterizes the arguments in this section as "garden variety" credibility evidence that district courts should not consider at summary judgment. (SEC Omnibus at 39.)

### ii.  The SEC's Scheme Liability Claims

Building on their arguments regarding Zirk's testimony, the Magna Defendants assert that there is no evidence supporting the elements of scienter and use of a fraudulent device. The Magna

Defendants write that they were neither intentionally engaged in nor reckless to the danger of fraud but, rather, the reasonably unwitting "victims of a serial fraudster." (Magna Br. at 21-22.)

The Magna Defendants write that the SEC's recklessness claims "survived dismissal" by alleging three facts. (Id. at 22.) First, the SEC alleged that Magna sent its diligence questions regarding Walker River to Lustros rather than Walker River itself. (Id.) The Magna Defendants respond that it was not unusual for them to send diligence requests to Lustros because Magna employees testified it was common for an issuer like Lustros to act as an intermediary for the transacting party like Walker River. (Id.)

Second, the SEC alleged that Magna was told Lustros was the entity receiving the proceeds from the note transaction. (Id.) The Magna Defendants respond that Magna was not aware Lustros received any transaction funds because Lustros communicated about the funds on Walker River's behalf. (Id.) The SEC contends that Magna was aware that the money paid to Walker River was going to Lustros. To support its contention, the SEC cites an email Zirk sent Manuel on December 19, 2012, after Magna sent a $200,000 wire to Walker River for parts of the First Lustros Transaction. (SEC Omnibus at 44.) Zirk wrote: "The wire for $200,000 is in. Thank you very much and I look forward to concluding the balance of this deal and many more in the

36

future." (Id.) The implication is that because Zirk confirmed
that the money was received and because he was not an employee
of Walker River, the Magna Defendants should have known that the
money was going to Lustros. The Magna Defendants interpret this
email as Lustros's confirming that Walker River received the
funds. (Magna Omnibus at 16.) They assert that there was nothing
unusual about this, given Lustros's role as the liaison between
Magna and Walker River. (Id.) They also note it is undisputed
that Magna wired the money for the transaction to Walker River's
bank account. (Id.)

Finally, the Magna Defendants claim there is "no evidence
any of the Magna Defendants knew Jameson was a personal
assistant to Zirk." (Magna Br. at 22.) The Magna Defendants
assert that the only documents containing this information were
"trivial documents" like out-of-office emails that Manuel
received long after the first Lustros transaction. (Id.)
Further, the Magna Defendants say that Manuel was not
responsible for the due diligence on Lustros, so there was "no
reason" that his seeing Jameson's name unattached to Walker
River "would have had an impact." (Id. at 22-23.) The SEC
asserts that the Magna Defendants misstate the record evidence,
saying that Manuel received one such message from Malone
identifying Jameson as her assistant minutes after Turlip sent

Manuel a draft of the diligence memo identifying Jameson as the sole officer and director of Walker River. (SEC Omnibus at 44.)

The SEC writes that even if a jury disregarded Zirk's testimony, there would still be sufficient evidence of the Magna Defendants' recklessness to meet the scienter element required for scheme liability claims. (SEC Omnibus at 41.) The SEC points to an email from Zirk to Magna in September 2012 that said Lustros was "fully funded by its principals," meaning there were no third-party debt holders with which Magna could transact. (Id.) Despite having received this email, Magna offered to buy third-party debt from Lustros two months later. (Id.) The Magna Defendants contend that this message was consistent with what Lustros told Magna during due diligence; that Suprafin, an entity owned by Zirk, initially funded the loan and later assigned it to third party Walker River. (Magna Omnibus at 14.)

The SEC also relies on private, internal messages written by Turlip in 2014 saying that he knew Zirk "was a criminal" and Turlip's continuing assertions of his Fifth Amendment right against self-incrimination. (SEC Omnibus at 42.) The Magna Defendants contend that Turlip's messages are inadmissible hearsay and that there is no evidence that: 1) Manuel thought Zirk was a criminal; 2) that Turlip communicated his opinion to Manuel at the time; or 3) that Turlip's opinion was premised on "anything objective." (Magna Omnibus at 14.)

Finally, the SEC identifies several "red flags" that they say "should have indicated to Manuel and Magna that the Walker River notes Magna purchased were fraudulent and/or that Walker River was an affiliate of Lustros and not a true third party." (SEC Omnibus at 42.) First, despite Magna requests made before the First Lustros Transaction, Lustros could not produce a copy of the note to be purchased and forwarded Manuel an email indicating that the note was still being prepared. (Id.) Second, the notes themselves were unusual, accruing no interest and lacking a payment date. (Id.) The notes obligated Lustros to pay the principal amount to three holders, Zirk, Suprafin, and Walker River, without specifying the amount owed to each. (Id. at 43.) Zirk signed each note on behalf of all three holders. (Id.) The SEC interprets these details as suggesting that it "did not matter which entity was repaid because all entities were related" and that Zirk had "authority to act on behalf of Walker River, a supposed third-party." (Id.) The SEC says that Magna never questioned any of these features of the notes during its due diligence process. (Id.)

Third, the SEC points out that Lustros's SEC filings disclosing the company's debts did not identify any outstanding convertible debt or debt owed to Walker River. (Id.) Magna noticed that the debt it proposed to purchase was not disclosed as being owed to Walker River and asked Lustros for more

39

information. (Id.) Lustros confirmed that the debt was disclosed as a loan by Zirk's company, Suprafin, and not Walker River. (Id.) Fourth, even if the debt had been owed to Walker River, information received during due diligence indicated that Walker River owned a percentage of Lustros stock (9.3%) that was above Magna's threshold for third-party sellers (5%). (Id. at 44.) The SEC notes testimony by the Magna Defendants admitting that these facts should have been investigated during Magna's due diligence process. (Id. at 43-44.) The SEC argues that these red flags should have been enough to warn a sufficiently cautious investor from participating in the transactions with Lustros. (Id.)

In reply, the Magna Defendants continue to characterize Magna's due diligence process as "substantial," "rigorous and serious." (Magna Omnibus at 13.) The Magna Defendants claim that they asked the right questions during their diligence, seeking to understand "whether the debtholder(s) were unaffiliated with Lustros." (Id.) As evidence of the effectiveness of Magna's due diligence, the Magna Defendants cite the fact that they identified that Lustros's 10-K did not accurately describe the note Magna purchased and asked Malone about the discrepancy. (Id. at 14-15.) They assert that in response, Malone lied to Magna, and Lustros filed a new 10-K to cover its tracks. (Id. at 14.) Further, they note that there is no evidence that Manuel was aware of Lustros's SEC filings. (Id.)

40

In sum, the Magna Defendants assert that there is "no evidence in the record that Magna employed a due diligence model that deviated from industry standards for a private firm." (Id. at 13.) They say that if Lustros had answered their questions honestly, Magna would have discovered the scheme, but instead Malone lied and represented that Walker River was unaffiliated with Lustros. (Id.)

### iii. Analysis

Beginning with the question of Zirk's testimony, the Magna Defendants urge the Court to ignore Zirk's testimony in its summary judgment analysis under the Jeffreys standard. In Jeffreys, the plaintiff, Percy Jeffreys, sued the City of New York and its police department for use of excessive force in his arrest. 426 F.3d at 553. Specifically, Jeffreys claimed that he was caught by police during an attempted burglary and that when he went to surrender, an unspecified number of police officers beat him and threw him out of a third story window. Id. at 551. By contrast, the reporting police officer said that when he announced himself, Jeffreys jumped out of the window to try to avoid arrest. Id. at 552. Despite claiming that he was attacked by one or more police officers, Jeffrey could not identify any individuals who participated in the attack, provide rough descriptions of their physical features, or definitively say how many officers participated in the attack at any given time. Id.

41

On three occasions prior to initiating his lawsuit, Jeffreys confessed that he had jumped out of the window. Id. In addition, through all the stages of his criminal case, Jeffreys did not mention the excessive force he later alleged he suffered. Id. Against his prior confessions and his failures to publicly discuss the allegations, Jeffreys offered statements from two family members who said Jeffreys told them of his excessive force claims. Id. The medical personnel who examined Jeffreys immediately after the alleged beating and fall failed to find any physical evidence of injuries that would corroborate his account. Id. at 552-53.

In the context of these facts, the district court found "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony" and that "no reasonable person could believe Jeffreys'[s] testimony." Id. at 555. The Court of Appeals subsequently approved the district court's decision to grant summary judgment against Jeffreys. Id. However, this Court does not forget that the standard articulated in Jeffreys is a "narrow exception" to the "bedrock rule of civil procedure that a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented." Frost, 980 F.3d at 245 (quotation marks and citation omitted).

Despite the Magna Defendants' arguments to the contrary, Zirk's testimony in this case is not like Jeffreys's. The issue in Jeffreys concerned a beating that Jeffreys said occurred and the NYPD said never happened. Here, Zirk and the Magna Defendants agree that Zirk met Manuel on December 6, 2012, in the Luxe Hotel in Los Angeles to discuss several potential financial transactions between Magna and Lustros, including a third-party debt purchase. (Magna 56.1 ¶¶ 19-20.) The parties only dispute whether Zirk and Manuel's conversation included an agreement to commit fraud based on the purchase of a backdated note. (Id.)

Unlike Jeffreys, Zirk asserted the existence of this fraud for years before the SEC brought its case against Magna. (Id. ¶¶ 50-65, 74-75.) While the Magna Defendants raise legitimate questions regarding inconsistencies in the statements that Zirk gave over time, those inconsistencies more closely resemble the "garden variety credibility issues" that are the proper domain of the trier of fact; they are not grounds for the Court to disregard Zirk's testimony on summary judgment. Frost, 980 F.3d at 247. In addition, the SEC cites evidence that corroborates Zirk's testimony, including certain "red flags" regarding the transactions that it says should have been identified during Magna's due diligence and should have dissuaded Magna from proceeding with the transaction. (SEC Omnibus at 42-44.)

Accordingly, the Court will not disregard Zirk's testimony. The issue of Zirk's credibility is one for the trial jury, not the Court on summary judgment. In addition, the Court finds there are several genuine issues of material fact concerning whether Magna knowingly or recklessly engaged in fraud regarding the Lustros Transactions. Thus, the Magna Defendants' motion for summary judgment on the Lustros scheme liability claims is DENIED.

## IV.  The Section 5 Claims

The SEC has pursued Section 5 claims against the Magna Defendants based on the NewLead and the Lustros transactions and against the Pallas Defendants based on the NewLead transactions. The SEC has moved for summary judgment on all the Section 5 claims. The Magna Defendants have moved for summary judgment on the Section 5 claims against them while the Pallas Defendants oppose the SEC's motion on their Section 5 claims. In the below fact section, the Court will state the facts relevant to the NewLead Transactions and will state additional facts relevant to the Lustros Section 5 claims.

### A. Relevant Facts

#### i.   The NewLead Transactions

In June 2004, Kautilya Sharma was indicted for the sale of unregistered securities, among other crimes. (SEC 56.1 ¶ 184.) Sharma subsequently pled guilty to one count of conspiracy to

sell unregistered securities and one count of conspiracy to commit securities fraud. (Id. ¶ 185.) Sharma settled a parallel SEC enforcement action, and in March 2006, he was administratively barred from associating with any broker, dealer, or investment adviser. (Id. ¶ 186.) Sharma was released from prison in 2007, and in 2008, he met Persian Salviola while working at a solar energy company called Planck Solar. (Id. ¶ 188.) Sharma and Salviola were romantically involved from 2008 to 2018. (Id. ¶ 190.)

In 2009 and 2010, Salviola acquired various coal assets which she held in her company, Planck Holdings. (Id. ¶ 192.) Sharma ran coal operations for Planck Holdings, which included identifying coal assets to acquire and obtaining leases and mining permits. (Id. ¶ 193.) In 2010, when Salviola sold Planck Holdings for $43 million, Sharma helped identify the buyer through a family relation that was affiliated with the company. (Id. ¶¶ 194-95.) In May 2010, after the sale of Planck Holdings, Salviola formed the Mantangi Irrevocable Trust ("Mantangi") and contributed one hundred thousand dollars as the initial assets. (Id. ¶¶ 199, 204.) Salviola was Mantangi's sole trustee. (Id. ¶ 201.) Sharma's three children were the beneficiaries of Mantangi. (Id. at 202.)

Pallas Holdings, LLC ("Pallas") was formed by Salviola in May 2010. (SEC 56.1 ¶ 196.) Salviola was the managing member of

Pallas and owned five percent of the company. (Id. ¶ 198.) The
Mantangi Irrevocable Trust was the other member and owned the
remainder of Pallas. (Id. ¶ 200.) Salviola loaned Pallas
approximately twenty-five million dollars, either directly or
through Matangi, which Pallas used to acquire coal assets,
including the Viking Mine and the Viking Prep Plant. (Id.
¶¶ 205-06.) Sharma also ran Pallas's coal operations, including
operating the Viking Mine and Prep Plant. (Id. ¶ 207.) Pallas
owned the Viking Mine through its interest in Viking Acquisition
Group, LLC ("VAG"). (Id. ¶ 210.) Pallas owned the Viking Prep
Plant through Pallas Highwall Mining, LLC, which in turn owned
Viking Prep Plant, LLC ("VPP"). (Id. ¶ 213-14.)

NewLead Holdings Ltd. ("NewLead") was a publicly traded
shipping company based in Greece. (Id. ¶ 216.) In Spring 2013,
Sharma negotiated with NewLead CEO Michael Zolotas on Pallas's
behalf regarding NewLead's potential purchase of the Viking Mine
and Prep Plant. (Id. ¶ 218.) The sale of Viking Mine closed on
September 13, 2013, when Pallas transferred ownership and
control of the Viking Mine to NewLead in according to the terms
of the Unit Purchase Agreement, in exchange for a fifteen
million dollar note (the "Mine Note"). (Pallas 56.1 Opp. at 9.)
The Mine Note obligated NewLead to pay the fifteen million
dollars in three ways: 1) $125,000 in cash; 2) $5,875,000 in
NewLead common stock; and 3) $9,000,000 to be paid through six

46

quarterly payments of $1,500,000 in any combination of cash, NewLead common stock, and set offs of invoices issued by NewLead to Pallas for processing coal at the Viking Prep Plant. (SEC 56.1 ¶ 222.)

Unlike the sale of the Viking Mine, the sale of the Viking Prep Plant did not close on September 13, 2013, because the Prep Plant was encumbered by a mortgage that had to be satisfied before it could be transferred to NewLead. (Id. ¶ 224.) As of September 30, 2013, Pallas had no signed agreements with NewLead on the purchase of the Prep Plant. (Id. ¶ 225.)

The parties continued to negotiate the transaction, (id. ¶¶ 229-36), eventually agreeing to a total purchase price of $10 million, (id. ¶ 237). During the negotiations, Pallas insisted that $6 million of the purchase price be paid in cash. (Id. ¶ 239.) NewLead had not had the cash available, so NewLead sought to generate the cash by issuing a $6 million note ("$6 Million Note") to Pallas that Pallas would then sell to Hanover, a New York LLC that Sason formed in April 2011. (Id. ¶¶ 8, 240-41.) To this end, on October 11, 2013, Zolotas sent Sharma a copy of a template settlement agreement from Magna. (Id. ¶ 241.) On October 16, 2013, NewLead sent the signed $6 Million Note to Pallas. (Id. ¶ 242.) NewLead did not make any payments to Pallas stemming from the $6 Million Note. (Id. ¶ 245.)

On or about November 4, 2013, Pallas and Hanover executed a debt purchase agreement. (Magna 56.1 Opp. at 115.) Pursuant to the agreement, Hanover agreed to pay six million dollars for the note according to a payment schedule if NewLead complied with the terms of a stipulation of settlement that was approved by court order (SEC 56.1 ¶ 250). Sharma negotiated the payment schedule with Manuel, including the timing of the payments. (Id. ¶ 252.) Salviola also had discussions with Magna about the payment schedule. (Magna 56.1 Opp. at 119.) The payment scheduled required Hanover to pay: 1) $750,000 on November 14, 2013; 2) $2,250,000 three days after court approval; and 3) payments of $750,000 sixty, ninety, one hundred twenty, and one hundred fifty days after court approval. (SEC 56.1 ¶ 256.) Hanover subsequently agreed with NewLead to settle the $6 Million Note with stock that was received and sold by Hanover's designee, MGP. (Id. ¶ 261.) Sharma and Salviola testified that Pallas did not loan money to NewLead in exchange for the $6 Million Note or provide services to New Lead pursuant to a written agreement in exchange for the $6 Million Note. (Id. ¶¶ 259-60.)

Between December 6, 2013, and June 27, 2014, MGP sold nearly 111 million shares of NewLead stock for more than $61 million. (Id. ¶ 280.) MGP sold all those shares within six

months of acquiring them. (Id. ¶ 281.) None of the shares was sold pursuant to an SEC registration statement. (Id. ¶ 282.)

Pallas's sale of the Viking Prep Plant closed on December 9, 2013, when Pallas entered into a sale contract with NewLead. (Id. ¶ 262.) NewLead bought the plant for $30 million, paid for in a $24 million note ("Prep Plant Note") issued to Pallas that day and through payments made pursuant to the $6 Million Note. (Id. ¶ 264.) The contract referenced NewLead's Form 6-K filing on December 2, 2013, which announced the New York State Supreme Court's fairness order as part of the consideration. (Id.) The Prep Plant Note obligated NewLead to pay the $24 million by issuing $10 million of NewLead common stock to Pallas and making five periodic payments of $2.8 million in any combination of cash, NewLead common stock, or set offs of invoices issued by NewLead to Pallas for processing Pallas's coal at the Viking Prep Plant. (Id. ¶ 265.)

Both the Mine Note and the Prep Plant Note contained "true-up" provisions which meant that, for any payments NewLead made to Pallas in stock, NewLead was obligated to either make cash payments or issue additional stock until Pallas received the full principal amount. (Id. ¶ 266.) Both notes stated that the securities issued pursuant to the notes had not been registered under the Securities Act and could not be sold, transferred, or otherwise disposed of in the absence of an effective

registration statement or exemption. (Id. ¶ 267.) Only NewLead could decide whether to make a payment under the notes with NewLead stock; Pallas did not have the right to convert or exchange the principal of either note into NewLead stock. (Id. ¶¶ 269-70.)

NewLead paid down the notes by issuing shares of NewLead common stock to Pallas. (Id. ¶¶ 271-72.) Between April 25, 2014, and June 2, 2017, Pallas received nearly 590 million shares of NewLead common stock pursuant to the two notes, which it sold for more than $21 million. (Id. ¶¶ 274-75.) Pallas sold nearly all the stock within a week of the date the shares were issued. (Id. ¶ 275.) None of Pallas's sales of NewLead common stock was made pursuant to a registration statement filed with the SEC. (Id. ¶ 278.)

### ii.  Sharma and Salviola's Involvement in Pallas's Sale of Unregistered NewLead Stock

Sharma conducted the negotiations with NewLead on behalf of Pallas and helped Salviola set up Pallas's brokerage account. (Id. ¶¶ 302-03.) Salviola signed Rule 144 representation letters on Pallas's behalf regarding the relevant transactions that were submitted to NewLead's transfer agent. (Id. ¶ 306.) Salviola also completed and signed questionnaires concerning the deposit of unregistered securities and submitted them to Pallas's brokers. (Id. ¶ 307.) Further, Salviola provided instructions on

when to sell Pallas's NewLead shares to Pallas's brokers. (<u>Id.</u>
¶ 310.)

### iii.  **Manuel and Sason's Involvement in Magna's Sale of Unregistered Lustros Stock**

Manuel originated the Lustros Transactions, helped to
negotiate their terms, and oversaw the diligence process for the
transactions. (SEC 56.1 ¶¶ 283-85.) Manuel provided approvals
for each of the Lustros Transactions, in addition to the other
members of Magna's investment committee. (<u>Id.</u> ¶¶ 46-50, 286.)
Manuel was Magna's primary point of contact with Lustros for the
transactions at issue in this case. (<u>Id.</u> ¶ 291.) For his part,
Sason's electronic signature was used on the transactional
documents and conversion notices associated with the Lustros
Transactions. (<u>Id.</u> ¶¶ 299-300.)

### iv.  **Sharma, Salviola, Manuel, and Sason's Involvement in MGP's Sale of Unregistered NewLead Stock**

Sharma negotiated the six-million-dollar component of the
Viking Prep Plant transaction with NewLead and the other parties
on Pallas's behalf. (SEC 56.1 ¶ 311.) Salviola prepared and
compiled diligence documents requested by Magna that Sharma sent
to NewLead. (<u>Id.</u> ¶ 312.) Manuel was the primary point of contact
with NewLead and its principals. (<u>Id.</u> ¶ 313.) He supervised the
due diligence and negotiated Hanover's purchase of the $6
Million Note. (<u>Id.</u> ¶ 315.) Manuel signed the Hanover-Pallas
agreement on Hanover's behalf and recommended that Sason approve

the NewLead Transaction. (Id. ¶ 316.) Sason approved the NewLead

Transaction and authorized its funding. (Id. ¶ 320.) Sason

personally approved the money that was used to purchase the

debts in the NewLead Transaction. (Id. ¶ 321.) Sason's

electronic signature was used on the term sheet for the NewLead

transaction. (Id. ¶ 322.) Sason physically signed his affidavit

and the stipulation of settlement submitted to the court. (Id.

¶ 323.)

### B. **Legal Standard**

Section 5 of the Securities Act says that "unless a

registration statement is in effect as to a security," it is

unlawful for any person to directly or indirectly "make use of

any means or instruments of transportation or communication in

interstate commerce or of the mails to sell such security" or

"to carry or cause to be carried through the mails or in

interstate commerce, by any means or instruments of

transportation, any such security for the purpose of sale or for

delivery after sale." 15 U.S.C. § 77e(a).

To establish a violation of Section 5, the SEC must show

"'(1) lack of a registration statement as to the subject

securities; (2) the offer or sale of the securities; and (3) the

use of interstate transportation or communication and the mails

in connection with the offer or sale.'" SEC v. Bronson, 14 F.

Supp. 3d 402, 408 (S.D.N.Y. 2014) (quoting SEC v. Cavanagh, 445

F.3d 105, 111 n.13 (2d Cir. 2006)). Section 5 is a strict liability statute requiring no showing of scienter or negligence. Id.  If the SEC makes its prima facie case, "the defendant bears the burden of proving the applicability of an exemption." Cavanagh, 445 F.3d at 111 n.13.

   C. **Discussion**

      i.   **The Magna Defendants' Sale of Lustros Stock**

         a. **Legal Standard**

One such exemption appears in Section 4(a)(1) of the Securities Act, which reads that Section 5 shall not apply to "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). Section 2 of the Securities Act defines "underwriter" as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security." 15 U.S.C. § 77b(11). SEC Rule 144 sets out criteria by which a seller can avoid being deemed an underwriter with respect to unregistered securities. SEC v. Longfin Corp., 316 F. Supp. 3d 743, 757 (S.D.N.Y. 2018). That in turn allows any person who is not an issuer or a dealer to claim an exemption from Section 5 liability. (Id.)

Rule 144 defines restricted securities to include "[s]ecurities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of

transactions not involving any public offering." 17 C.F.R.
§ 230.144(a)(3)(i). It defines an affiliate as "a person that
directly, or indirectly through one or more intermediaries,
controls, or is controlled by, or is under common control with,
such issuer." 17 C.F.R. § 230.144(a)(1). While Rule 144 fails to
define "control," the Court of Appeals has adopted the
definition of control set out in Rule 405 of Regulation C: "the
possession, direct or indirect, of the power to direct or cause
the direction of the management and policies of a person whether
through the ownership of voting securities, by contract, or
otherwise." S.E.C. v. Kern, 425 F.3d 143, 149 (2d Cir. 2005)
(quoting 17 C.F.R. § 230.405). "The 'determination [of control]
is a question of fact which depends upon the totality of the
circumstances including an appraisal of the influence upon
management and policies of a corporation by the person
involved.'" Longfin, 316 F. Supp. 3d at 759 (quoting United
States v. Corr, 543 F.2d 1042, 1050 (2d Cir. 1976)).

     The relevant provisions of Rule 144 require entities that
purchase restricted securities to hold the securities for at
least six months before selling them. See 17 C.F.R.
§ 230.144(d)(1)(i). The holding period for entities that acquire
the securities by purchase begins once the "full purchase price
or other consideration is paid or given by the person acquiring

the securities from the issuer or from an affiliate of the issuer." 17 C.F.R. § 230.144(d)(1)(iii).

### b. **Analysis**

The SEC has made its prima facie showing regarding the Section 5 claims against the Magna Defendants based on the Lustros Transactions. (SEC Omnibus at 16-17.) The evidence reflects that Magna sold more than three million shares of Lustros stock, (Magna 56.1 Opp at 48), for which no registration statement was in effect, (id. at 50). Magna used interstate commerce for these sales by communicating with Lustros employees in California, (id. at 42), Chile, (id. at 44), and Ohio, (id. at 45), and with Lustros's transfer agent in Utah, (id. at 46-47), among other things. Thus, the burden passes to Magna to show that an exemption to the registration requirement applied to these stock sales.

The Magna Defendants argue that there is a genuine dispute of material fact as to whether Walker River was an affiliate of Lustros. (Magna Omnibus at 30-31.) To support their argument, the Magna Defendants rely on the SEC's statement that "[o]n paper, Jameson was the sole officer and director of Walker River." (Magna Omnibus at 31 (citing SEC 56.1 ¶ 80).) They point to Jameson's status as Zirk's "personal assistant," saying that Jameson was not a Lustros employee. (Magna Omnibus at 31 (citing SEC 56.1 ¶¶ 76-77).) They assert that Zirk testified that

Jameson was the ultimate decision maker at Walker River. (Magna Omnibus at 32 (citing dkt. no. 156-11 at 139:17-140:2)[9].) Finally, the Magna Defendants assert that Lustros employees made repeated representations to Magna that Walker River was not an affiliate. (Magna Omnibus at 32-33.)

The SEC argues that neither Rule 144 nor Section 4(a)(1) of the Securities Act exempts the Magna Defendants' sales of Lustros stock from the registration requirement. (SEC Omnibus at 25-27.) The SEC reasons that the Lustros stock Magna received was restricted under Rule 144 because it was acquired from a Lustros affiliate, Walker River. (SEC Omnibus at 26.) The SEC asserts that Walker River was Lustros's affiliate because Walker River was under common control with Lustros. (Id.) The SEC continues that because Magna received restricted securities, it

---

[9]   Q: Maggie Jameson had no authority to okay or decline to do a deal with Walker River, did she?

A: Yes, she did.

Q: She did?

A: Of course. She still had to sign the paperwork. If she didn't want to sign the paperwork, then there was no deal.

Q: So it's your testimony, sir, under oath that Maggie Jameson could've told you, no, I'm not doing this deal for Walker River?

A: Of course.

was required to hold them for at least six months before
selling, which it failed to do. (Id.)

    To support its assertion that Walker River was under common
control with Lustros, the SEC points to a paragraph in the Magna
Defendants' statement of undisputed material fact in which the
Magna Defendants wrote that "[i]n reality, Walker River was
owned and controlled" by Zirk. (SEC Reply at 11-12 (quoting
Magna 56.1 ¶ 33).) The SEC argues that Jameson's legal ownership
of Walker River does not mean that she controlled Walker River
for the purposes of Rule 144. (SEC Reply at 12.) Instead, the
SEC points to Zirk's actions as demonstrating that he controlled
Walker River, including his directing Jameson to open accounts
and sign investment paperwork, his moving stock into Walker
River, and his directing Jameson when to sell the stock and how
to use the proceeds. (Id.)

    The SEC rejects the Magna Defendants' interpretation of
Zirk's testimony, (see supra at 56 n.9), writing that "at most,
the cited testimony indicates Jameson was required to sign the
requisite forms on behalf of Walker River for any transaction,"
(SEC Reply at 12). Instead, the SEC highlights Jameson's
testimony that she considered Walker River to belong to Zirk,
that she did not make any decisions regarding Walker River
herself, and Zirk's testimony where he confirmed that he owned
and controlled Walker River. (Id. at 12-13 (citing SEC 56.1

¶ 81).) The SEC similarly rejects the Magna Defendants' reliance on Lustros's responses to Magna's due diligence documents because the Magna Defendants concede that the responses were false. (Id. at 13.)

Reviewing the evidence in the light most favorable to the Magna Defendants as the non-moving party, the Court finds that Walker River was an affiliate of Lustros. Zirk's activities directing the "management and policies" of Walker River meet the definition for control applicable under Rule 144. The facts that the Magna Defendants recite do not raise a genuine dispute as to Walker River's status vis-à-vis Lustros. Thus, the Court finds that the Magna Defendants' sale of Lustros stock did not meet the requirements of Rule 144. The SEC's motion for summary judgment on the Section 5 claims against the Magna Defendants for the sale of unregistered Lustros stock is GRANTED.

### ii.  **The Pallas Defendants' Sale of NewLead Stock**

The SEC has made its prima facie showing regarding the Section 5 claims against the Pallas Defendants based on the NewLead Transactions. (SEC Omnibus at 16-17.) The evidence reflects that Pallas sold more than 588 million shares of NewLead stock for which no registration statement was in effect. (Pallas 56.1 Opp. at 24-25.) Pallas, based in Florida, (id. at 4), used interstate commerce in connection with these sales by communicating with its brokers in New York and New Jersey, (id.

at 24), to sell its NewLead stock on Nasdaq, a national stock exchange, (id. at 8). Thus, the burden passes to Pallas to show that an exemption to the registration requirement applied to the stock sales.

Like the Magna Defendants, the Pallas Defendants invoke Rule 144 in claiming that an exception to the registration requirement applied to their sales of NewLead stock. (Pallas Opp. at 8.) First, the Pallas Defendants look to Rule 144(d)(1)(i), which requires that a "minimum of six months must elapse between the later of the date of the acquisition of the securities from the issuer, or from an affiliate of the issuer, and any resale of such securities." The Pallas Defendants highlight that Rule 144 says the holding period commences when an entity acquires the securities, not when the securities are issued. (Pallas Opp. at 5.) The distinction is important because Pallas Defendants then rely on Rule 144(d)(3)(iii) to argue that they acquired the shares on the same date that each Viking Asset sale closed. (Id. at 6-8.)

In this case, significant time elapsed between when the Viking Asset sales closed and when NewLead issued its stock to Pallas. The Viking Mine sale closed on September 13, 2013. (Pallas 56.1 Opp. at 9.) The Viking Prep Plant sale closed on December 9, 2013. (Id. at 21.) Then, between April 25, 2014, and June 2, 2017, Pallas received more than 588 million shares of

NewLead stock pursuant to the Mine and Prep Plant Notes. (Id. at 24-25.) The Pallas Defendants assert they did not sell any of the shares they received pursuant to the Mine Note until April 25, 2014, more than seven months after the Viking Mine sale closed. (Pallas Opp. at 7-8.) The Pallas Defendants assert that they did not sell any of the shares they received pursuant to the Prep Plant Note until June 16, 2014, more than seven months after Prep Plant sale closed. (Id. at 8.) Based on Rule 144(d)(3)(iii), the Pallas Defendants argue that they acquired their NewLead stock on the date of the sale contract closings and not the date NewLead issued the securities to Pallas. Because the Pallas Defendants assert that they sold the NewLead stock more than six months after the sale of the relevant Viking Asset, the Pallas Defendants argue that these sales qualify for an exemption from the registration requirement under Rule 144. (Pallas Opp. at 7-8.)

In reply, the SEC argues that the Pallas Defendants may not rely on Rule 144(d)(3)(iii). (SEC Reply at 2.) Rule 144(d)(3)(iii) reads in relevant part:

> Contingent issuance of securities. Securities acquired as a contingent payment of the purchase price of an equity interest in a business, or the assets of a business, sold to the issuer or an affiliate of the issuer shall be deemed to have been acquired at the time of such sale if the issuer or affiliate was then committed to issue the securities subject only to conditions other than the payment of further consideration for such securities.

The SEC writes that the provision "embodies the general
principle that the holding period for restricted securities
begins when the holder 'is deemed to have paid for the
securities and thereby assumed the full risk of economic loss
with respect to them.'" (SEC Reply at 3 (quoting Resale of
Restricted and Other Securities: Interpretations of Rules,
Securities Act Release No. 6099, 17 S.E.C. Docket 1422, 1979 WL
174360, at *9 (Aug. 2, 1979).) The SEC asserts that it has
consistently found the provision does not apply where "the
seller is guaranteed payment and thus assumes no risk of loss."
(SEC Reply at 3.)

The SEC argues that the Pallas Defendants did not assume
any risk of loss in the NewLead Transactions because the Notes
contained "true-up" provisions that guaranteed payment of a
certain sum to Pallas. (Id. at 4.) If Pallas sold the NewLead
stock for less than the amount it was owed under the Notes,
NewLead was obligated to issue Pallas more stock until it was
able to reach the proceeds amount promised in the Notes. (Id.)

The Pallas Defendants argue the true-up provisions in the
Notes should not prevent them from relying on
Rule 144(d)(3)(iii). (Pallas Opp. at 9, n.5.) The Pallas
Defendants argue that the transactions addressed in Rollins,
Inc., SEC No-Action Letter, 1972 WL 11277 (Nov. 16, 1972),
Vernitron Corp., SEC No-Action Letter, 1973 WL 9474 (May 7,

61

1973), and <u>General Maritime Corp.</u>, SEC No-Action Letter, 2002 WL 1340251 (June 14, 2002) "all involved 'adjustments' based on the value of the stock at the time of the issuance" that it characterizes as "functionally similar to this case's true-ups." (<u>Id.</u>) The Pallas Defendants note that in the cases it cites, the adjustments did not prevent the SEC from approving the proposed transactions under Rule 144. (<u>Id.</u>)

The SEC rejects the Pallas Defendants' analogy between the true-up provisions in this case and the adjustments to the number of shares to be issued based on market conditions in the cases the Pallas Defendants cite. (SEC Reply at 5.) The SEC argues that the adjustments did not guarantee the recipient a certain amount of money when it sold the stock, unlike the true-up provisions at issue in this case. (<u>Id.</u>)

The Court agrees with the SEC. Under Rule 144(d)(3)(iii), the "holding period for shares issued pursuant to a contingency clause" in an agreement to purchase the assets of a business "would generally relate back to the closing date of the agreement, unless the shares were issued to fulfill a guarantee of a specific dollar figure on resale of the shares originally issued." <u>Jesse M. Brill, Esq.</u>, SEC Staff No-Action Letter, Fed. Sec. L. Rep. P 82, 431, 1979 WL 14359, at *2 (Sept. 24, 1979)). It is undisputed that by the terms of its agreement with Pallas, NewLead was required to continue issuing stock until Pallas

received a "specific dollar figure on resale of the shares originally issued." (Id.; see also Pallas 56.1 Opp. at 9-10, 22-23.) In other words, Pallas did not assume any risk of loss by accepting NewLead stock as payment for the Viking Assets transactions. Thus, the Court finds that Rule 144(d)(3)(iii) does not apply to the NewLead stock sold by the Pallas Defendants. Because the Pallas Defendants' sale of NewLead stock was not covered by an exemption to the registration requirement, the SEC's motion for summary judgment on the Section 5 claims against the Pallas Defendants related to the sale of unregistered NewLead stock is GRANTED.

### iii. The Magna Defendants' Sale of NewLead Stock

MGP sold more than 110 million shares of NewLead stock for which no registration statement was in effect. (Magna 56.1 Opp. at 130-31.) Hanover and MGP used interstate commerce by wiring money to Pallas to purchase the $6 Million Note. (Id. at 129-30.) MGP's NewLead stock sales occurred while NewLead was listed on Nasdaq. (Id. at 99.) The Court finds that the SEC has made its prima facie showing regarding MGP's sale of unregistered NewLead stock. Thus, the burden passes to MGP to show that an exemption to the registration requirement applied to the stock sales.

The Magna Defendants claim that the NewLead stock they sold qualifies for the Section 3(a)(10) exemption from registration.

(Magna Br. at 23.) The Magna Defendants assert Magna obtained NewLead's shares in exchange for satisfaction of NewLead's debt to forty creditors, including Pallas, and that the debt was bona fide and outstanding in December 2013. (Id. (citing Magna 56.1 ¶ 130).) The SEC responds that the Section 3(a)(10) exemption does not apply to MGP's sales of NewLead stock because the $6 Million Note was not a bona fide debt at the time of the NewLead Transaction. (SEC Omnibus at 29-30.)

### a. Legal Standard

Another exemption from the registration requirement appears in Section 3(a)(10) of the Securities Act. 15 U.S.C. § 77c(a)(10). The exemption applies to "any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions." Id. In other words,

> the statutory prerequisites for an issuer claiming a Section 3(a)(10) exemption, as relevant here, are: (i) exchange for outstanding securities, claims or property interests; (ii) a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities shall have the right to appear; and (iii) a finding of fairness and approval by a court.

YA II PN, Ltd. v. Taronis Techs., Inc., 435 F. Supp. 3d 622, 625 (S.D.N.Y. 2020).

b. **Analysis**

1. **The Magna Defendants' Motion for Summary Judgment**

Pallas's sale of the Viking Mine to NewLead closed on September 13, 2013, when Pallas and NewLead signed a sale contract. (Magna 56.1 Opp. at 100.) However, Pallas's sale of the Viking Prep Plant to NewLead did not close until December 9, 2013, because of cash-flow issues. (Id. at 123.) The Viking Prep Plant was subject to a $3 million mortgage that had to be satisfied before the sale could be completed. (Id. at 103.) As such, Pallas wanted $6 million of the Prep Plant purchase price be paid in cash so that it could satisfy the mortgage. (Id. at 110 (citing dkt. no. 156-27 at 104:24-105:16.) NewLead did not have $6 million in cash on hand to pay Pallas. (Magna 56.1 Opp. at 110-11.) This is where Hanover, and the Magna Defendants in turn, become relevant. To generate the funds for the cash payment, Pallas and NewLead agreed that NewLead would issue the $6 Million Note to Pallas and Pallas would then sell the note to Hanover. (Id. at 111.) NewLead sent the $6 Million Note to Pallas on October 16, 2013. (Id. at 112.)

The SEC asserts that the $6 Million Note was delivered exclusively as a means of generating cash for NewLead's purchase of the Viking Prep Plant and that NewLead would not have honored the $6 Million Note unless it received the Prep Plant. (SEC

Omnibus at 29-30.)  The SEC writes that at the time Pallas sold
the $6 Million Note to Hanover in November 2013, there was no
contract in place for the sale of the Prep Plant. (Id. at 30.)
The SEC argues that because either party was free to walk away
from the deal, the $6 Million Note was not a bona fide debt of
NewLead. (Id.)  The SEC says Pallas's representations that the
$6 Million Note was a bona fide outstanding claim for money
either loaned to NewLead by Pallas or due to Pallas for services
rendered pursuant to a written agreement with NewLead show that
it was not a bona fide debt because Pallas did not loan money or
provide services to NewLead in exchange for the $6 Million Note.
(Id. at 31.)

     The Magna Defendants characterize the SEC's arguments as
saying that the Court should "exercise, in effect, appellate
review over a final state court determination" and void the
state court's determination in the December 2, 2013
Section 3(a)(10) fairness hearing. (Magna Omnibus at 27.) The
Magna Defendants further argue that the SEC has not presented
any legal authority for the Court to "determine[e] retroactively
that Hanover (and its designee, MGP), upon receipt of
unrestricted, freely-tradable NewLead shares approved by the
state court, was not entitled to rely on that judicial
approval." (Id. at 28.) The Magna Defendants write that the SEC
failed to develop evidence from NewLead to controvert its CFO's

66

affidavit filed in connection with the Section 3(a)(10) fairness hearing that averred that the debts Hanover acquired were bona fide debt, including Pallas's $6 Million Note. (Id. at 30.)

The SEC replies that court approval of the fairness of an exchange is not alone sufficient to trigger the Section 3(a)(10) exemption; the securities must also be "issued in exchange for one or more bona fide . . . claims." (SEC Reply at 6.) The SEC writes that it "is not asking the Court to overturn or invalidate the state court judgment as to the fairness of the terms of the exchange as to a NewLead creditor." (Id.) Instead, the SEC says it is asking the Court to assess independently the nature of the $6 Million Note, which the SEC asserts is within this Court's jurisdiction under the Securities Act. (Id. at 7 (citing 15 U.S.C. § 77t(b)). The SEC notes that the state court that issued the fairness opinion was told that the $6 Million Note was issued in exchange for money or services Pallas provided to NewLead, which the SEC asserts is "undisputedly false." (Id.)

The Court agrees with the SEC that Pallas did not loan money or provide services to NewLead in exchange for the $6 Million Note and therefore, the $6 Million Note was not a bona fide outstanding claim for money either loaned to Pallas or due to Pallas for services rendered. It is not enough that the $6 Million Note transaction was approved by the state court in a

fairness hearing. For Section 3(a)(10) to apply, the transaction must have also involved an exchange for outstanding securities, claims or property interests. YA II PN, 435 F. Supp. 3d at 625. The Court finds that Section 3(a)(10) does not apply to the MGP's sales of NewLead stock. Accordingly, the Magna Defendants' motion for summary judgment on the Section 5 claims based on MGP's sale of NewLead stock is DENIED.

### 2. **The SEC's Motion for Summary Judgment**

However, the Pallas Defendants assert that there is a genuine dispute of material fact as to whether Pallas and NewLead reached an agreement for the sale of the Viking Prep Plant before the sale contract was signed in December 2013. (Pallas Opp. at 12.) First, the Pallas Defendants argue that the existence of the $6 Million Note is itself evidence of the agreement to sell the Prep Plant. (Id.) Second, the Pallas Defendants rely on the history of negotiations between Pallas and NewLead to make a "reasonable inference that Newlead's promise to purchase the Viking Prep Plant for $30 Million, including $6 million in cash, became an enforceable obligation – or a 'bona fide claim' (§ 77c(a)(10)) – on or about September 13, 2013." (Pallas Opp. at 14.)

The Pallas Defendants assert that from the start, Pallas and NewLead contemplated the transfer of both Viking Assets. (Id. at 13 (citing, Declaration of Perian Salviola ("Salviola

68

Decl.") [dkt. no. 173]).) The Pallas Defendants write that the parties negotiated the total purchase price for the Viking assets together rather than individually. (Pallas Opp. at 13 (citing Salviola Decl.).) The Pallas Defendants contend that Pallas conditioned the sale of both Viking Assets on NewLead's payment of $6 million in cash on or before the closing of the Viking Assets. (Pallas Opp. at 13 (citing Pallas 56.1 Opp. at 38-39 (several preliminary emails and agreements from June 2013 that mentioned payment of $6 million on closing)).)

The Pallas Defendants assert that on September 8, 2013, Pallas and NewLead agreed to a $45 million purchase price for both Viking Assets. (Pallas Opp. at 13. (citing dkt. no. 175-13 at SEC-Sason-108186, an email exchange between Sharma and Zolotas).) The Pallas Defendants argue that Pallas and NewLead closed on the Viking Mine with the expectation that NewLead would soon obtain financing and be prepared to close on the Prep Plant. (Pallas Opp. at 14 (citing the Salviola Decl.; Sharma's testimony in which he said that there was an agreement on September 30th that was not represented in written documents [dkt. no. 156-27 at 150:22-151:6]; and the September 8, 2013 Sharma-Zolotas emails[10]).) Finally, the Pallas Defendants say

---

[10]   Sharma: As we have all our documents done and the mines are not being funded with cash, should we just close on the mines right away? We can close (footnote continued)

that Pallas would not have closed on the Mine had NewLead not committed to the purchase of the Prep Plant. (Pallas Opp. at 14 (citing the Salviola Decl. and the September 8, 2013 Sharma-Zolotas emails.)

In reply, the SEC writes that there was no enforceable agreement for the sale of the Prep Plant until December 9, 2013. (SEC Reply at 9 (citing Pallas 56.1 Opp. at 17-19, 21-22, 34).) The SEC notes that the only contemporaneous evidentiary support for the Pallas Defendants' claims is the September 8, 2013 Sharma-Zolotas emails, in which Pallas and NewLead purportedly agreed to the sale of both Viking Assets for a total price of $45 million. (SEC Reply at 9.)

The SEC argues that this evidence fails to pass muster for two reasons. First, the email was not signed by the party to be charged, meaning that it did not satisfy the applicable statute of frauds. (Id.) Second, the sale contract for the Viking Mine, which was executed five days after these emails, superseded the emails because the contract said that it embodied the "entire agreement" and "supersede[d] all prior agreements, correspondence, arrangements and understandings related to the

---

(footnote continued) the plant as soon as Jamil is ready? Only if you are 100% sure of Jamil closing.

Zolotas: I am 100% fine.

[Dkt. no. 175-13 at SEC-Sason-108186.]

subject matter hereof." (Id. at 9-10 (citing dkt. no. 158-31 at
SEC-Sason-97727).)

Finally, the SEC points to several contemporaneous emails
that contradict the Pallas Defendants' claim that there was an
earlier agreement for the Viking Prep Plant: 1) an email from
September 30, 2013, after the $6 Million Note had been issued,
where Pallas's counsel stated that "Pallas does not have any
signed agreements with Newlead on the purchase of the prep
plant" (dkt. no. 158-37 at SEC-Sason-123371); 2) emails between
Sharma and Zolotas on October 11, 2013, in which Sharma rejected
a new proposed payment term by saying "sorry no deal" (dkt. no.
158-40 at SEC-Sason-114197); and 3) emails that show Pallas and
NewLead were negotiating key terms of the Viking Prep Plant sale
as late as November 29, 2013. (Pallas 56.1 Opp. at 15.)

Reviewing the evidence in the light most favorable to the
Pallas Defendants as the non-moving party, the Court finds that
the Pallas Defendants do not raise a genuine dispute of material
fact. Almost all the contemporary evidence shows that Pallas and
NewLead had not reached an agreement for the sale of the Prep
Plant by October 16, 2013, when NewLead sent Pallas the final
version of the $6 Million Note, or by November 4, 2013, when
Pallas sold the Note to Hanover. Even assuming that Pallas and
NewLead had intended to sell the Viking Assets together in one
package, as might be inferred from the September 8, 2013 emails

between Sharma and Zolotas, (dkt. no. 175-13 at SEC-Sason-108186), the parties' intentions were overridden by the text of the Viking Mine sale contract, which said it reflected the parties' "entire agreement" and "supersede[d] all prior agreements, correspondence, arrangements and understandings related to the subject matter hereof," (dkt. no. 158-31 at SEC-Sason-97727). Because there was no agreement for the sale of the Prep Plant in place at the time that the NewLead stock was issued, the stock was not issued "in exchange for one or more bona fide outstanding securities, claims or property interests," and Section 3(a)(10) does not apply to MGP's sales of NewLead stock. The SEC's motion for summary judgment on the Section 5 claims based on MGP's sale of NewLead stock is GRANTED.

### iv.   **Necessary Participant Liability**

Liability for violations of Section 5 extends to those who have "'engaged in steps necessary to the distribution of [unregistered] security issues.'" SEC v. Sourlis, 851 F.3d 139, 143–44 (2d Cir. 2016) (quoting SEC v. Chinese Consol. Benev. Ass'n, Inc., 120 F. 2d 738, 741 (2d Cir. 1941)). "The 'necessary participant test . . . essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place'—in other words, whether the defendants' acts were a 'substantial factor in the sales transaction.'" SEC v. Universal

Express, Inc., 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) (quoting

SEC v. Murphy, 626 F.2d 633, 651-52 (9th Cir. 1980)).

> As for substantial participation, to be sure it is a
> concept without precise bounds, but one who plans a
> scheme, or, at the least, is a substantial motivating
> factor behind it, will be held liable as a seller. In
> practice, however, the "necessary participant" and
> "substantial factor" standards differ little, for no
> court using the "necessary participant" test has found
> liable a defendant whose acts were not a substantial
> factor in the sales transaction.

SEC v. Gallison, 588 F. Supp. 3d 509, 521 (S.D.N.Y. 2022)

(quotation marks and citation omitted).

### a. Manuel and Sason's Roles in Magna's Sales of Lustros Stock

#### 1. The Magna Defendant's Motion for Summary Judgment

The Magna Defendants assert that neither Sason nor Manuel

was a necessary participant or a substantial factor in Magna's

sales of Lustros stock. In making this argument, the Magna

Defendants attempt to draw a distinction between Magna's

acquisition of the Lustros stock and Magna's sale of the Lustros

stock. (Magna Omnibus at 17-18.) The Magna Defendants represent

that necessary participant liability only applies to those who

had "a substantial role in multiple aspects of the sale of

securities," not those who were involved in acquiring the stock

to be sold. (Id. at 17-18.) Thus, they conclude that as a matter

of law, Sason and Manuel were not necessary participants in

Magna's sale of Lustros stock.

In contrast, the SEC writes that the precedent does not recognize this distinction, "especially where (as here) it is undisputed that the purpose of the acquisitions of unregistered securities was to sell them and sell them quickly." (SEC Reply at 15 (citing Longfin, 316 F. Supp. 3d at 766 (finding that the Defendant purchased from an issuer with a view to distribution based on objective evidence, such as the length of time the shares were held).) The SEC paints the precedent as focusing the inquiry on whether the defendant acted to secure unregistered stock for the purpose of selling it in an ultimately unlawful distribution. (Id.)

Consistent with its prior holding at the motion to dismiss stage, the Court holds that as a matter for law, Sason and Manuel may be liable as necessary participants under Section 5 for their involvement in securing the unregistered stock that Magna then sold in the unlawful distribution. In arguing otherwise, the Magna Defendants rely heavily on the analysis in SEC v. Genovese, 17-CV-5821 (LGS), 2021 WL 1164654 (S.D.N.Y. Mar. 26, 2021). In Genovese, the Court organized the defendant's transaction-related activities into two categories: the defendant's "direct involvement" in the sale, (id. at *4), and the defendant's "activities ancillary" to the sale, (id. at *5). Regarding the "activities ancillary" category, the Court wrote

74

"[t]hese activities are too remote from the actual sale to rise to the level of necessary or substantial participation." Id.

Critically, the defendant's ancillary activities in Genovese were unrelated to the ultimate unregistered stock sale. Id. (describing solicitations regarding a "potential unrelated investment" and introductions made for the purpose of a "potential unrelated capital raise"). That is not true in this case. The ancillary activities at issue here concern Manuel and Sason's involvement in acquiring the stock that the Magna Defendants ultimately sold in unregistered transactions. The evidence shows that the Magna Defendants acquired this Lustros stock intending to sell it. (See Longfin, 316 F. Supp. 3d at 766 (when courts determine whether a person acquired shares with a view to distribution, they look to "objective evidence, such as the length of time the shares were held"); Magna 56.1 Opp. at 49 (undisputed that Magna kept 98% of the Lustros shares it acquired in its brokerage account for thirty days or less before it sold them).)

These activities are not "too remote from the actual sale to rise to the level of necessary or substantial participation." Genovese, 2021 WL 1164654, at *5. Indeed, but for Manuel and Sason's actions to acquire the Lustros stock, the Magna Defendants would never have executed the Lustros stock sales. Thus, the Magna Defendant's motion to dismiss the Section 5

75

claims against Manuel and Sason regarding the Magna's sales of
unregistered Lustros stock is <u>DENIED</u>.

### 2. **The SEC's Motion for Summary Judgment**

Next, the Court will consider the SEC's motion for summary
judgment on the necessary participant liability claims against
Manuel and Sason. The Magna Defendants built their defense of
Manuel on the acquisition-versus-sale distinction that the Court
rejected above. (<u>See</u> Magna Br. at 28-29.) Without that legal
distinction, the Court finds that there is no dispute of
material fact that Manuel's involvement in Magna's acquisition
of Lustros stock was sufficiently substantial to subject him to
necessary participant liability under Section 5. It is
undisputed that Manuel originated each of the Lustros
Transactions, helped negotiate the transactions' terms with
Lustros, oversaw the diligence process for each transaction, and
approved each transaction. (Magna 56.1 Opp. at 131-34.) This
conduct is similar to conduct that other courts have found to
meet the standard of necessary participant liability under
Section 5. <u>Cf.</u> <u>SEC v. Verdiramo</u>, 890 F. Supp. 2d 257, 271
(S.D.N.Y. 2011) (finding that issuing securities that were later
sold into the market is sufficient for necessary participant
liability), <u>SEC v. Universal Exp., Inc.</u>, 475 F. Supp. 2d 412,
424 (S.D.N.Y. 2007) (same). Thus, the Court finds that Manuel
was a necessary participant and substantial factor in the

76

Magna's sale of unregistered Lustros stock. The SEC's motion for summary judgment regarding the Section 5 claims against Manuel based on Magna's sales of Lustros stock is <u>GRANTED</u>.

However, the Magna Defendants have raised a genuine dispute of material fact as to whether Sason's involvement in the Lustros Transactions meets the standard set out in the necessary participant test. It is undisputed that Sason did not speak to or know of any of the Lustros representatives that Magna interacted with regarding the Lustros Transactions. (SEC 56.1 Opp. at 47.) It is undisputed that Sason did not "personally review, authorize, or discuss" with his employees affixing his electronic signature to "any documents to facilitate the Lustros transactions at issue, including any of the notices of conversion filed with Lustros' transfer agent to receive free-trading shares. (<u>Id.</u>) It is undisputed that Sason did not participate in the "day-to-day operations" of the Magna team that executed the Lustros transactions and did not participate in trading Lustros stock thereafter. (<u>Id.</u>)

In addition, the Magna Defendants write that Sason did not "originate, structure, negotiate, supervise, monitor or otherwise engage" in the sale of any Lustros stock. (Magna Br. at 26.) They assert that there is no record evidence that shows Sason had a role in "drafting, preparing or signing operative

documents, engaging in issuer due diligence, [or] negotiating transaction terms." (Magna Omnibus at 21.)

Against this evidence, the SEC notes that it is undisputed that Sason formed and controlled Magna, the entity that acquired and then sold the unregistered Lustros stock. (Magna 56.1 Opp. at 7.) It is undisputed that Sason approved each of the Lustros Transactions and authorized their funding. (See dkt no. 156-3, Answer and Affirmative Defenses of Joshua Sason, Magna Management, LLC, Magna Equities II, LLC, and MG Partners, LTD. to Complaint ("Magna Answer") at 25, 29, 35.) It is undisputed that Sason's electronic signature was used on the transactional documents for each of the Lustros Transactions, including the conversion notices that Magna used to convert portions of the debt it acquired into Lustros stock. (Magna 56.1 Opp. at 143-44.) It is also undisputed that Sason had originally opened the brokerage accounts that Magna used to sell the Lustros stock and authorized Magna employee James McDade to give brokers trading instructions for the account. (Magna 56.1 Opp. at 32.)

Given the conflicting nature of the evidence, the Court finds there is a genuine dispute of material fact regarding whether Sason was a necessary participant and substantial factor in Magna's unregistered Lustros stock sales. Thus, the SEC's motion for summary judgment regarding this claim is DENIED.

### b. Manuel and Sason's Roles in MGP's Sales of NewLead Stock

The legal issues and factual evidence concerning Manuel and Sason's Section 5 liability related to MGP's sales of NewLead stock are much the same as those raised by the parties related to Magna's sales of Lustros stock. The following facts are undisputed. Manuel supervised the due diligence related to the NewLead Transaction and to the purchase of the $6 Million Note. (Magna 56.1 Opp. at 151-52.) He also negotiated Hanover's purchase of the $6 Million Note from Pallas and signed the agreement between Hanover and Pallas on behalf of Hanover. (Id. at 152.) Manual recommended to Sason that Sason approve the NewLead Transaction. (Id.)

In response, the Magna Defendants again attempt to draw a distinction between MGP's acquisition of the NewLead stock and MGP's sale of NewLead stock. (Magna Omnibus at 26.) Because the Court has rejected the Magna Defendants' argument as a matter of law, the Magna Defendants' motion for summary judgment as to the Section 5 claim against Manuel based on MGP's sale of unregistered NewLead stock is DENIED. In addition, based on the undisputed facts, the Court finds that Manuel's involvement in Magna's acquisition of NewLead stock was sufficiently substantial to subject him to necessary participant liability under Section 5. Thus, the SEC's motion for summary judgment

regarding the Section 5 claim against Manuel based on MGP's sale of unregistered NewLead stock is <u>GRANTED</u>.

Regarding Sason's involvement in MGP's sales of NewLead stock, the following facts are undisputed by the Magna Defendants. Sason approved the NewLead Transaction and authorized its funding. (Magna 56.1 Opp. 154-55.) Sason's electronic signature was used on the term sheet for the NewLead Transaction. (<u>Id.</u> at 155.) Sason physically signed that affidavit and the stipulation to settlement that were submitted to the New York State Supreme Court. (<u>Id.</u> at 156.) Sason formed Hanover, which purchased the $6 Million Note from Pallas, and was its managing member, CEO, and near-total owner. (<u>Id.</u> at 9-10.) Sason was a director and nearly 50% owner of MGP through his ownership of Hanover. (<u>Id.</u> at 11-13.) MGP had an escrow account that it used in connection with the NewLead Transaction. (<u>Id.</u> at 158.) Sason signed an escrow agreement for the account on MGP's behalf which appointed McDade as MGP's authorized representative. (<u>Id.</u> at 159.)

In the same vein, the following facts are undisputed by the SEC. Sason "did not participate in the origination, structuring, due diligence, negotiations or trading relating to the NewLead transaction at issue in the Complaint." (SEC 56.1 Opp. at 52.) Sason had "no personal knowledge of the specific NewLead debts that were purchased from NewLead's creditors." (<u>Id.</u>) Sason did

not engage in "internal discussions with any employees regarding the debts" or interact with any representative of NewLead or Pallas, including Salviola or Sharma. (Id.) Sason had "no role in sourcing, structuring or negotiating the NewLead transaction at issue in the Complaint or in reviewing any of the due diligence materials that Hanover prepared." (Id.) Sason did not sign the debt purchase agreement, but his electronic signature was affixed to a remittance schedule "pursuant to which Hanover made payments to Pallas." (Id. at 53.) Sason "had no personal knowledge about any of the NewLead creditor claims at issue; rather, he relied on the analysis and determinations of Hanover or Magna employees and its outside counsel at Greenberg Traurig that handled the engagement." (Id. at 54.)

As it found above regarding Sason's involvement in Magna's sales of Lustros stock, given the conflicting nature of the evidence, the Court finds there is a genuine dispute of material fact regarding whether Sason was a necessary participant and substantial factor in MGP's sales of unregistered NewLead stock. Thus, the Magna Defendants' motion for summary judgment and the SEC's motion for summary judgment regarding this claim are both DENIED.

### c. **Sharma and Salviola's Roles in MGP's Sales of** **NewLead Stock**

The SEC argues that Pallas's sale of the $6 Million Note to Hanover, and MGP's subsequent sale of more than 110 million shares of unregistered NewLead stock, implicates Sharma and Salviola as necessary participants in MGP's sales under Section 5. (SEC Omnibus at 23.) The following facts are undisputed. Sharma negotiated the $6 million cash component of the Prep Plant sale with NewLead. (Pallas 56.1 Opp. at 29.) Sharma agreed with NewLead to finance the cash component of the sale by having Pallas sell the $6 Million Note to Hanover. (Id. at 16, 18.) Salviola signed the purchase agreement with Hanover. (Id. at 19.) The agreement set a schedule for Hanover's payments to Pallas and conditioned those payments on a court's allowing NewLead to issue stock to MGP as Hanover's designee. (Id. at 19, 21.) Sharma negotiated the payment schedule with Manuel, who discussed it further with Salviola. (Id. at 19-20.) Salviola also "prepared and compiled certain diligence documents requested by Magna, which Sharma then passed along to NewLead." (Id. at 29.)

The Pallas Defendants say that Sharma and Salviola's involvement in MGP's sales of NewLead stock is limited to Pallas's sale of the $6 Million Note to Hanover, a link in the causal chain that led to MGP's sales of unregistered NewLead

stock. (Pallas Opp. at 11.) The SEC responds that the Pallas Defendants were "the motivating factor in MGP's sales of NewLead stock attributable to the settlement of the $6 Million Note, the sale of which the Pallas Defendants knew would result in the issuance of NewLead stock." (SEC Reply at 19.)

Like the Magna Defendants, the Pallas Defendants cite Genovese in arguing that the Pallas Defendants' involvement in the unregistered stock sales was too remote to give rise to necessary participant liability under Section 5. (Pallas Opp. at 11.) Yet like the Magna Defendants, the Pallas Defendants misread the precedent. The Court's holding in Genovese turned on the fact that the ancillary activities by the defendant in that case were unrelated to the unregistered stock sale. 2021 WL 1164654, at *5. The evidence in this case shows the Pallas Defendants were intimately involved in the interrelated set of transactions that allowed MGP to obtain and sell unregistered NewLead stock. Without the Pallas Defendants' involvement, and their sale of the $6 Million Note to Hanover, MGP would never have received unregistered stock from NewLead. Salviola even testified that Hanover generated at least some of the money it was using to pay Pallas from MGP's NewLead stock sales, making the Pallas Defendants beneficiaries of MGP's NewLead stock sales. (Dkt. no. 156-28 at 166:16-167:22.) Thus, the Court finds that Sharma and Salviola were necessary participants and

substantial factors in MGP's sales of unregistered NewLead stock. The SEC's motion for summary judgment on the Section 5 claims against Sharma and Salviola based on MGP's sales of unregistered NewLead stock is <u>GRANTED</u>.

        **d. <u>Sharma and Salviola's Roles in Pallas's Sales of NewLead Stock</u>**

The SEC asserts that Sharma and Salviola were both necessary participants and substantial factors in Pallas's sales of unregistered NewLead stock. (SEC Omnibus at 22.) The following facts are undisputed. Sharma negotiated with NewLead about the terms and structure of each transaction and helped Salviola set up Pallas's brokerage account. (Pallas 56.1 Opp. at 26-27.) A trust Salviola formed to compensate Sharma was the 95% owner of Pallas. (Pallas 56.1 Opp. at 4-5). As for Salviola, she was Pallas's managing member, (<u>id.</u> at 4), and the only authorized signatory on Pallas's bank and brokerage accounts, (<u>id.</u> at 27). Salviola signed the agreements to sell both Viking Assets, (<u>id.</u> at 9-10, 22-23), and signed Rule 144 representation letters on behalf of Pallas that were submitted to NewLead's transfer agent, (<u>id.</u> at 28.) Sharma and Salviola worked together to deposit Pallas's NewLead stock into its brokerage accounts and ultimately sell the stock. (<u>Id.</u> at 28-29.) The SEC argues that the fact that a trust formed to compensate Sharma was the

near total owner of Pallas makes Sharma a primary beneficiary of Pallas's NewLead stock sales. (SEC Omnibus at 22.)

Apart from claiming that the Pallas Defendants' sales of NewLead stock were exempt from the registration requirement under Rule 144, the Pallas Defendants do not oppose the SEC's claims that Sharma and Savliola were necessary participants and substantial factors in Pallas's sale of unregistered NewLead stock. Thus, the SEC's motion for summary judgment regarding this claim is <u>GRANTED</u>.

## V.  Conclusion

The Magna Defendants' motion for summary judgment is <u>DENIED</u>. The SEC's motion for summary judgment regarding the Section 5 claims against Sason related to Magna's sale of unregistered Lustros stock and MGP's sale of unregistered NewLead stock is <u>DENIED</u>. The SEC's motion for summary judgment as to the Section 5 claims against the remaining Magna Defendants related to Magna's sale of unregistered Lustros stock is <u>GRANTED</u>. The SEC's motion for summary judgment as to the Section 5 claims against the Pallas Defendants related to Pallas's sale of unregistered NewLead stock is <u>GRANTED</u>. The SEC's motion for summary judgment as to the Section 5 claims

against the remaining Magna Defendants related to MGP's sale of unregistered NewLead stock is <u>GRANTED</u>.

The only claims remaining for trial are the scheme liability claims against Manuel and the Magna Entities and the Section 5 claims against Sason. Counsel shall confer and inform the Court no later than May 18, 2023, how they propose to proceed.

The Clerk of the Court shall close the open motions. (Dkt nos. 138 and 151.)


SO ORDERED.


Dated:    New York, New York
          May 4, 2023

_____
LORETTA A. PRESKA
Senior United States District Judge